## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-1163

D.B.U., *et al*.,

      Petitioners-Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al*.,

      Respondents-Defendants.

---

## PETITIONERS-PLAINTIFFS' EMERGENCY MOTION
## FOR TEMPORARY RESTRAINING ORDER

---

**Petitioners-Plaintiffs ("Petitioners") and the proposed class <u>are in imminent danger of being removed from the United States (with 24 hours or less notice)</u>—and this Court could potentially permanently lose jurisdiction. Petitioners are also in imminent danger of <u>being transferred outside of the District of Colorado</u> en route to removal and thus request an injunction on any transfer out of the District of Colorado, as well as 30-day notice of any intent to remove Petitioners and the opportunity to contest an alien enemy designation.**

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, and the All Writs Act, Petitioners and the proposed class hereby apply for a temporary restraining order against Respondents-Defendants ("Respondents"). Petitioners are civil immigration detainees who are at substantial risk of immediate, summary removal from the United States pursuant to the use of the Alien Enemies Act ("AEA"), 50 U.S.C. § 21 *et seq.* against a *non*-state actor for the first time in the country's history.

# INTRODUCTION

In a Proclamation signed on March 14 and published on March 15, the President invoked a war power, the Alien Enemies Act of 1798 ("AEA"), to summarily remove noncitizens from the U.S. and bypass the immigration laws Congress has enacted. *See* Invocation of the Alien Enemies Act (Mar. 15, 2025)[1] ("Proclamation"). The Proclamation targets Venezuelan noncitizens accused of being part of Tren de Aragua ("TdA"), a criminal gang. On the evening of March 15, 2025, the D.C. District Court issued an order temporarily pausing removals pursuant Proclamation of a provisionally certified nationwide class. *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *2 (D.C. Cir. Mar. 26, 2025). That order was immediately appealed by the government, but the court of appeals denied a stay. *Id.* On April 7, in a 5-4 decision, the Supreme Court granted the government's application to stay the order on the basis that Petitioners had to proceed through habeas, while emphasizing that individuals who are designated under the AEA Proclamation are "entitle[d] to due process" and notice "within a reasonable time and in such manner as will allow them to actually seek habeas relief" before removal. *Trump v. J.G.G.*, No. 24A931, 2025 WL 102409 (U.S. Apr. 7, 2025).

To date, the government has not indicated the type of notice they intend to provide or how much time they will give individuals before seeking to remove them under the AEA. However, in a hearing in the Southern District of Texas on Friday April 11**, the government said they had not ruled out the possibility that individuals will receive no more than 24 hours' notice; the government did not say whether it was considering providing even less than 24 hours**.

---

[1] https://perma.cc/ZS8M-ZQHJ.

In light of the Supreme Court's ruling that challenges to the Proclamation must be brought in habeas, Petitioners file this action on behalf of a class in their district of confinement. All five of the original petitioners in the D.C. litigation have likewise filed class habeas petitions and motions for temporary restraining orders for putative classes. The first was filed on April 8, 2025 in the Southern District of New York on behalf of two of the five, and the second on April 9, 2025 in the Southern District of Texas on behalf of the other three. Within hours, both district courts granted *ex parte* requests for TROs, ordering that the named petitioners and putative class members should not be removed from the United States or transferred out of their respective districts. *See G.F.F. v. Trump*, No. 25-cv-2886 (S.D.N.Y. Apr. 8, 2025), ECF No. 6, *as amended*, ECF No. 35 (S.D.N.Y. Apr. 11, 2025); *J.A.V. v. Trump*, No. 25-cv-72 (S.D. Tex Apr. 9, 2025), ECF No. 11, *as amended*, ECF No. 12 (S.D. Tex. Apr. 11, 2025). Both courts subsequently held TRO hearings, extended the TROs, and scheduled preliminary injunction hearings, S.D.N.Y. on April 22 and S.D. Tex. on April 24.

As several judges have already found, Petitioners are likely to succeed on the merits of their challenge and they are at imminent risk of removal to El Salvador, where more than one hundred individuals alleged TdA members have already been sent pursuant to the Proclamation and where they potentially face lifetime incommunicado sentences in one of the most notorious prisons in the world. Numerous accounts, both in declarations and public news reporting, have raised serious questions about the validity of the government's designations of people as "alien enemies," with no process provided for anyone to contest those designations. A TRO is needed because there may not be sufficient time for this Court to intervene before people are put on planes to remove Petitioners from the United States.

Petitioners contend that the Proclamation is invalid under the AEA for several reasons. First, TdA is not a "foreign nation or government," as required to invoke the AEA. Second, TdA is not engaged in an "invasion" or "predatory incursions" within the meaning of the AEA, because criminal activity does not meet the longstanding definitions of those statutory requirements. Thus, the government's attempt to summarily remove Venezuelan noncitizens exceeds the wartime authority that Congress delegated in the AEA. Moreover, despite judicial consensus, *see Trump v. J.G.G.*, No. 24A931, 2025 WL 102409, at *2 (U.S. Apr. 7, 2025), the government has still provided no meaningful notice, process, or opportunity for individuals to challenge their designation as alien enemies, contrary to the AEA and due process. Removals under the Proclamation also violate the process and protections that Congress has prescribed for the removal of noncitizens in the immigration laws.

**Accordingly, Petitioners move the Court for a TRO barring their summary removal under the AEA and barring Respondents from relocating them outside of this District pending this litigation.**[2]    As already demonstrated, in the government's rush to transfer individuals to El Salvador, the government mistakenly deported at least one Salvadoran man without legal basis. *See Noem v. Abrego Garcia*, No. 24A949, 2025 WL 1077101, at *1 (U.S. Apr. 10, 2025). And declarations and news accounts suggest that many of the alleged Venezuelan TdA members sent to El Salvador were not in fact TdA members. Any error would be just as devastating to Petitioners and thus requires this Court's intervention to preserve the status quo and

---

[2] Petitioners do not seek to enjoin the President, but he remains a proper respondent because, at a minimum, Petitioners may obtain declaratory relief against him. *See, e.g.*, *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) (concluding that court had jurisdiction to issue writ of mandamus against the President but "opt[ing] instead" to issue declaration).

its jurisdiction.

The TRO sought here does *not* seek to prohibit the government from prosecuting any individual who has committed a crime.  Not does it seek release from immigration detention or to prohibit the government from removing any individual who may lawfully be removed under the immigration laws.

## LEGAL AND FACTUAL BACKGROUND

### I.    The Alien Enemies Act

The AEA is a wartime authority that grants the President specific powers with respect to the regulation, detention, and deportation of enemy aliens. Passed in 1798 in anticipation of a war with France, the AEA, as codified today at 50 U.S.C. § 21, provides:

> Whenever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies.

This Act has been used only three times in the country's history and each time in a period of war—the War of 1812, World War I, and World War II.

The Act provides that, generally, individuals designated as enemy aliens will have time to "settle affairs" before removal and the option to voluntarily "depart."[3] *See, e.g.*, *United States ex rel. Dorfler v. Watkins*, 171 F.2d 431, 432 (2d Cir. 1948) ("An alien must be afforded the privilege

---

[3] 50 U.S.C. § 21 (providing for removal of only those "alien enemies" who "refuse or neglect to depart" from the U.S.); *id.* § 22 (granting time for departure in accordance with treaty stipulation or "where no such treaty exists, or is in force," a "reasonable time as may be consistent with the public safety, and according to the dictates of humanity and national hospitality").

of voluntary departure before the [AG] can lawfully remove him against his will.").

## II.    Congress's Comprehensive Reform of Immigration Law

Following World War II, Congress consolidated U.S. immigration laws into a single text under the Immigration and Nationality Act of 1952 ("INA"). The INA, and its subsequent amendments, provide a comprehensive system of procedures that the government must follow before removing a noncitizen from the U.S. *See* 8 U.S.C. § 1229a(a)(3) (INA provides "sole and exclusive procedure" for determining whether noncitizen may be removed).

As part of that reform and other subsequent amendments, Congress prescribed safeguards for noncitizens seeking protection from persecution and torture. These protections codify the humanitarian framework adopted by the United Nations in response to the humanitarian failures of World War II. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 439-40 (1987); *Aliyev v. Mukasey*, 549 F.3d 111, 118 n.8 (2d Cir. 2008) ("It is no accident that many of our asylum laws sprang forth as a result of events in 1930s Europe."). First, the asylum statute, 8 U.S.C. § 1158, provides that any noncitizen in the U.S. has a right to apply for asylum. Second, the withholding of removal statute, 8 U.S.C. § 1231(b)(3), provides that noncitizens "may not" be removed to a country where their "life or freedom" would be threatened based on a protected ground. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 420 (1999) (withholding is mandatory upon meeting statutory criteria). Third, protections under the Convention Against Torture ("CAT") prohibit returning noncitizens to a country where it is more likely than not that they would face torture. *See* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") § 2242(a), Pub. L. No. 105-207, Div. G. Title XXI, 112 Stat. 2681 (codified at 8 U.S.C. § 1231 note); 8 C.F.R. § 1208.16-.18.

### III.    The AEA Proclamation and the Unlawful Removals

On March 14, the President signed the AEA Proclamation at issue here. It provides that "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies." *See* Proclamation. Although the AEA calls for a "public proclamation," 50 U.S.C. § 21, the administration did not make the invocation public until around 3:53 p.m. EDT on March 15, despite making extensive preparations to remove class members under the Act prior to that time and actually seeking to remove individuals before the Proclamations' publication. *J.G.G. v. Trump*, No. 1:25-cv-766-JEB (D.D.C. Mar. 18, 2025), ECF No. 28-1 (Cerna Decl.) ¶ 5.

The Proclamation does not provide any process for individuals to contest that they are members of the TdA and do not therefore fall within the terms of the Proclamation. The Proclamation also claims to supplant the removal process under the congressionally enacted immigration laws, which, among other things, provide a right to seek protection from persecution and torture. *See, e.g.*, 8 U.S.C. §§ 1158, 1231(b)(3), 1231 note.

To implement the Proclamation, the government began moving detained people with pending immigration proceedings from detention facilities around the country to detention centers in Texas in early March, disrupting immigration court hearings where individuals were seeking humanitarian protections. *See J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *17 (D.C. Cir. Mar. 26, 2025); *J.G.G.*, 2025 WL 890401, at *3. On March 15, by the time the secret Proclamation was made public, these men had been shackled, driven to an airport and told they would be put on a plane, despite having no order permitting ICE to remove them. *Id.* Five named petitioners filed

a class action in the District of Columbia. *Id.* A TRO for the named petitioners and others issued the morning of March 15, leading the named petitioners to be pulled off the planes. *Id.* Although the district court granted a TRO against removal for the provisionally certified class that evening, the government summarily removed well over 100 people—many with pending removal proceedings—to El Salvador pursuant to the Proclamation. *Id.* at *3-5. Many of those people were living in Colorado before they were detained at the Aurora Facility and summarily removed to El Salvador.[4]

      Whether most (or perhaps all) of the original nationwide class from the District of Columbia District Court matter lacks ties to TdA remains to be seen, because the government secretly rushed the men out of the country and has provided petitioners with no information about the class. But evidence since the flights on March 15 increasingly shows that many class members removed to El Salvador are not "members" of TdA; many have no ties to TdA at all.[5] *See also J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 67-21 (Sarabia Roman Decl., Exhs. 4-20) (media reports regarding evidence contradicting gang allegations). These false accusations are particularly

---

[4] Exh. A (Barber Decl.) ¶ 8; Exh. B (Hightower Decl.) ¶ 11; *see e.g.*, Angeline McCall, *Venezuelan man from Colorado sent to Salvadoran prison without removal order or apparent criminal history*, 9News (Apr. 10, 2025), https://www.9news.com/article/news/politics/venezuelan-man-colorado-salvadoran-prison-removal-order/73-566817f3-0bf2-4f9f-b2c5-3f39708ac9db.

[5] *See, e.g.*, Cecilia Vega, *U.S. Sent 238 Migrants to Salvadoran Mega-Prison; Documents Indicate Most Have No Apparent Criminal Records* (Apr. 6, 2025), https://www.cbsnews.com/news/what-records-show-about-migrants-sent-to-salvadoran-prison-60-minutes-transcript/ ("We could not find criminal records for 75% of Venezuelans – 179 men – now sitting in prison."); Tom Phillips and Clavel Rangel, '*He is not a gang member': outrage as US deports makeup artist to El Salvador prison for crown tattoos*, Guardian (Apr. 1, 2025), https://www.theguardian.com/us-news/2025/apr/01/its-a-tradition-outrage-in-venezuela-as-us-deports-makeup-artist-for-religious-tattoos; Tom Phillips and Clavel Rangel, '*Deported because of his tattoos': has the US targeted Venezuelans for their body art?*, Guardian (Mar. 20, 2025), https://www.theguardian.com/us-news/2025/mar/20/deported-because-of-his-tattoos-has-the-us-targeted-venezuelans-for-their-body-art.

devastating given Petitioners strong claims for relief under our immigration laws. Exh. A (Barber Decl.) ¶ 8; Exh. B (Hightower Decl.) ¶ 11.

The government's errors are unsurprising, given the methods it is employing to identify members of TdA. The "Alien Enemy Validation Guide" that the government used to ascertain alien enemy status, requires ICE officers to tally points for different categories of alleged TdA membership characteristics. *J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 67-21 (Sarabia Roman Decl., Exh. 1). This relies heavily on physical attributes like "tattoos denoting membership/loyalty to TDA" and hand gestures, symbols, logos, graffiti, or manner of dress. But experts who study the TdA have explained how none of these physical attributes are reliable ways of identifying gang members. *See, e.g., J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 67-3 (Hanson Decl.) ¶¶ 22-24, 27; *id.* at 67-4 (Antillano Decl.) ¶ 14; *id.* at 67-12 (Dudley Decl.) ¶ 25.

Experts on El Salvador have also explained how those removed there face grave harm and torture at the Salvadoran Terrorism Confinement Center ("CECOT"), including electric shocks, beating, waterboarding, and use of implements of torture on detainees' fingers. *See J.G.G.*, 2025 WL 1024097, at *9 (U.S. Apr. 7, 2025) (Sotomayor, J., dissenting); *see also J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 44-4 (Bishop Decl.) ¶¶ 21, 33, 37, 39, 41; *id.* at 44-3 (Goebertus Decl.) ¶¶ 8, 10, 17. These abusive conditions are life threatening, as demonstrated by the hundreds of people who have died in Salvadoran prisons. *J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 44-3 (Goebertus Decl.) ¶ 5; *id.* at 44-4 (Bishop Decl.) ¶¶ 43–50. Worse, those removed and detained at CECOT face indefinite detention. *Id.* at 44-3 (Goebertus Decl.) ¶ 3 (quoting the Salvadorean government that people held in CECOT "will never leave"); Nayib Bukele, X.com post (Mar. 16, 2025, 5:13AM ET) (detainees "were immediately transferred to CECOT . . . for a period of one year

(renewable)").[6]

## IV.    Petitioners

Petitioners are noncitizens in custody who face a substantial risk of imminent removal under the President's AEA Proclamation.

Petitioner D.B.U. is a 32-year-old Venezuelan detained at the Denver Detention Contract Facility and who is at imminent risk of removal under the Proclamation. Exh. A (Barber Decl.). D.B.U. fled Venezuela after he was persecuted and imprisoned for his political activity. Exh. A (Barber Decl.) ¶ 3. D.B.U. was arrested during a high-profile raid of a party that was characterized in the media as a Tren de Aragua party. Exh. A (Barber Decl.) ¶ 4. Upon his arrest, D.B.U. was interrogated about his alleged affiliation with Tren de Aragua. Exh. A (Barber Decl.) ¶ 4. He has a single tattoo, his niece's name, unrelated to Tren de Aragua. Exh. A (Barber Decl.) ¶ 6. Because of his tattoos, and the public assertion that he is affiliated with Tren de Aragua, D.B.U. fears that he will be removed under the Proclamation. Exh. A (Barber Decl.) ¶ 8. He strongly disputes, however, that he is a member of the TdA. Exh. A (Barber Decl.) ¶ 6.

Petitioner R.M.M. is a 25-year-old Venezuelan also detained at the Denver Detention Contract Facility, who is at imminent risk of removal under the Proclamation. R.M.M. fled Venezuela after two members of his family were killed by Tren de Aragua. Exh. B (Hightower Decl.) ¶ 4. ICE filed a Form I-213 on April 11, 2025, stating that R.M.M. is a "known member of the Venezuelan gang Tren de Aragua." Exh. B (Hightower Decl.) ¶ 5. R.M.M. is not and has never been a member of Tren de Aragua. Exh. B (Hightower Decl.) ¶ 9. R.M.M. has tattoos – his mother's name, his birth year, a pattern, a religious symbol, and a character from the board game

---

[6] https://perma.cc/52PT-DWMR.

Monopoly - but they have nothing to do with Tren de Aragua. Exh. B (Hightower Decl.) ¶ 10. Because of his tattoos, and ICE's assertion that he is affiliated with Tren de Aragua, R.M.M. fears that he will be removed under the Proclamation. Exh. B (Hightower Decl.) ¶ 11.

## LEGAL STANDARD

To obtain a TRO, Petitioners must establish that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Greater Yellowstone Coal. v. Flowers,* 321 F.3d 1250, 1255 (10th Cir. 2003) (quoting *Fed. Lands Legal Consortium ex rel. Robart Estate v. United States*, 195 F.3d 1190, 1194 (10th Cir. 1999)). All factors are satisfied here. Further, because Petitioners seek to preserve the status quo, a TRO in this case "does not require [Respondents] to do something that they were not doing during the last uncontested period." *Evans v. Fogarty*, 44 Fed. Appx. 542, 928  (10th Cir. 2002).

## ARGUMENT

### I.    Petitioners Are Likely to Succeed on the Merits.

#### A.    The Proclamation Does Not Satisfy the AEA.

The Proclamation is unprecedented, exceeding the President's statutory authority in three critical respects: there is no invasion or predatory incursion; no foreign government or nation; and no process to contest whether an individual falls within the Proclamation. When the government asserts "an unheralded power" in a "long-extant statute," courts "greet its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014).

That skepticism is well warranted here. As Judge Henderson stressed in denying the

government's request for a stay of a TRO, a gang's criminal activities do not constitute an "invasion or predatory incursion" under the AEA and the Act was a wartime authority meant to address "military" attacks. *J.G.G. v. Trump*, No. 25-5067, 2025 W 914683, at *1-13 (D.D.C. Mar. 26, 2025).

### 1. There Is No "Invasion" or "Predatory Incursion" upon the United States.

The Proclamation fails on an essential statutory requirement: that there be an "invasion or predatory incursion" directed "against the territory of the United States." The text and history of the AEA make clear that it uses these terms to refer to military actions indicative of an actual or impending war. At the time of enactment, an "invasion" was a large-scale military action by an army intent on territorial conquest. *See* Webster's Dict., Invasion (1828) ("invasion" is a "hostile entrance into the possession of another; particularly, the entrance of a hostile army into a country for purpose of conquest or plunder, or the attack of a military force"); *see also J.G.G.*, 2025 WL 914682, at *20 (in the Constitution, "invasion" "is used in a military sense" "*in every instance*"). And "predatory incursion" referred to smaller-scale military raids aimed to destroy military structures or supplies, or to otherwise sabotage the enemy, often as a precursor to invasion and war. *See* Webster's Dict., *Incursion* (1828) ("incursion . . . applies to the expeditions of small parties or detachments of an enemy's army, entering a territory for attack, plunder, or destruction of a post or magazine"); *J.G.G.*, 2025 WL 914682, at *10 ("predatory incursion" is "a form of hostilities against the United States by another nation-state, a form of attack short of war"). The interpretive canon of *noscitur a sociis* confirms that the AEA's powers extended beyond an existing war only when war was imminent. *Ludecke*, 335 U.S. at 169 n.13 ("the life of [the AEA] is defined by the existence of a war"). Reading "invasion" and "predatory incursion" in light of

the neighboring term, "declared war," highlights the express military nature of their usage here. *See Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961).

The historical context in which the AEA was passed reinforces what Congress meant by "predatory incursion" and "invasion." At the time of passage, French ships were already attacking U.S. merchant ships in U.S. *See, e.g.*, 7 Annals of Cong. 58 (May 1797) (promoting creation of a Navy to "diminish the probability of . . . predatory incursions" by French ships while recognizing that distance from Europe lessened the chance of "invasion"); Act of July 9, 1798, ch. 68, 1 Stat. 578, 578 (authorizing US ships to seize "any armed French vessel" "found within the jurisdictional limits of the United States"). Congress worried that these attacks against the territory of U.S. were the precursor to all-out war with France. *J.G.G.*, 2025 WL 914682, at *1 ("In 1798, our fledgling Republic was consumed with fear . . . of external war with France."). This "predatory violence" by a sovereign nation led, in part, to the AEA. *See* Act of July 7, 1798, ch. 67, 1 Stat. 578, 578 ("[W]hereas, under authority of the French government, there is yet pursued against the United States, a system of predatory violence").[7]

"Mass illegal migration" or criminal activities, as described in the Proclamation, plainly do not fall within the statutory boundaries. On its face, the Proclamation makes no findings that TdA is acting as an army or military force. Nor does the Proclamation assert that TdA is acting with an intent to gain a territorial foothold in the U.S. for military purposes. And the Proclamation makes

---

[7] At the same time, the 1798 Congress authorized the President to raise troops "in the event of a declaration of war against the U.S., or of an actual invasion of their territory, by a foreign power, or of imminent danger of such invasion." Act of May 28, 1798, ch. 47, 1 Stat. 558. As Judge Henderson noted, "[t]his language bears more than a passing resemblance to the language of the AEA, which Congress enacted a mere thirty-nine days later. *J.G.G.*, 2025 WL 914682, at *9. As such, the historical context makes plain that Congress was concerned about *military* incursions by the armed forces of a foreign nation that constitute or imminently precede acts of war.

no suggestion that the U.S. will imminently be at war with Venezuela. The oblique references to the TdA's ongoing "irregular warfare" within the U.S. do not suffice because the Proclamation makes clear that it refers to "mass illegal migration" and "crimes"—neither of which constitute war within the Founding Era understanding. It asserts that TdA "commits brutal crimes" with the goal of "harming United States citizens, undermining public safety, and . . . destabilizing democratic nations."  But these actions are not "against the territory" of the U.S. Indeed, if mass migration or criminal activities by some members of a particular nationality could qualify as an "invasion," then virtually any group, hailing from any country, could be deemed enemy aliens. *See J.G.G.*, 2025 WL 914682, at *10 (observing that "[m]igration alone does not suffice" to establish an "invasion" or "predatory incursion under the AEA).

### 2.  The Purported Invasion Is Not by a "Foreign Nation or Government."

The Proclamation fails to assert that any "foreign nation or government" within the meaning of the Act is invading the United States. Put simply, the Proclamation never finds that TdA is a foreign "nation" or "government."  Instead, the Proclamation asserts that "[o]ver the years," the Venezuelan government has "ceded ever-greater control over their territories to transnational criminal organizations." But the Proclamation notably does *not* say that TdA operates as a government in those regions. In fact, the Proclamation does not even specify that TdA currently controls *any* territory in Venezuela.

Moreover, when a "nation or government" is designated under the AEA, the statute unlocks power over that nation or government's "natives, citizens, denizens, or subjects." 50 U.S.C. § 21. *Countries* have "natives, citizens, denizens, or subjects." By contrast, criminal organizations, in the government's own view, have "members." Proclamation § 1 ("members of TdA"). And it

14

designates TdA "members" as subject to AEA enforcement—but "members" are not "natives, citizens, denizens, or subjects." That glaring mismatch underscores that Respondents are attempting not only to use the AEA in an unprecedented way, but also in a way that Congress never permitted—as a mechanism to address, in the government's own words, a *non*-state actor. *Venezuela* has natives, citizens, and subjects, but TdA (not Venezuela) is designated under the Proclamation.[8]  Even as the Proclamation singles out certain Venezuelan nationals, it does not claim that *Venezuela* is invading the United States. And, as the President's own CIA Director recently testified, the intelligence community has no assessment that says the U.S. is at war with or being invaded by Venezuela. Ryan Goodman, Bluesky (Mar. 26, 2025).[9] The AEA requires the President to identify a "foreign nation or government" that is invading or engaging in an invasion or incursion. Because it does not, the Proclamation fails on its face.

Instead, the Proclamation half-heartedly attempts to link TdA to Venezuela by suggesting that TdA is "supporting," "closely aligned with," or "has infiltrated" the Maduro regime. *See* Proclamation. But experts are in accord that it is "absolutely implausible that the Maduro regime controls TdA or that the Maduro government and TdA are intertwined." *J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 67-3 (Hanson Decl.) ¶17; *id.* at 67-4 (Antillano Decl.) ¶ 13; *id.* at 67-12 (Dudley Decl.) ¶¶ 2, 21. As one expert who has done numerous projects for the U.S. government, including

---

[8] Moreover, the AEA presumes that a designated nation possesses treaty-making powers. *See* 50 U.S.C. § 22 ("stipulated by any treaty . . . between the United States and the hostile nation or government"). Nations—not criminal organizations—are the entities that enter into treaties. *See, e.g.*, *Medellin v. Texas*, 552 U.S. 491, 505, 508 (2008) (treaty is "a compact between independent nations" and "agreement among sovereign powers"); *Holmes v. Jennison*, 39 U.S. 540, 570-72 (1840) (similar).
[9]  https://bsky.app/profile/rgoodlaw.bsky.social/post/3llc4wzbkr22k (Q: "Does the intelligence community assess that we are currently at war or being invaded by the nation of Venezuela?" A: "We have no assessment that says that.").

on the topic of TdA, explained, the Proclamation's characterization of the relationship between the Venezuelan state and TdA with respect to TdA's activities in the United States is "simply incorrect." *Id.* at 67-12 (Dudley Decl.) ¶¶ 5, 17-18. The President's own intelligence agencies reached that same conclusion prior to his invocation of the AEA. *See id.* at 67-21 (Sarabia Roman Decl., Exh. 19) ("shared judgment of the nation's spy agencies" is "that [TdA] was not controlled by the Venezuelan government").

Further, the AEA's historical record confirms that it was intended to address conflicts with foreign sovereigns, not criminal gangs like TdA. *See* 5 Annals of Cong. 1453 (Apr. 1798) ("[W]e may very shortly be involved in war[.]"); John Lord O'Brian, Special Ass't to the Att'y Gen. for War Work, Civil Liberty in War Time, at 8 (Jan. 17, 1919) ("The [AEA] was passed by Congress . . . at a time when it was supposed that war with France was imminent."); Jennifer K. Elsea & Matthew C. Weed, Cong. Rsch. Serv., RL3113, Declarations of War and Authorizations for the Use of Military Force 1 (2014) (Congress has never issued a declaration of war against a nonstate actor). If Respondents were allowed to designate any group with ties to officials as a foreign government, and courts were powerless to review that designation, any group could be deemed a government, leading to an untenable and overbroad application of the AEA.

### 3. Summary Removals Without Notice, a Meaningful Opportunity to Challenge "Alien Enemy" Designations, or the Right of Voluntary Departure Violate the AEA and Due Process.

As the Supreme Court has now made clear, the government must provide Petitioners notice "within a reasonable time and in such a manner as will allow them to actually seek" relief from summary removals under the Proclamation. *J.G.G.*, 2025 WL 102409, at *2 ("detainees subject to removal orders under the AEA are entitled to notice and an opportunity to challenge their

removal."). Because Respondents have been providing no notice, process, or opportunity to contest a designation to others who have been actually removed under the AEA and those it has designated as subject to removal under the AEA (and it is unclear whether or how they will comply with the Supreme Court's recent order), a TRO is warranted to ensure that the government provides the Court with protocol for how it will provide notice. *See J.G.G.*, 2025 WL 102409, at *2 ("'It is well established that the Fifth Amendment entitles [noncitizens] to due process of law' in the context of removal proceedings.").

As during World War II, that notice must be at least 30 days in advance of any attempted removal. It must also be in a language that the detainee understands, and be provided to undersigned counsel.

### B. The Proclamation Violates the Specific Protections that Congress Established for Noncitizens Seeking Humanitarian Protection.

The Proclamation is unlawful for an independent reason: it overrides statutory protections for noncitizens seeking relief from torture by subjecting them to removal without meaningful consideration of their claims. Congress codified the U.N. Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT") to ensure that noncitizens have meaningful opportunities to seek protection from torture. *See* 8 U.S.C. § 1231 note; C.F.R. §§ 208.16-.18. CAT categorically prohibits returning a noncitizen to any country where they would more likely than not face torture. 8 U.S.C. §1231 note. CAT applies regardless of the mechanism for removal. The D.C. Circuit recently addressed a similar issue in *Huisha-Huisha v. Mayorkas*, reconciling the Executive's authority under a public-health statute, 42 U.S.C. § 265, with CAT's protections. 27 F.4th 718 (D.C. Cir. 2022). Because § 265 was silent about where noncitizens could be expelled, and CAT explicitly addressed that question, the court held no conflict existed. *Id.*

Both statutes could—and therefore must—be given effect. *Id.* at 721, 731-32. This case is on all fours with *Huisha-Huisha,* because the AEA and CAT must be harmonized by applying CAT's protections to AEA removals.

Despite this clear statutory framework, Respondents have not provided any opportunity to assert rights under CAT to individuals who are similarly situated to Petitioners and the other members of the class. *See supra.* Even if they had permitted these individuals to apply, their opportunity would have been meaningless because Respondents deliberately withheld information about the country to which they were being removed. Petitioners fear that Respondents will behave in this jurisdiction as they have in others, and deny them meaningful opportunity to assert their rights under CAT.

The AEA can similarly be harmonized with other subsequently enacted statutes specifically designed to protect noncitizens seeking asylum and withholding. *See* Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980) (asylum and withholding); 8 U.S.C. §§ 1158 (asylum), 1231(b)(3) (withholding of removal). Congress has unequivocally declared that "[a]ny alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum." 8 U.S.C. § 1158(a)(1). Likewise, the withholding of removal statute explicitly bars returning a noncitizen to a country where their "life or freedom" would be threatened based on a protected ground. *Id.* § 1231(b)(3)(A). These humanitarian protections were enacted in the aftermath of World War II, when the United States joined other countries in committing to never again turn our backs on people fleeing persecution and torture. Sadako Ogata, U.N. High Comm'r for Refugees, Address at the Holocaust Memorial

Museum (Apr. 30, 1997).[10] A President invoking the AEA cannot simply sweep away these protections.

### C.    The Proclamation Violates the Procedural Requirements of the INA

Since the last invocation of the AEA more than 80 years ago, Congress has carefully specified the procedures by which noncitizens may be removed. The INA leaves little doubt that its procedures must apply to every removal, unless otherwise specified by that statute. It directs: "Unless otherwise specified in this chapter," the INA's comprehensive scheme provides "the sole and exclusive procedure for determining whether an alien may be . . . removed from the United States." 8 U.S.C. § 1229a(a)(3); *see also United States v. Tinoso*, 327 F.3d 864, 867 (9th Cir. 2003) ("Deportation and removal must be achieved through the procedures provided in the INA."). Indeed, Congress intended for the INA to "supersede all previous laws with regard to deportability." S. Rep. No. 82-1137, at 30 (Jan. 29, 1952).[11]

Congress was aware that alien enemies were subject to removal in times of war or invasion when it enacted the INA. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) (courts presume Congress drafts statutes with full knowledge of existing law). Indeed, the AEA was invoked just a few years before passage of the 1952 INA. With this awareness, Congress provided that the INA contains the "sole and exclusive" procedures for removal and declined to carve out AEA removals from standard immigration procedures, even as it expressly excepted other groups of noncitizens,

---

[10] https://perma.cc/X5YF-K6EU.

[11] One of the processes otherwise specified in the INA is the Alien Terrorist Removal Procedure at 8 U.S.C. § 1531 *et seq.* The Attorney General may opt to use this when she has classified information that a noncitizen is an "alien terrorist." *Id.* § 1533(a)(1). But even that process requires notice, a public hearing, provision of counsel for indigents, opportunity to present evidence, and individualized review by an Article III judge. *Id.* §§ 1532(a), 1534(a)(2), (b), (c)(1)-(2).

including those who pose security risks. *See, e.g.*, 8 U.S.C. § 1531 *et seq.* (establishing fast-track proceedings for noncitizens posing national security risks).

Ignoring the INA's role as the "sole and exclusive" procedure for determining whether a noncitizen may be removed, Respondents bypass the mandated congressional scheme to formulate an entirely separate procedure for removal and usurp Congress's Article I power in the process.

## II.    Petitioners Face Imminent Irreparable Harm.

In the absence of a TRO, Petitioners are at imminent risk of summary removal to places, such as El Salvador, where they face life-threatening conditions, persecution, and torture. *See supra*; *J.G.G.*, 2025 WL 1024097, at *5 ("[I]nmates in Salvadoran prisons are 'highly likely to face immediate and intentional life-threatening harm at the hands of state actors.'"). That easily constitutes irreparable harm. *See Tesfamichael v. Gonzales*, 411 F.3d 169, 178 (5th Cir. 2005) ("irreparable harm" where petitioners face "forced separation and likely persecution" "if deported"); *Huisha-Huisha*, 27 F.4th at 733 (irreparable harm exists where petitioners "expelled to places where they will be persecuted or tortured"); *see also J.G.G.*, 2025 WL 890401, at *16 ("[T]he risk of torture, beatings, and even death clearly and unequivocally supports a finding of irreparable harm."). And Petitioners may never get out of these prisons. *See J.G.G.*, 2025 WL 1024097, at *5; *see also supra*.

Even if the government instead removes Petitioners to Venezuela, they face serious harm there, too. In fact, petitioners fled Venezuela for the very purpose of escaping persecution there, and have pending and forthcoming asylum cases on that basis. For example, D.B.U. has already been arbitrarily imprisoned and beaten in the past based on his political opinion and fears persecution if returned. Exh. A (Barber Decl.) ¶ 3. And returning to Venezuela labeled as a gang

member by the U.S. government only increases the danger, as they will face heightened scrutiny from Venezuela's security agency, and possibly even violence from rivals of TdA. *J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 67-3 (Hanson Decl.) ¶ 28.

Not only do Petitioners face grave harm, thus far the government has tried to execute their removals without any due process. *See Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146, 172 (D.D.C. 2021) (irreparable harm where plaintiffs "face the threat of removal prior to receiving any of the protections the immigration laws provide"). Although the Supreme Court has now made clear that meaningful notice is required under the AEA, *J.G.G.*, 2025 WL 102409, at *2, Respondents have yet to explain how they will provide meaningful notice, much less any sense of when that notice will be provided to individuals or what form it will take. As such, there remains an unacceptably high risk that the government will deport class members who are not in fact members of TdA.

### III. The Balance of Equities and Public Interest Weigh Decidedly in Favor of a Temporary Restraining Order.

The balance of equities and public interest merge in cases against the government. *See Nken v. Holder*, 556 U.S. 418, 436 (2009). Here, the balance overwhelmingly favors Petitioners. The public has a critical interest in preventing wrongful removals, especially where it could mean a lifetime sentence in a notorious foreign prison. *See id.*; *see also Nunez v. Boldin*, 537 F. Supp. 578, 587 (S.D. Tex. 1982) (protecting people who face persecution abroad "goes to the very heart of the principles and moral precepts upon which this country and its Constitution were founded"); *Leiva-Perez v. Holder*, 640 F.3d 962, 971 (9th Cir. 2011) (noting "the public's interest in ensuring that we do not deliver [noncitizens] into the hands of their persecutors"). Indeed, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax*,

670 F.3d 1111, 1132 (10th Cir. 2012). Conversely, the government can make no comparable claim to harm from an injunction. *See Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (the government "cannot suffer harm from an injunction that merely ends an unlawful practice"); *Wages & White Lion Inv., L.L.C. v. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021) ("There is generally no public interest in the perpetuation of unlawful agency action.").

Petitioners, moreover, do not contest Respondents' ability to prosecute criminal offenses, detain noncitizens, and remove noncitizens under the immigration laws. *See J.G.G.*, 2025 WL 914682, at *30 ("The Executive remains free to take TdA members off the streets and keep them in detention. The Executive can also deport alleged members of TdA under the INA[.]"); *see also Awad*, 670 F.3d at 1132 ("delayed implementation of a measure that does not appear to address any immediate problem generally will not cause any immediate harm, even if the measure were eventually to be found constitutional and enforceable.").

## IV.    The All Writs Act Confers Broad Power to Preserve the Integrity of Court Proceedings.

In addition to this Court's equitable powers, this is a textbook case for use of the All Writs Act ("AWA"), which provides courts a powerful tool to "maintain the status quo by injunction pending review of an agency's action through the prescribed statutory channels." *F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 604 (1966); 28 U.S.C. § 1651(a); *California v. M&P Inv.*, 46 F. App'x 876, 878 (9th Cir. 2002) (finding Act should be broadly construed to "achieve all rational ends of law") (quoting *Adams v. United States*, 317 U.S. 269, 273 (1942)). If Petitioners are illegally sent to a foreign country, and El Salvador assumes jurisdiction, the government will argue, as it already has, that this Court will no longer has jurisdiction to remedy the unlawful use of the AEA. *See J.A.V. v. Trump*, No. 1:25-CV-072, 2025 WL 1064009, at *1 (S.D. Tex. Apr. 9, 2025) ("A federal

court has the power under the All Writs Act to issue injunctive orders in a case even before the court's jurisdiction has been established.").

Whereas a traditional TRO requires a party to state a claim, an injunction based on the AWA requires only that a party identify a threat to the integrity of an ongoing or prospective proceeding, or of a past order or judgment. *ITT Cmty. Dev. Corp. v. Barton*, 569 F.2d 1351, 1359 (5th Cir. 1978) (court may enjoin "conduct which, left unchecked, would have . . . the practical effect of diminishing the court's power to bring the litigation to a natural conclusion"). Courts have explicitly relied upon the AWA in order to prevent even a risk that a respondent's actions will diminish the court's capacity to adjudicate claims before it. *See U.S. v. Moore*, 427 F.2d 1020, 2026 (10th Cir. 1970) ("federal courts have both the inherent and statutory power to issue orders to ensure their lawful orders are carried out and obeyed."); *Michael v. INS*, 48 F.3d 657, 664 (2d Cir. 1995) (staying an order of deportation "in order to safeguard the court's appellate jurisdiction" and preserve its ability to hear subsequent appeals by the petitioner).

## V.    The Court Should Not Require Petitioners to Provide Security.

The Court should not require a bond under Fed. R. Civ. P. 65. A court has "wide discretion in the matter of requiring security and if there is an absence of proof showing a likelihood of harm, certainly no bond is necessary. *Continental Oil Co. v. Frontier Refining Co.*, 338 F.2d 780, 782 (10th Cir. 1964). There is no likelihood of harm to the government in this case, given that the requested TRO would merely preserve the status quo and would not infringe on any law enforcement or prosecutorial powers. In the alternative, the Court should require a nominal bond of $1.

## CONCLUSION

The Court should grant a TRO as to the named Petitioners and the class.

Respectfully submitted this 12th day of April, 2025

*s/ Sara R. Neel*
_____
Sara R. Neel
Emma Mclean-Riggs
Anna I. Kurtz
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF COLORADO
303 E. 17th Avenue
Denver, CO 80203
(720) 402-3107
sneel@aclu-co.org
emcleanriggs@aclu-co.org
akurtz@aclu-co.org

Lee Gelernt*
Daniel Galindo*
Ashley Gorski*
Patrick Toomey*
Sidra Mahfooz*
Omar Jadwat
Hina Shamsi*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660

lgelernt@aclu.org
dgalindo@aclu.org
agorski@aclu.org
ptoomey@aclu.org
smahfooz@aclu.org
odjadwat@aclu.org
hshamsi@aclu.org

Noelle Smith*
Oscar Sarabia Roman*
My Khanh Ngo*

Cody Wofsy*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
nsmith@aclu.org
osarabia@aclu.org
mngo@aclu.org
cwofsy@aclu.org

Tamara F. Goodlette
Laura P. Lunn
Monique R. Sherman
Rocky Mountain Immigrant Advocacy Network
tgoodlette@rmian.org
llunn@rmian.org
msherman@rmian.org

Attorneys for Petitioners-Plaintiffs
* Attorney not admitted to the District of Colorado

## **Certificate of Conferral**

Counsel for Petitioners-Plaintiffs ("Petitioners") attempted to confer with counsel for Respondents-Defendants ("Respondents") by emailing the local U.S. Attorney's Office at 7:36 PM on April 12, 2025, and seeking their position. Petitioners' counsel was not able to obtain a response prior to filing.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 12, 2025, I electronically filed the foregoing

**PETITIONERS-PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY**

**RESTRAINING ORDER** with the Clerk of the Court using the CM/ECF system, and that in

accordance with Fed. R. Civ. P. 5, all counsel of record shall be served electronically through

such filing.

*/s/ Sara R. Neel*

_____

Sara R. Neel