# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF COLORADO

Civil Action No. 25-cv-1163-CNS

D.B.U. *et al.*,

    Petitioners-Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

    Respondents-Defendants.

**REPLY IN SUPPORT OF PETITIONERS-PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER**

Petitioners-Plaintiffs ("Petitioners") respectfully file this reply in support of their emergency motion for temporary restraining order ("TRO") and request that the Court keep the classwide TRO, ECF No. 14, in place while the parties brief Petitioners' request for a preliminary injunction on an expedited basis. The need for this interim relief is even more evident in light of the events of last week, during which dozens of Venezuelan men who have been accused of being members of Tren de Aragua ("TdA"), like Petitioners and the putative class here, were suddenly transferred from all over the country to the Bluebonnet Detention Center in north Texas and given 24 hours' or less notice ahead of their scheduled removals pursuant to the Alien Enemies Act ("AEA")—necessitating the Supreme Court's intervention. *See* Order, *A.A.R.P. v. Trump*, No. 24A1007 (Sup. Ct. Apr. 19, 2025) (granting stay of removal of the putative class); *Supreme Court blocks, for now, new deportations under 18th century wartime law*, The Associated Press, NPR, Apr. 19, 2025, https://www.npr.org/2025/04/19/g-s1-61385/supreme-court-block-deportations.

The government's brief and declaration say that, in light of the Supreme Court's directive on April 7, 2025, in *J.G.G*, it will provide "reasonable" notice. Resp. to Petitioners' Motion for TRO, ECF No. 26 ("Opp") 15. Yet not only did the government give the Texas detainees 24 hours' or less notice, but the form they distributed was in English and *nowhere* stated that the detainees had a right to contest their designation and removal under the AEA, much less how long they had or how to do it. *See* Ex. A (AEA notices). If not for this Court's TRO, Petitioners and the putative class in Colorado would have been at imminent risk of transfer out of this District, summary removal under the AEA, and this Court potentially losing its jurisdiction. The Court should maintain the TRO and order expedited briefing on the preliminary injunction.

1

I.  **Petitioners Have Standing to Support a TRO**

The fact that neither Petitioner is *currently* designated, Opp. 4, does not undermine standing or this Court's jurisdiction. While stating that Petitioners are "not subject to the Proclamation" at this time, ECF No. 26-1, ¶¶ 13, 21 (Valdez Dec.), Respondents fully preserve the ability to change their mind, for instance, once the TRO is dissolved, *id.* ¶¶ 15, 23. Respondents claim that if Petitioners were subject to the Proclamation in the future, they would be provided notice in a language they understand and have time and opportunity to file a habeas. That representation is blatantly undermined by the events of the past few days in the *A.A.R.P.* class habeas in the Northern District of Texas.

In response to the government's representation to the Court in *A.A.R.P.* that the two named petitioners were not then-designated under the AEA, the district court denied the request for a classwide TRO. *A.A.R.P. v. Trump*, No. 1:25-cv-59-H (N.D. Tx.), ECF 27. In doing so, the court stated: "the Supreme Court's opinion in *J.G.G.,* along with the government's general representations about the procedures necessary in these cases, strongly suggest that the putative class is also not facing such an imminent threat." *Id*. at 9. Hours after that order, ICE officers began attempting to execute a widespread plan to ship Venezuelans accused of TdA membership to the CECOT prison in El Salvador under the AEA, in violation of law and with no meaningful due process. *A.A.R.P. v. Trump*, No. 1:25-cv-59-H (N.D. Tx.), ECF 30. ICE agents at Bluebonnet began distributing notices under the AEA, *see* Ex. A, and told the men that their removals were imminent and would happen that evening or the next day. *See id.* ECF 30-1 (Brown Dec.). Those removals have now been paused by the Supreme Court. *See supra*.

The notice the government provides gives no timeframe for the removal. It does

not inform the noncitizen how long they have to contest their designation or even how to do so. Ex. A. (AEA Notices). Nor does it provide notice of any opportunity for judicial review or permit the designee to indicate that they intend to contest their designation. It says only that "[i]f you desire to make a phone call, you will be permitted to do so." *Id.* The form is also only in English, though the overwhelming number of people designated under the AEA speak only Spanish. As the attorney for one of the *A.A.R.P.* petitioners described: ICE officers approached F.G.M. the night of April 17, 2025, accusing him of TdA membership and telling him to sign papers that were in English; F.G.M. understands only Spanish and he refused to sign, but was told that the papers "were coming from the President, and that he will be deported even if he did not sign it." *A.A.R.P. v. Trump*, No. 1:25-cv-59-H (N.D. Tx), ECF 30-1, ¶ 3. An English-speaking Venezuelan man then read the paper to his attorney, and it tracked what the AEA notice says, and relayed that ICE said they would be deported "today or tomorrow." *Id*. ¶ 4. And at a hearing on Friday evening in D.C., hours before the Supreme Court's stay of removal, the government confirmed its position that removals can occur with as little as 24 hours' notice and that, in its view, this would be "consistent" with the Supreme Court's April 7, 2025 ruling in *Trump v. J.G.G.*, 604 U.S. ---, 2025 WL 1024097.

Justifiably, courts around the country have issued TROs to prevent individuals from being whisked away from those Districts without ever having had the opportunity to challenge their removal under the AEA. The courts have done so, even though the government claimed no one had yet been designated under the AEA in those Districts, precisely to avoid what occurred in the Northern District of Texas on Friday. *See, e.g., G.F.F. v. Trump*, No. 25-cv-2886 (S.D.N.Y. Apr. 11, 2025), ECF No. 35; *J.A.V. v. Trump*,

No. 1:25-CV-072, 2025 WL 1064009, at *2 (S.D. Tex. Apr. 9, 2025); *D.B.U. v. Trump*, No. 1:25-CV-01163-CNS, 2025 WL 1106600 (D. Colo. Apr. 14, 2025); *A.S.R. v. Trump*, No. 3:25-CV-00113-SLH, 2025 WL 1122485, at *1 (W.D. Pa. Apr. 15, 2025).

The government's cited habeas cases about custody do not help their arguments. Opp. 8–9. In fact, they underscore that courts apply a broad interpretation of the "custody" requirement for habeas petitions. In *Maleng v. Cook*, the Supreme Court held that a petitioner could not use habeas to challenge a sentence he had *already* served, but Respondents omit that the Court also expressly held that the petitioner serving a sentence in California could challenge his *future* confinement in Washington. 490 U.S. 488, 491, 493 (1989). Petitioners here are challenging the government's threatened use of the AEA to remove them, not an expired sentence.[1] And the Supreme Court has already explicitly held that petitioners must challenge the use of AEA against them through habeas. *See Trump v. J.G.G.*, No. 24A931, 2025 WL 1024097 (U.S. Apr. 7, 2025).

Petitioners have met their burden to show standing, especially at this preliminary stage. A plaintiff can satisfy Article III's standing requirement by showing that there is a "substantial risk that the harm will occur" in the future. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 164 (2014). Petitioners have established that they face a substantial risk of being designated as a TdA member and thus subject to the AEA Proclamation. Both Petitioners have been issued I-213 Forms in which the government alleged they were affiliated with TdA, including for D.B.U. as recently as April 16, 2025. *See* Ex. B ¶ 3 (Sherman Dec.); ECF 2-2, ¶¶ 5-6 (Hightower Dec.). While the government asserts that

---

[1] For that reason, *Alaska v. Wright*, 593 U.S. 152 (2021), *Mays v. Dinwiddie*, 580 F.3d 1136 (10th Cir. 2009), and *Davis v. Roberts*, 425 F.3d 830 (10th Cir. 2005), also have no bearing on this petition.

4

the I-213 Form "is not a determination that an individual is subject to the Proclamation," they also refuse to disclose how they make such determinations, ECF 26-1, ¶ 24, nor do they foreclose the possibility that Petitioners would be designated in the future, *id*. ¶¶ 15, 23. Indeed, Petitioners' risk is substantial since the government has already asserted TdA membership in immigration court, including for D.B.U. on April 17, 2025. Ex. B ¶ 3 (Sherman Dec.). Petitioners have carried their burden at this stage that they are at grave risk of removal under the AEA and that they are adequate class representatives for others similarly situated to obtain class wide relief for the putative class. *See supra*.

Respondents point to *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) to assert that harm is speculative, but unlike *Clapper*, Petitioners do not "re[ly] on a highly attenuated chain of possibilities," including that "independent decisionmakers" like the Director of National Intelligence and Article III judges "will exercise their judgment." 568 U.S. at 410, 413. Here, Petitioners' risk is but one step away and entirely within Respondents' control: if the TRO is dissolved, all the government has to do is designate the individual—possibly after transferring them out of this District and away from their counsel to a facility where attorneys have no meaningful ability to communicate with their clients and where no TRO is in place—and give them a notice, in English, 24 hours (or less) before deporting them; all before they can seek judicial review.[2] Indeed, that is what occurred in Texas, where individuals were transferred from all around the country for swift removal.

## II. The Court Can Review Petitioners' Claims

---

[2] Respondents' reliance on *Murthy v. Missouri*, 603 U.S. 43 (2024), Opp. 10-11, is even further afield as the issue there was traceability to the government's actions. Any designation under the AEA and subsequent enforcement action would cause harm to Petitioners directly by Respondents.

The Court should reject the government's remaining arguments on reviewability. Opp. 11-13. The Supreme Court has already made clear that "'questions of interpretation and constitutionality' of the Act" are reviewable. *Trump v. J.G.G.*, 2025 WL 1024097, at *2 (Apr. 7, 2025) (citing *Ludecke v. Watkins*, 335 U.S. 160, 163, 172 n. 17 (1948)).

The government relies on *Ludecke*, but *Ludecke* itself reached the merits of the statutory question presented there: whether a "declared war" no longer existed within the meaning of the Act when "actual hostilities" had ceased—*i.e.*, the "shooting war" had ended. 335 U.S. at 166-70. The Court concluded, on the merits, that the statutory term "declared war" did not mean "actual hostilities," and that once Congress declares war, the war continues for purposes of the AEA until the political branches declare it over. *Id.* at 171. Nowhere did *Ludecke* suggest that questions of statutory interpretation are beyond the court's competence. Indeed, four years later, the Court reversed a government W.W. II removal decision because "[t]he statutory power of the Attorney General to remove petitioner as an enemy alien ended when Congress terminated the war." *Jaegeler v. Carusi*, 342 U.S. 347, 348 (1952); *see also Citizens Protective League*, 155 F.2d 290, 295 (D.C. Cir. 1946) (interpreting and applying the term "declared war," just like *Ludecke*).

Consistent with Ludecke's recognition that questions about the "construction," "interpretation," and "validity" of the AEA are justiciable, 335 U.S. at 163, 171, courts have reviewed a range of issues concerning the meaning and application of the AEA's terms. *See Kessler v. Watkins*, 163 F.2d 140, 142 (2d Cir. 1947) (interpreting meaning of "foreign nation or government"); *Zdunic v. Uhl*, 137 F.2d 858, 860-61 (2d Cir. 1943) ("[t]he meaning of [various terms] as used in the statute . . . presents a question of law"; interpreting "denizen" and remanding for hearing on disputed facts). These kinds of

questions—concerning the "construction" and "interpretation" of the AEA, *Ludecke*, 335 U.S. at 163, 171—are precisely the types of questions that this Court must review.

Nor does the political question doctrine preclude such determinations. *See J.G.G. v. Trump*, --- F. Supp. 3d ----, 2025 WL 890401, at *10 (D.D.C. Mar. 24, 2025) ("this Court is confident that it can—and therefore must, at the appropriate time—construe the [statutory] terms"); *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *5-8 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring) (rejecting the government's political question argument). More generally, the political question doctrine is a "narrow exception" to courts' jurisdiction, *Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012), and exists primarily to reinforce the separation of powers, *Baker v. Carr*, 369 U.S. 186, 210 (1962). But applying the doctrine here would undermine Congress's constitutional authority, because it would render the limits that Congress wrote into the statute unenforceable.

Finally, the government cannot elide the AEA's statutory bounds by pointing to the President's inherent Article II power. Opp. 12-13. The President has no constitutional power to unilaterally remove people. Under Article I, Congress holds plenary power over immigration. *See INS v. Chadha*, 462 U.S. 919, 940 (1983). The AEA operates as a specific delegation of authority from Congress to the President, a delegation that Congress limited to instances of war or imminent war by a foreign nation. *Cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-388 (Jackson, J., concurring).

### III.   The Court May Enjoin Transfers Out of the District.

None of the INA's jurisdictional provisions bars an injunction on transfers out of the District. Respondents do not contend that any of the INA's jurisdictional provisions prevent the Court from reviewing whether individuals can be removed outside the country

7

under the AEA. That is understandable since the government's position is the AEA process exists outside the immigration process. Even assuming the government could transfer people outside of this District, the Court would retain jurisdiction over this case because the class habeas petition and motion for class certification were filed prior to any transfer. In any event, Respondents are wrong that the INA's jurisdictional provisions bar this Court from prohibiting transfers within the United States.

As an initial matter, if the INA's jurisdictional provisions do not apply to the removal of individuals under the AEA here—which Respondents have stated in other cases they do not because "the INA and AEA are distinct mechanisms for effectuating the removal" of noncitizens, *A.A.R.P. v. Trump*, No. 1:25-cv-59-H (N.D. Tx.), ECF 19 at 28-29—then they similarly do not apply to the transfer of individuals inside the country. Regardless, none of the INA provisions apply to claims that Petitioners raise.

*First*, both 8 U.S.C. § 1252(a)(2)(B)(ii) and § 1252(g) apply only to *discretionary* determinations. *See Kucana v. Holder*, 558 U.S. 233, 247 (2010) (holding that § 1252(a)(2)(B)(ii) applies only to those decisions where Congress has "set out the Attorney General's discretionary authority in the statute"); *Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AADC*"), 525 U.S. 471, 482 (1999) (holding that § 1252(g) "applies only to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'"). Here, Petitioners raise non-discretionary statutory and constitutional challenges to removals under the AEA; in other words, Petitioners are not challenging *discretionary* actions that the provisions are meant to shield from review. *See Zadvydas v. Davis*, 533 U.S. 678, 688 (2001).[3]

---

[3] Respondents rely heavily on *Van Dinh v. Reno*, 197 F.3d 427 (10th Cir. 1999), Opp. 14,

*Second*, the government mistakenly claims that 8 U.S.C. § 1231(g) provides discretionary authority for transfers (and hence bars injunctions under § 1252(a)(2)(B)(ii), § 1252(g), and § 1252(f)(1)), but nothing in § 1231(g) mentions or even authorizes "transfer," let alone commits transfer decisions to the agency's unreviewable discretion. *See Reyna ex rel. J.F.G. v. Hott*, 921 F.3d 204, 209-10 (4th Cir. 2019); *Aguilar v. U.S. Immigr. & Customs Enf't*, 510 F.3d 1, 20 (1st Cir. 2007). Likewise, because § 1231(g) does not address transfers, they are not encompassed within the actions that cannot be enjoined under § 1252(f)(1). *Transfers* (especially pursuant to the AEA) do not fall within the three specific, discrete actions covered under § 1252(g). *See AADC*, 525 U.S. at 482.[4]

*Lastly*, if there were any doubt, the All Writs Act permits a court to "enjoin almost any conduct 'which, left unchecked, would have . . . the practical effect of diminishing the court's power to bring the litigation to a natural conclusion.'" *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1102 (11th Cir. 2004). As a practical matter, if the government were permitted to transfer Petitioners and class members outside the District to distant detention centers, counsel will face obstacles in gathering evidence and presenting facts relevant to the claims in this case, including whether or not Petitioners and class members are properly designated as alien enemies under the Proclamation.

## IV.    The Remaining Factors Support Extending the TRO Motion.

A TRO is necessary to protect Petitioners and the putative class from irreparable

---

but that was a case about the availability of attorney's fees for a *Bivens* class action, and in any event predates *Kucana*. Moreover, its failure to identify any discretion specified by statute is inconsistent with the Supreme Court's later holding in *Kucana*.

[4] Respondents' reliance on *Tercero v Holder*, 510 F. App'x 761 (10th Cir. 2013), is also inapt, as the court there cited § 1231(g) without any meaningful analysis, and disregards *AADC*'s holding that § 1252(g) only applies to decisions to commence proceedings, adjudicate actions, or execute INA removal orders. 525 U.S. at 482.

harm given the evidence of harm and torture that individuals may face if deported to Venezuela or the notorious CECOT prison in El Salvador. Any assertion that such harm is speculative is belied by the government's position that it can provide Petitioners with notices without any timeline or notice of their ability to contest and whisk them out of the country in 24 hours or less before they seek any judicial review.

The government's reliance on *Nken v. Holder*, 556 U.S. 418 (2009), Opp. 16, is misplaced not only because the Supreme Court there stated there is a public interest in preventing immigrants from being wrongfully removed, particularly to countries where they face substantial harm, but also because the Court relied on the government's concession that individuals could return to the U.S. if they prevailed in their cases. 556 U.S. at 435. As this Court is undoubtedly aware, the government has now taken the position that even if it errs—as it did in removing a Salvadoran man to CECOT—courts have no ability to remedy the situation. *See Abrego Garcia v. Noem*, No. 8:25-cv-951, ECF No. 11-3 ¶¶ 11-15 (D. Md. Mar. 31, 2025); *id.* ECF No. 12-1, at *8 (Apr. 1, 2025).

The government attempts to justify its extraordinary use of the AEA during peacetime to summarily deport individuals without due process by relying on vague assertions that an injunction may interfere generally with the "President's statutory and constitutional authority." Opp. 16. But the government cannot engage in unlawful conduct contrary to statutory and constitutional law to meet its political goals. *See, e.g., League of Women Voters of the United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action").

The Court should keep the classwide TRO in place while the parties submit briefing on an expedited schedule for a motion for a preliminary injunction.

Dated: April 20, 2025

Respectfully submitted,

 /s/ Timothy R. Macdonald_____
Timothy R. Macdonald
Sara R. Neel
Emma Mclean-Riggs
Anna I. Kurtz
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF COLORADO
303 E. 17th Avenue
Denver, CO 80203
(303) 777-5482
tmacdonald@aclu-co.org
sneel@aclu-co.org
emcleanriggs@aclu-co.org
akurtz@aclu-co.org

Lee Gelernt
Daniel Galindo
Ashley Gorski*
Patrick Toomey*
Sidra Mahfooz*
Omar Jadwat
Hina Shamsi*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
dgalindo@aclu.org
agorski@aclu.org
ptoomey@aclu.org
smahfooz@aclu.org
odjadwat@aclu.org
hshamsi@aclu.org

Noelle Smith*
Oscar Sarabia Roman*
My Khanh Ngo*
Cody Wofsy*
AMERICAN CIVIL LIBERTIES UNION

11

FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
nsmith@aclu.org
osarabia@aclu.org
mngo@aclu.org
cwofsy@aclu.org

Tamara F. Goodlette
Laura P. Lunn
Monique R. Sherman
Rocky Mountain Immigrant Advocacy Network
7301 Federal Blvd., Suite 300
Westminster, CO  80030
(303) 433-2812
tgoodlette@rmian.org
llunn@rmian.org
msherman@rmian.org

*Attorneys for Petitioners-Plaintiffs*
*\* Attorney not yet admitted to the District of Colorado*

## CERTIFICATE OF SERVICE

I hereby certify that on April 20, 2025, I electronically filed the foregoing **REPLY IN SUPPORT OF PETITIONERS-PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER** with the Clerk of the Court using the CM/ECF system, and that in accordance with Fed. R. Civ. P. 5, all counsel of record shall be served electronically through such filing.

/s/ Mia Bailey
Mia Bailey