IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:25-cv-01163-CNS

D.B.U. and R.M.M., on behalf of themselves and others similarly situated,

      Petitioners-Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States:
PAMELA BONDI, Attorney General of the United States, in her official capacity;
KRISTI NOEM, Secretary of the U.S. Department of Homeland Security, in her official capacity;
U.S. DEPARTMENT OF HOMELAND SECURITY;
TODD LYONS, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity;
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT;
MARCO RUBIO, Secretary of State, in his official capacity;
U.S. STATE DEPARTMENT;
ROBERT GAUDIAN, Director of the Denver Field Office for U.S. Immigration and Customs Enforcement, in his official capacity; and
DAWN CEJA, Warden, Denver Contract Detention Facility, in her official capacity,

      Respondents-Defendants.

---

# ORDER

---

      Petitioners-Plaintiffs are civil immigration detainees who fear imminent transfer from this judicial district and removal without adequate notice. Their fear is premised on the President's use of the Alien Enemies Act to remove noncitizens from the United States.

Before the Court is Petitioners-Plaintiffs' Emergency Motion for Temporary Restraining Order. ECF No. 2. Following the Court's April 14, 2025, Order, *see* ECF No. 10, Respondents-Defendants filed their Response to Petitioners-Plaintiffs' Emergency Motion for Temporary Restraining Order on April 17, 2025, ECF No. 26. After considering the parties' written submissions, and having heard oral argument on April 21, 2025, the Court GRANTS Petitioners' Emergency Motion for Temporary Restraining Order.

The Court's Order proceeds as follows. First, it describes this case's legal, factual, and procedural background. Second, it sets forth the legal standard governing the Court's analysis of Petitioners' motion. And third, the Court analyzes Petitioners' motion under that standard. The Court's analysis leads to this conclusion: Petitioners have met their TRO burden.

Because Petitioners have met this burden, the Court orders that Petitioners and members of the provisionally certified class shall not be transferred outside the District of Colorado. The Court orders the following regarding the notice Respondents and the government must provide Petitioners and the provisionally certified class of individuals they seek to represent: Respondents shall provide a twenty-one (21) day notice to individuals detained pursuant to the Act and Proclamation. Such notice must state the government intends to remove individuals pursuant to the Act and Proclamation. It must also provide notice of a right to seek judicial review, and inform individuals they may consult an attorney regarding their detainment and the government's intent to remove them. Such notice must be written in a language the individual understands.

# I.    BACKGROUND

## A.  Legal Background

On March 14, 2025, President Donald J. Trump signed a Proclamation designating Tren de Aragua (TdA) a "Foreign Terrorist Organization" and declaring, among other things, TdA "is perpetuating, attempting, and threatening an invasion or predatory incursion against the territory of the United States." Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua, 90 Fed. Reg. 13,033 (Mar. 14, 2025). The Proclamation's declarations, findings, directions were made "[p]ursuant to [the President's] authority," *id.*, under 50 U.S.C. § 21—the Alien Enemies Act. *See also* ECF No. 26 at 2.

The Act's history, structure, context, and language is discussed fully below. But for present purposes, it suffices to recite the Proclamation's understanding of the Act: The Act is a law of the United States that "vested in [the President]" the "authority" to "proclaim and direct" that TdA was, as indicated above, invading the "territory of the United States;" its members "are a danger to the public peace or safety of the United States;" and, fundamentally, the power to direct that "all Alien Enemies described in [the Proclamation] are subject to immediate apprehension, detention, and removal." Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua, 90 Fed. Reg. 13,033 (Mar. 14, 2025).

Plaintiffs in other jurisdictions have challenged their detention and removals under the Act. *See, e.g., J.G.G. v. Trump*, Civil Action No. 25-766 (JEB), --- F. Supp. 3d ----,

2025 WL 890401, at *1 (D.D.C. Mar. 24, 2025) ("In the predawn hours of Saturday, March 15, five Venezuelan noncitizens being held in Texas by the Department of Homeland Security sought emergency relief in this Court. They justifiably feared that, in a matter of hours, they might be removed from the country pursuant . . . the Alien Enemies Act of 1798."). Following accelerated appellate procedures in the District of Columbia, *see id.*, the Supreme Court issued a unanimous, *per curiam* opinion regarding the "judicial review" to which individuals detained under the Act are entitled. *Trump v. J. G. G.*, No. 24A931, 604 U.S. ----, 2025 WL 1024097, at *2 (U.S. Apr. 7, 2025); *see also id.* at 2025 WL 1024097, at *6 ("Begin with that upon which *all nine Members of this Court agree* . . . . [I]ndividual[s] subject to detention and removal under the [the Act are] entitled to 'judicial review' as to 'questions of interpretation and constitutionality' of the Act . . . ." (quotations omitted) (Sotomayor, J., dissenting). In sum, individuals "subject to detention and removal" under the Act are entitled to judicial review as to "questions of [the Act's] interpretation and constitutionality", and "must receive notice . . . that they are subject to removal under the Act. The notice must be afforded within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs." *J. G. G.*, 2025 WL 1024097, at *2 (per curiam).

In a different putative class action challenging detainees' removal under the Act filed in the Northern District of Texas, following "an application on behalf of [the] putative class . . . seeking an injunction," the Supreme Court recently directed the government "not to remove any member of the putative class of detainees from the United States until further order from" the Supreme Court. *A.A.R.P. v. Trump*, No. 24A1007, --- U.S. ----,

2025 WL 1147581, at *1 (U.S. Apr. 19, 2025) (citing 28 U. S. C. § 1651(a)); *see also A.A.R.P. v. Trump*, No. 1:25-CV-059-H, --- F. Supp. 3d ----, 2025 WL 1148140, at *1 (N.D. Tex. Apr. 17, 2025).

### B. Factual Background

This factual background is drawn predominantly from the parties' TRO briefs and the briefs' supporting exhibits. *See Denver Homeless Out Loud v. Denver, Colorado*, 514 F. Supp. 3d 1278, 1285 (D. Colo. 2021), *vacated and remanded on other grounds*, 32 F.4th 1259 (10th Cir. 2022).

#### 1. Petitioner D.B.U.

D.B.U. is a Venezuelan citizen who entered the United States through Texas in 2022, and fears returning to Venezuela. ECF No. 2-1 at 1 ¶ 3. He has a single tattoo, which bears his niece's name. ECF No. 2-1 at 1 ¶ 6.

On or about January 26, 2025, Immigration and Customs Enforcement (ICE) arrested D.B.U. ECF No. 2-1 at 1 ¶ 4. At the time of his apprehension, D.B.U. was attending a party. *Id*. ICE and the Drug Enforcement Agency (DEA) characterized the party as a "Tren de Aragua" party in public communications, and accused D.B.U. as being a TdA member. *Id*. Following D.B.U.'s arrest, ICE and DEA agents interrogated him regarding his possible TdA membership. Id. D.B.U. denied—and continues to deny— TdA membership. *Id*.; *see also* ECF No. 2-1 at 1 ¶ 6. D.B.U. has not been criminally charged. ECF No. 2-1 at 1 ¶ 4.

D.B.U. is currently detained at the ICE Denver Contract Detention Facility (the Facility). ECF No. 2-1 at 1 ¶ 2; id. at 2-1 at 1 ¶ 5. In an April 17, 2025, immigration

proceeding, an immigration judge "indicate[d] that ICE suggests that D.B.U. has a gang affiliation." ECF No. 31-2 at 2 ¶ 3. There is a "grave risk of ICE alleging that [D.B.U.] is a member" of TdA, and that ICE will invoke the Act against him. ECF No. 2-1 at 2 ¶ 8.

      *2. Petitioner R.M.M.*

R.M.M. is a Venezuelan citizen, born in 2000, who entered the United States at or near Eagle Pass, Texas, in or around 2023. ECF No. 2-2 at 1 ¶ 2. He is married, and has two children, ages six and four. *Id.* R.M.M.'s wife and children live in Aurora, Colorado. *Id.* He has several tattoos for personal reasons, including one of his children's birth years, another of a family member's name, and one tattoo of religious significance. ECF No. 2-2 at 2 ¶ 10.

R.M.M. is "extremely afraid" to return to Venezuela. ECF No. 2-2 at 1 ¶ 4. There, he has protested against the "Maduro regime" and has been harmed by groups "aligned with the regime." *Id.* He fled Venezuela because TdA murdered his wife's father and uncle. *Id.* He fears TdA will murder him, his wife, and his children. *Id.* R.M.M. and his family hoped to find "safety and stability" for their family in the United States. ECF No. 2-2 at 1 ¶ 3.

On April 11, 2025, ICE filed a redacted Form I-213 in R.M.M.'s bond case identifying him as an "Associate/Active" of TdA, and stating R.M.M. was a "known member of the Venezuelan gang Tren de Aragua." ECF No. 2-2 at 1 ¶ 5. In support of its Form I-213 contention, ICE recounted the circumstances of R.M.M.'s arrest. ECF No. 2-2 at 2 ¶ 6. On March 1, 2025, an ICE Enforcement and Removal Operations Denver Field Operations Unit conducted surveillance at the address of an individual—not R.M.M.—

"allegedly named in a [TdA] investigation. *Id.* (quotations omitted). A person of interest left the addresses and "approach[ed] four Hispanic males . . . standing outside their vehicles," one of whom was R.M.M. *Id.* (quotations omitted). ICE determined these individuals, including R.M.M., were "amenable to removal," and arrested them. *Id.* R.M.M. denies connection to ICE's person of interest, and maintains he was only "standing outside [the] vehicles" to meet a prospective buyer for his vehicle, at a public location the buyer selected. *Id.* The Form I-213 also details the search of a Jeep and motel room, to which R.M.M. denies connection. *See* ECF No. 2-2 at 1–2 ¶ 7. R.M.M. has no prior criminal history or pending charges against him. ECF No. 2-2 at 2 ¶ 9.

R.M.M. is currently detained at the Facility. ECF No. 2-2 at 2 ¶ 8. He is pending immigration removal proceedings, and is pursuing asylum, withholding of removal, and protection under the Convention Against Torture (the Convention) based on his fear of persecution and torture if returned to Venezuela. *Id.* R.M.M. and his wife deny TdA affiliation and seek asylum in part because of past persecution at TdA's hands. ECF No. 2-2 at 2 ¶ 9. There is a "grave risk that ICE will invoke" the Act against him. *Id.* at 2 ¶ 11.

### 3. Petitioners' Immigration Status & Notice

D.B.U. and R.M.M. are presently in removal proceedings before immigration court. *See* ECF No. 26-1 at 4 ¶ 12; *id.* at 5 ¶ 20.

Despite lodging allegations to the contrary during immigration proceedings, ICE "reviewed the facts" in D.B.U.'s case and "determined that he is not subject to the Proclamation," and D.B.U. has "not been issued a notice" that he is subject to the Proclamation. ECF No. 26-1 at 4 ¶¶ 13–14. ICE represents if it "determines in the future

that D.B.U. is subject to the Proclamation, he would be provided notice of such determination in a language he understands," and attendant procedures "will allow time and opportunity to file a habeas petition." *Id.* at 4 ¶ 15.

As with D.B.U., ICE has "reviewed the facts" of R.M.M.'s case and "determined that he is not subject to the Proclamation." ECF No. 26-1 at 5 ¶ 21. ICE represents if it "determines in the future that R.M.M. is subject to the Proclamation, he would be provided notice of such determination in a language he understands," and attendant procedures "will allow time and opportunity to file a habeas petition." *Id.* at 5 ¶ 23.

Consistent with these representations, ICE states it "has adopted processes for individuals detained under the [Act] for removal." ECF No. 26-2 at 3 ¶ 7. These processes "require that each individual be provided notice of the proceedings, in a language the alien understands. They allow time and opportunity to file a habeas petition." *Id.* at 3 ¶ 8.

The government provides a "Notice and Warrant of Apprehension and Removal Under the Alien Enemies Act" (the Notice) to individuals "determined to be an Alien Enemy and, [who] under [the Act]" are removable pursuant to it. ECF No. 31-1 at 3. The Notice provides "any statement you make now or while you are in custody may be used against you in any administrative or criminal proceeding." *Id.* The Notice clarifies that it "is not a removal order under the Immigration and Nationality Act," and permits that "if you desire to make a phone call, you will be permitted to do so." *Id.* The Notice contains a "Certificate of Service," under which an officer or agent must sign and represent the Notice's recipient was served and the Notice was "read to [the] person in a language he

or she understands." *Id.* The Notice is written in English. *See id.* The government has provided no other version of the Notice written in any language other than English.

### C. Procedural Background

The Proclamation's understanding of what the Act empowers—the powers it "vests"—gives rise to Petitioners' habeas claims and TRO motion.

Fearing "imminent risk of removal pursuant to the Proclamation without any hearing or meaningful review," ECF No. 1 at 14 ¶ 57, on April 12, 2025, Petitioners filed their Class Petition for Writ of Habeas Corpus and Class Complaint for Declaratory and Injunctive Relief*, see generally* ECF No. 1, and Emergency Motion for Temporary Restraining Order, *see generally* ECF No. 2. Consistent with their class petition, in the TRO motion Petitioners seek emergency relief on the grounds that they are in "imminent danger of being transferred" outside this judicial district "en route to removal," and seek an injunction prohibiting their transfer and "30-day notice of any intent to remove Petitioners and the opportunity to contest an alien enemy designation." ECF No. 2 at 1 (emphases removed); *see also id.* at 4 ("Petitioners move the Court for a TRO barring their summary removal under the [Act] and barring Respondents from relocating them outside of this District pending this litigation."). On April 12, 2025, Petitioners also filed their Motion for Leave to Proceed Under Pseudonym, ECF No. 3, and Motion for Class Certification, ECF No. 4.

On April 14, 2025, pursuant to the All Writs Act, the Court issued an order prohibiting Respondents from removing Petitioners "from the District of Colorado or the United States unless or until this Court or the Court of Appeals for the Tenth Circuit"

vacated the order. ECF No. 10. The Court ordered Petitioners' counsel to serve Respondents with several documents, including copies of the TRO motion and order. *Id.* The Court ordered Respondents to respond to Petitioners' TRO motion by April 17, 2025, and for both parties to appear for a hearing on April 21, 2025. *Id.* That same day, the Court granted Petitioners' pseudonym motion. *See generally* ECF No. 11. And following Petitioners' Emergency Motion for Clarification, ECF No. 13, the Court stated its prior order prohibited removal of named Petitioners and "the class they propose to represent," to remain in effect for no longer than fourteen days, ECF No. 14.

Respondents timely filed their response to Petitioners' TRO motion on April 17, 2025. ECF No. 26. On April 20, 2025, Petitioners replied. ECF No. 31. The Court heard oral argument on April 21, 2025.

## II.    LEGAL STANDARD

The legal standard governing TROs is the same standard governing preliminary injunctions. *See Nellson v. Barnhart*, 454 F. Supp. 3d 1087, 1091 (D. Colo. 2020) (citation omitted); *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 319 F. Supp. 3d 70, 81 (D.D.C. 2018) ("Like a preliminary injunction, a temporary restraining order is an extraordinary form of relief."). To prevail on a TRO motion, movants must show: "(1) they are 'likely to succeed on the merits,' (2) they are 'likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in [their] favor,' and (4) 'an injunction is in the public interest.'" *M.G. through Garcia v. Armijo*, 117 F.4th 1230, 1238 (10th Cir. 2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The final two factors "merge" when the government "is the opposing party." *Denver*

*Homeless Out Loud v. Denver, Colorado*, 32 F.4th 1259, 1278 (10th Cir. 2022) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). "An injunction can issue only if each factor is established." *Denver Homeless*, 32 F.4th at 1278 (citing *Winter*, 555 U.S. at 23–24)).

### III.    ANALYSIS

The Court's analysis of Petitioners' TRO motion proceeds in two parts. First, it addresses various threshold issues Respondents raise in their Response. These issues, Respondents assert, preclude judicial review. They do not. Second, the Court considers the TRO factors, and Petitioners' arguments attendant to them, in turn. Their consideration compels the conclusion Petitioners have met their TRO burden.

### A. Threshold Issues

Before reaching Petitioners' TRO arguments, the Court first addresses the threshold issues Respondents raise—for instance, whether the Court has habeas jurisdiction and Petitioners have standing.

### 1.  Habeas Jurisdiction

Respondents argue that because Petitioners "challenge their removal under the Proclamation" and they are "not facing removal under the Proclamation or the [Act]," that the Court "lacks jurisdiction" over Petitioners' habeas action. ECF No. 26 at 8. Petitioners contend the TRO record and relevant decisional law do "not undermine . . . this Court's jurisdiction." ECF No. 31 at 3. The Court agrees with Petitioners.

The parties agreed at oral argument Petitioners' habeas claims impose a jurisdictional requirement. *See* ECF No. 1 at 22 (reciting Petitioners' habeas claim for relief against all Respondents); *Maleng v. Cook*, 490 U.S. 488, 490 (1989) ("The federal

habeas statute gives the United States district courts jurisdiction to entertain petitions for habeas relief . . ." (citations omitted)). And the parties do not dispute, to meet this requirement, a petitioner must be "in custody" for habeas purposes. *Compare* ECF No. 26 at 8, *with* ECF No. 31 at 5. *See, e.g., Braden v. 30th Jud. Cir. Ct. of Kentucky*, 410 U.S. 484, 488 (1973). Their dispute arises over whether, on the TRO record, Petitioners satisfy this requirement.

Petitioners do. To be sure, Respondents' contention "that habeas petitions must be dismissed for lack of jurisdiction where the petitioner seeks to challenge a conviction that is not a basis of the petitioner's restraint on liberty" is well-taken. ECF No. 26 at 9. So too are the cases Respondents marshal in support of their jurisdictional argument. *See, e.g.* ECF No. 26 at 8 (citing *Maleng*, 490 U.S. at 490–91). But in the criminal context, petitioners may mount habeas challenges for "sentences . . . even though [they are] not presently serving them." *Maleng*, 490 U.S. at 493 (citation omitted); *see also* ECF No. 31 at 5. And cases in that context concluding petitioners failed to meet the habeas custodial requirement—including *Calhoun v. Attorney General of Colorado*, 745 F.3d 1070 (10th Cir. 2014), cited by Respondents' counsel during oral argument—are meaningfully distinguishable. *See Calhoun*, 745 F.3d at 1074 ("It is *undisputed* that Mr. Calhoun was *unconditionally* released from the obligations of his probation before he filed his § 2254 petition. Accordingly, there is no condition of his sentence that *could subject him to reincarceration* or place another restraint on his liberty.") (emphases added); *see also Alaska v. Wright*, 593 U.S. 152, 154 (2021) (applying "in custody" requirement under 28 U.S.C. §§ 2241 and 2254).

The Court turns to the TRO record to expose these meaningful distinctions. *Cf. Calhoun*, 745 F.3d at 1074. Certainly, it is undisputed that D.B.U. and R.M.M. are not "currently"—in the words of counsel—civilly detained pursuant to the Act and Proclamation. *See, e.g.,* ECF No. 2-1 at 2 ¶ 8; ECF No. 2-2 at 2 ¶ 11. But, taking Respondents at their word from oral argument, and certainly from the TRO record, there is no definite evidence ICE will conclude or has concluded Petitioners *do not* fall under the Proclamation's ambit, and are instead subject only to Title 8's immigration removal procedures. *Compare* ECF No. 26-1 at 4–5 ¶¶ (stating for both D.B.U. and R.M.M. that "*[i]f ICE determines in the future* [they] are subject to the Proclamation" then they would receive notice attendant to the Proclamation) (emphasis added), *with Calhoun*, 745 F.3d at 1074 ("[T]here is *no condition* of his sentence that *could* subject him to reincarceration or place *another restraint* on his liberty.") (emphasis added). Simply put, D.B.U. and R.M.M.'s "current" status must be balanced against the possibility of their reclassification as Proclamation-eligible—and removable—detainees, a possibility which Respondents have explicitly declined to foreclose. *See also* ECF No. 31 at 3. This is hardly an evidentiary record where, in light of the "liberal construction" accorded the "in custody" habeas requirement, *Maleng*, 490 U.S. at 492, concluding Petitioners have met their jurisdictional burden "would read the 'in custody' requirement out of the statute," *id. See also Boumediene v. Bush*, 553 U.S. 723, 780 (2008) ("[T]he common-law habeas court's role was most extensive in cases of pretrial and noncriminal detention, where there had been little or no previous judicial review of the cause for detention.").

The Court's conclusion is bolstered—if not compelled—by *A.A.R.P.* and its procedural history. 2025 WL 1147581, at *1. Recall the Supreme Court directed the government "not to remove any member of the putative class of detainees from the United States until further order of th[e] Court." *Id.* The Supreme Court did so despite the district court's conclusion its petitioners and the putative class failed to show irreparable harm because the government stated it "[did] not presently expect to remove A.A.R.P. or W.M.M. under the [Act] until after the pending habeas petition is resolved." *A.A.R.P.*, 2025 WL 1148140, at *1 (quotations omitted). Where the Supreme Court has prohibited the government from removing members of a putative class that a district found not to be at risk of imminent or irreparable harm—based on the government's representations— the Court must follow suit. *See United States v. Rose*, 537 F. Supp. 2d 1172, 1177 (D.N.M. 2008) ("[T]his Court is bound to follow the applicable precedent of the Supreme Court." (citations omitted)). Thus, consistent with *A.A.R.P.*, it does not matter for habeas jurisdictional purposes whether Petitioners are or are not "currently" detained pursuant to Proclamation. *See also* ECF No. 31 at 3–4. This is especially the case where such distinction was immaterial to the United States Supreme Court in granting a putative class the same temporary relief Petitioners seek here. *See A.A.R.P.*, 2025 WL 1147581, at *1.

Accordingly, Petitioners have satisfied the habeas "in custody" jurisdictional requirement. *See* 28 U.S.C. § 2241.

### 2. *Justiciable & Reviewable*

The parties advance various arguments concerning a fundamental issue: Whether Petitioners' claims are justiciable and reviewable. *Compare* ECF No. 26 at 10, *with* ECF

No. 31 at 5. The Court agrees with Petitioners. Their claims are justiciable, and they have met their Article III standing burden. Moreover, "other principles" regarding judicial review identified by Respondents do not bar adjudication of Petitioners' claims. ECF No. 26 at 10.

*First*, Respondents argue Petitioners' claims are "unripe for review," which "bar[s] the Court from reviewing Petitioners' [Act] arguments in the TRO motion." ECF No. 26 at 10. Respondents press the same argument—Petitioners' harms are speculative—in arguing more broadly that Petitioners lack standing. *See id. See also S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1152 (10th Cir. 2013) ("Both standing and ripeness present the threshold jurisdictional question of whether a court may consider the merits of a dispute." (citation omitted)); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (explaining Article III standing requirements). And although the doctrines differ, *see Morgan v. McCotter*, 365 F.3d 882, 890 (10th Cir. 2004), because Respondents premise their arguments regarding each on the same argument and facts, the Court addresses them together, *see, e.g., Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 n.5 (2014).

The "speculative harm" argument echoes Respondents' jurisdictional habeas argument and rings hollow for substantially similar reasons. *See* ECF No. 26 at 10. Based on the TRO record, it is not dispositive that D.B.U. and R.M.M. are not "currently" designated as "subject" to the Proclamation when the government may revise this designation at any time—and failed to eliminate that possibility, or the speed with which such re-designation could occur, when asked directly at oral argument. *Cf.* ECF No. 26-1 at 4 ¶¶ 13–15. At bottom, Petitioners have shown a sufficient risk of "being designated"

as TdA members, and thus falling under the Proclamation, to, at this procedural stage, survive Respondents' ripeness and standing challenges. ECF No. 31 at 5. The harms Petitioners face have "matured sufficiently to warrant judicial intervention," *see Morgan*, 365 F.3d at 890 (quotations omitted), surviving Respondents' ripeness challenge. *See also id.* (noting the "ripeness issue, however, focuses *not* on whether the plaintiff *was in fact* harmed" (quotations omitted) (emphases added)). Petitioners have shown there is a "substantial risk that the harm" of being subject to the Proclamation will arise—despite their current designation as individuals who do not fall under it—such that they have met their standing burden. *Susan B. Anthony*, 573 U.S. at 158 ("An allegation of future injury may suffice if . . . there is a 'substantial risk' that the harm will occur." (citation omitted)); *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (same) (quoting *Susan B. Anthony*, 573 U.S. at 158); *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153–54 (2010). Should their designation change, the Court has grave concerns that Petitioners would be afforded notice that comports with due process to challenge the determination.

*Second*, Respondents challenge the Court's ability to "consider Petitioners' request for [ ] review" of the "President's findings and determinations supporting the Proclamation," based on several "limiting principles." ECF No. 26 at 11. The principles Respondents identify pose no limit to the Court's ability to consider Petitioners' claims.

***Presidential Foreign Relations.*** Respondents recite the President's general foreign relations responsibilities and powers, including the power to recognize "foreign states and governments," as powers prohibiting judicial review or injunctive relief. *See* ECF No. 26 at 11. The Court recognizes these powers, but so too must it recognize the

Supreme Court's command that Petitioners are entitled, in this habeas proceeding, to judicial review regarding the Act's "interpretation" and its "constitutionality." *J. G. G.*, 2025 WL 1024097, at *2 (quotations omitted) (per curiam). But even without the Supreme Court's binding guidance in *J. G. G.*, the Court would reject Respondents' contention, given that interpreting and assessing the constitutionality of the Act in the context of Petitioners' claims does not amount to "supplant[ing] a foreign policy decision of the political branches . . . ." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012). *See also J.G.G. v. Trump*, Civil Action No. 25-766 (JEB), --- F. Supp. 3d ----, 2025 WL 890401, at *9 (D.D.C. Mar. 24, 2025) ("A court should not unnecessarily flinch from a justiciable controversy that it has 'a responsibility to decide' simply because the claim arises in the foreign-affairs context.") (quoting *Zivotofsky*, 566 U.S. at 194–201).

   ***Presidential Power Under the Act.*** Next, Respondents argue the Act itself precludes judicial review. *See* ECF No. 26 at 11. Once again, *J. G. G.* begins and ends the Court's analysis—and rejection—of this argument. *See* 2025 WL 1024097, at *2 (per curiam). But notwithstanding *J. G. G.*'s binding command that Petitioners are *entitled* to mount their interpretive and constitutional challenges, *see Rose*, 537 F. Supp. 2d at 1177, the case Respondents cite in support of this argument offers no support. *See* ECF No. 31 at 7. *Ludecke* itself—discussed further below—involved judicial review of the Act and facts giving rise to its application. *Ludecke v. Watkins*, 335 U.S. 160, 166 (1948) ("And so *we reach the claim* that while the President had summary power under the Act, it did not survive cessation of actual hostilities." (footnote omitted) (emphasis added)); *J.G.G.*, 2025 WL 890401, at *10; *Citizens Protective League v. Clark*, 155 F.2d 290, 294 (D.C. Cir.

1946) ("The one question, whether the individual involved is or is not an alien enemy, is admitted by the Attorney General to be open *to judicial determination*.") (emphasis added). Decades old decisional law dooms Respondents' argument—to say nothing of the Supreme Court's *per curiam* opinion issued earlier this month. *See Ludecke*, 335 U.S. at 170 (This brings us to the final question. Is the statute valid as we have construed it?").

***Political Question.*** Finally, Respondents argue "the President's findings that the [Act's] preconditions are satisfied is a political question." ECF No. 26 at 12. Citing the District of Columbia's analysis of this precise issue in *J.G.G. v. Trump*, 2025 WL 890401, Petitioners counter "the political question doctrine [does not] preclude" judicial review. ECF No. 31 at 8. The Court agrees with Petitioners. Although the Supreme Court in *J. G. G.* vacated the district court's underlying temporary restraining order, the Supreme Court did *not* disturb the district court's political question analysis. Given this, and the district court's extremely thorough and persuasive analysis in *J.G.G.*, the Court concludes Petitioners' claims do not present a judicially unreviewable political question. *See* 2025 WL 890401, at *9–11; *Baker v. Carr*, 369 U.S. 186, 211 (1962) ("Yet it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance.") Respondents err in arguing otherwise. *See J.G.G.*, 2025 WL 890401, *9 ("To the degree that a claim requires the court to interpret a statutory provision or decide a law's constitutionality, the political-question doctrine is not implicated: deciding such questions 'is a familiar judicial exercise.'") (quoting *Zivotofsky*, 556 U.S. at 196); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 401 (2024) ("The judiciary is the final authority on issues of statutory construction." (quotations and alterations omitted)).

### 3. Immigration & Nationality Act

Finally, in their efforts to forestall asking whether Petitioners have satisfied the relevant factors to secure temporary injunctive relief, *see Nellson*, 454 F. Supp. 3d at 1091, Respondents argue the Immigration and Nationality Act (INA) "deprives the Court of authority to enjoin [them] from transferring Petitioners or putative class members outside" the District of Colorado. ECF No. 26 at 13. The Court notes that, although positioned as threshold matter preceding analysis of the TRO factors in Respondents' brief, *see id.*, Respondents' argument addresses the *relief* the Court can grant, given Petitioners are currently detained under the INA, not the Act and Proclamation. Petitioners discern no obstacles to relief in the INA provisions Respondents identify. *See, e.g.,* ECF No. 31 at 9. The Court agrees with Petitioners.

To make clear, Respondents cannot argue the INA's jurisdictional provisions preclude Petitioners' *habeas* challenge or separately govern removals under the Proclamation and Act. The INA does not reach so far as to prohibit judicial review "as to questions of interpretation and constitutionality" of the Act simply because any case, putative class or class member, or petitioner may implicate or also be involved in Title 8 immigration proceedings. *J. G. G.*, 2025 WL 1024097, at *1 (quotations omitted) (per curiam). While, on their face, the INA provisions that Respondents cite appear to support their argument, *see, e.g.,* ECF No. 26 at 14, no immigration judge has yet made a removal determination as to either D.B.U. or R.M.M. And moreover, this is not a circumstance where Petitioners seek to restrain any "transfer power" through a "*Bivens* class action suit," *Van Dinh v. Reno*, 197 F.3d 427, 433 (10th Cir. 1999), or *review* the decision to

detain Petitioners here or elsewhere, *see Tercero v. Holder*, 510 F. App'x 761, 766 (10th Cir. 2013). Petitioners, through habeas, challenge removal proceedings under the Proclamation and Act, implicating the place of their detention only to the extent necessary to adjudicate their *habeas* claims. *Cf. id.*; ECF No. 31 at 9; *Ozturk v. Trump*, No. 2:25-cv-374, --- F. Supp. 3d ----, 2025 WL 1145250, at *23 (D. Vt. Apr. 18, 2025).

Regardless, the Court is once again bound by the Supreme Court's recent decisions addressing precisely the legal and factual issues this case poses. For instance, in *J. G. G.*, the Supreme Court determined—where petitioners' habeas challenge concerned their detention under the Act—"jurisdiction lies in only one district: the district of confinement." 2025 WL 1024097, at *1 (per curiam). Petitioners are detained here. Explained above, the Court has jurisdiction over their claims, *see id.*, and therefore jurisdiction to grant any appropriate relief. *See Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 248 (1944) ("Equitable procedure has always been characterized by flexibility which enables it to meet new situations which demand equitable intervention, and to accord all the relief necessary to correct the particular injustices involved in these situations."); *Boumediene*, 553 U.S. at 779 ("[C]ommon-law habeas corpus was, above all, an adaptable remedy. Its precise application and scope changed depending upon the circumstances." (citations omitted).

This conclusion is further supported by *A.A.R.P.*, where the district court concluded petitioners did *not* face an imminent threat of removal under the Act, and the Supreme Court *nonetheless* ordered the government "not to remove any member of the putative class of detainees from the United States" until further order. 2025 WL 1147581, at *1

(citing § 1651(a)). Therefore, *A.A.R.P.* teaches the Court may craft—is *required* to craft—the remedy Petitioners seek, even if named Petitioners are not "currently" detained under the Act and Proclamation. Especially where granting such relief, at *this stage*, is temporary, and ensuring that Petitioners and putative class members remain in this judicial district could be important at later stages of habeas litigation. *Harris v. Nelson*, 394 U.S. 286, 299–300 (1969); *Boumediene*, 553 U.S. at 779.

Accordingly, the INA provisions Respondents identify do not, at this stage, preclude the Court from granting Petitioners relief, particularly where doing so would be on a temporary basis. *See, e.g., A.A.R.P.*, 2025 WL 1147581, at *1.

\* \* \*

Respondents advance several arguments on either side of the merits of Petitioners' claims—against their justiciability, and whether the Court can grant any relief for them. For the reasons set forth above, these arguments do not persuade. And because they do not, the Court proceeds to analyze whether Plaintiffs have met their burden under the factors governing their request for a temporary restraining order. *See Nellson*, 454 F. Supp. 3d at 1091.

**B. Petitioners' Likelihood of Success on the Merits**

Petitioners advance several arguments regarding their likelihood of success on the merits. The Court considers them in turn.

*1. Proclamation "Satisfying" the Act*

According to Petitioners, the Proclamation exceeds the President's "statutory authority in three critical respects." ECF No. 2 at 11. *First*, there is no "invasion or

predatory incursion." *Id. Second*, any purported invasion is not perpetuated by a "foreign government or nation." *Id.* And *third*, there is "no process to contest whether an individual falls within the Proclamation." *Id.* Skepticism of the Proclamation's contrary findings is required, Petitioners urge, to the point of satisfying their first TRO burden. *Id.*; *see also M.G.*, 117 F.4th at 1238. The Court agrees.

### a. Invasion or Predatory Incursion

Petitioners' first argument, *see* ECF No. 2 at 12, proceeds from a straightforward premise. The President's authority under the Proclamation is "vested" under the Act. The Act demands, as a "statutory requirement," an "invasion or predatory incursion." ECF No. 12; 50 U.S.C. § 21. And because the Act's "text and history" use these terms "to refer to military actions indicative of an actual or impending war"—not "mass illegal migration" or "criminal activities"—the Act cannot sustain the Proclamation. ECF No. 2 at 12–13. The Court agrees with Petitioners.

The Court does not define these words—"invasion," "predatory," and "incursion"— against blank definitional or historic registers. Begin with language. *See, e.g., Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980) ("[T]he starting point for interpreting a statute is the language of the statute itself."). "The term 'invasion' was a legal term of art with a well-defined meaning at the Founding." *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *8 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring); *see also id.* (defining "invasion as a "'[h]ostile entrance upon the right or possessions of another; hostile encroachment,' such as when 'William the Conqueror invaded England'") (quoting Samuel Johnson, Invasion, sense 1, A DICTIONARY OF

THE ENGLISH LANGUAGE (4th ed. 1773)); (reciting second dictionary defining "invasion as a "'hostile entrance into the possession of another; particularly the entrance of a hostile army into a country for the purpose of conquest or plunder, or the attack of a military force'") (quoting Noah Webster, Invasion, sense 1, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)).

The Court finds these at-the-Founding definitions persuasive in demonstrating what "invasion" does—and does not—mean as a matter of plain language. "Invasions" contemplate military action. *J.G.G.*, 2025 WL 914682, at *9 ("The term 'invasion' was well known to the Fifth Congress and the American public circa 1798. The phrase echoes throughout the Constitution ratified by the people just nine years before. And *in every instance*, it is used in a military sense.") (Henderson, J., concurring). And at a bare minimum, "invasion" means more than the Proclamation's description of TdA's "infiltrat[ion]," "irregular warfare," and "hostile actions" against the United States— notwithstanding the Proclamation's conclusory description of "the devastating effects of [TdA's] invasion." Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua, 90 Fed. Reg. 13,033 (Mar. 14, 2025). *See also id.* (finding "TdA is undertaking hostile actions and conducting irregular warfare"); *id.* (stating TdA members are "chargeable with actual hostility against the United States").

Definitions of "predatory incursion" likewise reveal a mismatch between what the phrase means and what the Proclamation says. As with the analysis of earlier definitions of "invasion," the Court again finds Judge Henderson's research and analysis of Founding era definitions for "predatory" and "incursion"—which Petitioners cite, and to which they

direct the Court—persuasive in its own analysis of Petitioners' TRO motion. *See* ECF No. 2 at 12; *J.G.G.*, 2025 WL 914682, at *10 (Henderson, J., concurring). Explained in Judge Henderson's concurring statement to the D.C. Circuit's *per curiam* order denying emergency stays prior to the Supreme Court's ultimate intervention in *Trump v. J. G. G.*, 2025 WL 1024097, at *1, the "predatory" nature of an "incursion" "includes a '[p]lundering,' such as the '*predatory* war made by Scotland.'" 2025 WL 914682, at *10 (Henderson, J., concurring) (original alteration and emphasis) (citing Samuel Johnson, Predatory, sense 1, A DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 1773)).

Indeed, consistent with these definitions, the Supreme Court's discussion of the "power to be exercised by the President such as that conferred by the Act" rests on the presumption the United States is in a "state of war." *Ludecke*, 335 U.S. at 168–69 (quotations omitted)); *id.* at 170 n.13 ("[T]he life of [the] statute is defined by *the existence of a war.*") (emphasis added); *id.* at 170 ("The political branch of the Government has not brought *the war with Germany* to an end.") (emphasis added). A year earlier the Second Circuit's analysis of the Act rested on the same premise. *See U.S. ex rel. Kessler v. Watkins*, 163 F.2d 140, 143 (2d Cir. 1947) ("It seems quite necessary to suppose that the President could not carry out prior to the official termination of the declared *state of war*, deportations which the Executive regarded as necessary for the safety of the country but which could not be carried out during *active warfare* because of the danger to the aliens themselves or the interference with the effective conduct of *military operations*.") (emphasis added); *Clark*, 155 F.2d at 295 ("[T]he state of war has not been terminated by act of Congress or by Executive Proclamation.").

Satisfied with what "invasion" and "predatory incursion" mean, the Court could stop. *See Burlington N. R. Co. v. Oklahoma Tax Comm'n*, 481 U.S. 454, 461 (1987) ("[W]hen we find the terms of a statute unambiguous, judicial inquiry is complete." (quotations omitted)). These words, fundamentally, demand military and wartime action. The Proclamation makes no finding that satisfies these definitional demands. Thus, to the extent the Proclamation relies on the Act's "invasion" and "incursion" provisions to justify its removal powers, it does so improperly. *See J.G.G.*, 2025 WL 914682, at *2 ("A central limit to this power is the Act's conditional clause—that the United States be at war or under invasion or predatory incursion.") (Henderson, J., concurring) (per curiam).

But assume these unambiguous words are ambiguous. Turn to history. *See, e.g., United States v. Pub. Utilities Comm'n of Cal.*, 345 U.S. 295, 315 (1953); *United States v. Donruss Co.*, 393 U.S. 297, 303 (1969). As doing so is not required, *see, e.g., Burlington*, 481 U.S. at 461, the Court does not pause here for long, except to say it finds Petitioners' recitation of the Act's historical context persuasive. *See* ECF No. 2 at 13; *see also J.G.G.*, 2025 WL 914682, at *9 (explaining the Act's historical background) (Henderson, J., concurring); *id.* at *16 ("As James Madison explained, the [Act] was passed based on Congress's 'power to declare war' and was in accord with 'the law of nations.'") (quoting *The Report of 1800*) (Millett, J., concurring). The Act's history further demonstrates that invasions require the "use [of] military force," *id.* at *9 (Henderson, J., concurring), and any contrary efforts to cramp the Proclamation's findings into that historical meaning fail.

b. *"Foreign Nation or Government"*

Petitioners contend, as with its failures to identify an "invasion" or "predatory incursion," the Proclamation likewise fails to assert a "foreign nation or government" is "invading the United States." ECF No. 2 at 14. The Court agrees with Petitioners. The Court discerns little reason to linger on this point, especially where, as Petitioners observe, the Proclamation finds TdA is "closely aligned with [and] infiltrated[] the Maduro regime." Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua, 90 FR 13033. The Proclamation does not find TdA *itself* is a foreign nation, country, or government. At bottom, the Proclamation fails to adequately find or assert TdA is a "foreign nation or government," § 21, sufficient to justify the Act's invocation. Indeed, if TdA was such a "foreign nation or government," *id.*, there would be no need for it to "undertak[e] hostile actions . . . *at the direction*, clandestine or otherwise, of the Maduro regime in Venezuela," Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua, 90 FR 13033 (emphasis added).

c. *Summary Removals & Notice*

Petitioners contend the government has been subjecting individuals to "summary removals without notice." ECF No. 2 at 16 (capitalization omitted); *id.* at 17 (citing *J. G. G.*, 2025 WL 1024097, at *2)). After reviewing the Notice attached to Petitioners' reply brief, the Court agrees with Petitioners the Notice provided to Petitioners—and, ostensibly, other detainees in the Facility—is deficient and fails to comport with due process.

Outlined above, the Notice—written in English—provides "any statement you make now or while you are in custody may be used against you in any administrative or criminal proceeding." ECF No. 31-3 at 3. Further that the Notice "is not a removal order under the Immigration and Nationality Act." *Id.* It permits that "if you desire to make a phone call, you will be permitted to do so." *Id.* The Notice contains a "Certificate of Service," under which an officer or agent must sign and represent the Notice's recipient was served and the Notice was "read to [the] person in a language he or she understands." *Id.*

This does not, as discussed during oral argument, instruct individuals that they have a right to pursue a habeas challenge. At most, the Notice "permits" individuals to make "*a* phone call." *Id.* (emphasis added). And while the Notice requires government employees to certify they have *read* the Notice to an individual "in a language he or she understands," this does not guarantee individuals are provided the Notice in a language they understand "in a manner as will allow them to actually seek habeas relief," *J. G. G.*, 2025 WL 1024097, at *2. Vaguely granting someone permission to make one phone call if they ask—with, at most, a verbal read-aloud of the Notice that on its face says nothing about the right to seek habeas relief—does not rise to the level of "allow[ing] [detainees] to *actually* seek habeas relief in the proper venue before [their] removal occurs." *Id.* (emphasis added); *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process . . . is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." (citations omitted)).

This is all the truer where, as Petitioners observe, the notice gives no timeframe for removal or even informs an individual *how* to contest their removal—much less, noted above, that notice judicial review could be pursued. *See* ECF No. 31 at 4; *Mullane*, 339 U.S. at 314 ("The notice must be of such nature as reasonably to convey the required information . . . and it must afford a reasonable time for those interested to make their appearance." (citations omitted)); *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." (quotations omitted)).

At bottom, when "notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Mullane*, 339 U.S. at 315. Accordingly, given the TRO record, the Court agrees with Petitioners the notice provided is deficient. *Compare id.*; *and* ECF No. 31 at 3, *with* ECF No. 31-3 at 3.

The parties dispute what notice is required or would be sufficient. On one hand, Respondents contend twenty-four hours is enough. On the other, Petitioners urge the Court to impose a thirty (30) day notice requirement on Respondents and the government. After considering both parties' arguments, Respondents are instructed—absent further guidance from the Supreme Court—to provide a twenty-one (21) day notice to Petitioners and the provisionally certified class they seek to represent, namely "All noncitizens in custody in the District of Colorado who were, are, or will be subject to the March 2025 Presidential Proclamation entitled Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua and/or its implementation."

Such notice must state the government intends to remove individuals pursuant to the Act and Proclamation. It must also provide notice of a right to seek judicial review, and inform individuals they may consult an attorney regarding their detainment and the government's intent to remove them. Such notice must be written in a language the individual understands. These requirements are reasonable to ensure individuals are "actually inform[ed]," *Mullane*, 339 U.S. at 315, of their rights and the nature of proceedings against them, consistent with Supreme Court precedent on this very issue, and crafted to the "appropriate nature of the case," *see J. G. G.*, 2025 WL 1024097, *2 (quoting *Mullane*, 339 U.S. at 313. *See also id.* ("The notice must be afforded within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs.").

### d. Additional Arguments

Finally, Petitioners argue the Proclamation is unlawful for two "independent reason[s]": that it violates protections for noncitizens seeking humanitarian protection, ECF No. 2 at 17, and violates the INA's "procedural requirements," *id.* at 19 (capitalization omitted). Because Petitioners are likely to succeed on the merits of their claims based on the Proclamation's shortcomings in light of Respondents' deficient notice and the Act's statutory language, the Court need not—and does not—reach their alternative arguments regarding these independent reasons. *See, e.g., Oklahoma v. United States Dep't of the Interior*, 577 F. Supp. 3d 1266, 1278 (W.D. Okla. 2021) ("[I]f it is not necessary to decide more, it is necessary not to decide more." (quotations omitted)).

### C. Irreparable Harm

The parties dispute whether Petitioners will suffer irreparable harm absent a temporary restraining order. *Compare* ECF No. 2 at 20, *with* ECF No. 26 at 15. The Court agrees with Petitioners: Absent a TRO, they face immediate, irreparable harm.

Petitioners are at "significant risk" of summary removal. *See, e.g.,* ECF No. 2 at 20; *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018) (quotations omitted). This is so because, while they may be "currently" removable under Title 8 and the INA, Respondents declined to definitively conclude—in their briefing or during oral argument—that Petitioners were *not* removable now or later under the Act and Proclamation. And there is nothing stopping the government from re-classifying Petitioners as Proclamation-eligible deportees at any stage in their immigration proceedings, as D.B.U.'s proceedings already suggest. ECF No. 31-2 at 2 ¶ 3. Put differently, Title 8 proceedings do not *eliminate* the risk of irreparable harm that Petitioners would or could be, at any moment, set for deportation and removal under the Act and Proclamation. All the more so where, based on the TRO record, the Notice provides constitutionally deficient process for Petitioners. *See Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016) (noting "the violation of a constitutional right must weigh heavily in that [irreparable harm] analysis" (quotations omitted)); *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 806 (10th Cir. 2019) ("Any deprivation of any constitutional right fits that [irreparable injury] bill."). Moreover, changing Petitioners' designation as deportable and removable under the Act and Proclamation poses the

significant risk they would be removed within twenty-four hours or less with constitutionally inadequate notice.

This is not a circumstance, put differently, where the harms Petitioners face are so remote—or are simply monetary—as to fail in establishing they face irreparable harm in the Court's TRO analysis. *See, e.g., id.; Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146, 172 (D.D.C. 2021), *aff'd in part, rev'd in part and remanded on other grounds*, 27 F.4th 718 (D.C. Cir. 2022) ("Unlike economic harm, the harm resulting from expulsion from the United States pursuant to an unlawful policy likely cannot be remediated after the fact." (citation omitted)). Accordingly, Petitioners have met their irreparable harm burden.

### D.  Balanced Equities and Public Interest

According to Respondents, the merged "balancing-the-equities" and "public interest" factors favor the government—and therefore do not favor granting Petitioners' TRO request—because a TRO is "unnecessary" to protect Petitioners, but conversely would "impede the government's ability to enforce the immigration laws and to arrest, detain, and remove unlawfully present aliens who may pose a danger to the public." ECF No. 26 at 16. Petitioners contend these factors favor them because, *inter alia*, the public has a strong interest in preventing wrongful removals, and moreover any TRO does not prohibit Respondents from prosecuting or removing individuals under the INA. ECF No. 2 at 22. The Court agrees with Petitioners.

Absent a TRO, Petitioners face the risk of being deported—perhaps *wrongfully* deported—under the Act and Proclamation in violation of their constitutional rights. Again:

How Petitioners are currently classified does not eliminate this risk, when that classification—and the legal framework under which they may be removed—can change at any time. Conversely, Respondents are not prohibited, should a TRO issue, from proceeding to deport and remove individuals under the INA *at all. J.G.G.*, 2025 WL 914682, at *30 ("The Executive remains free to take TdA members off the streets and keep them in detention. The Executive can also deport alleged members of TdA under the INA . . .") (Millett, J., concurring). Nor would a TRO in this particular case "irreparably harm the United States' conduct of foreign policy." *Cf.* ECF No. 26 at 16; *J.G.G.*, 2025 WL 890401, at *17; *J.G.G.*, 2025 WL 914682, at *21 ("A TRO directing military deployments or maneuvers certainly would raise profound separation of powers questions warranting the most careful consideration and remediation. But nothing remotely like that happened here.") (Millett, J., concurring).

Practically speaking, a TRO would inflict little more on Respondents than ensure they adhere to the requirement the Supreme Court has already imposed on them: give Petitioners and putative class members adequate notice, with adequate time, to adequately pursue habeas relief. *See J. G. G.*, 2025 WL 1024097, at *2 (per curiam). Ensuring compliance with a pre-existing requirement imposed by the Supreme Court and Constitution, without limiting any powers under an entirely different statutory regime that permits deportations and removals, does not rise to a level of "harm" that outbalances the harm Petitioners face absent the issuance of a TRO in this case at this stage. *See Fish*, 840 F.3d at 755 ("There is no contest between the mass denial of a fundamental constitutional right and the modest administrative burdens to be borne by [government

officials].”). Especially where the countervailing harm Petitioners and the putative class face is violation of their constitutional rights and potentially wrongful removal. *See, e.g., Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) (“[I]t is always in the public interest to prevent the violation of a party's constitutional rights.” (quotation omitted)); *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 734 (D.C. Cir. 2022) (“[T]he Supreme Court has said that the public has a strong interest in 'preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm.'”) (quoting *Nken v. Holder*, 556 U.S. 418, 436 (2009)).

\* \* \*

The Court is mindful of the differing roles played by three coordinate branches of government. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd*., 561 U.S. 477, 483 (2010) (“Our Constitution divided the powers of the new Federal Government into three defined categories, Legislative, Executive, and Judicial.” (quotations omitted)). And Respondents are right: the President has certain powers regarding, for example, foreign policy. *See, e.g., Ludecke*, 335 U.S. at 173 (“The Founders in their wisdom made him not only the Commander-in-Chief but also the guiding organ in the conduct of our foreign affairs.”). But, exercising its judicial power, *see* U.S. CONST. Art. III, § 1, in this case the Court must ask whether the exercise of those powers comports with the words chosen by Congress in a centuries-old statute and those ratified in our Constitution. *See also Marbury v. Madison*, 5 U.S. 137, 177 (1803).

Based on the record and parties' arguments, that inquiry yields one answer: Petitioners have met their burden of showing preliminary injunctive relief, in the form of a

temporary restraining order, is proper. As such, consistent with Federal Rule of Civil

Procedure 65, the Court ORDERS the following:

- Respondents shall not move Petitioners and members of the provisionally certified class outside the District of Colorado. Respondents shall provide a twenty-one (21) day notice to Petitioners and members of the provisionally certified class detained pursuant to the Act and Proclamation. Such notice must state the government intends to remove individuals pursuant to the Act and Proclamation. It must also provide notice of a right to seek judicial review, and inform individuals they may consult an attorney regarding their detainment and the government's intent to remove them. Such notice must be written in a language the individual understands. Such notice must be provided to Petitioners and the provisionally certified class they seek to represent, namely: "All noncitizens in custody in the District of Colorado who were, are, or will be subject to the March 2025 Presidential Proclamation entitled Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua and/or its implementation."

- Petitioners, should they choose to do so, shall file a preliminary injunction motion within three days of this Order, by April 25, 2025. Respondents shall file a response to any preliminary injunction motion Petitioners may file by April 30, 2025. Any reply shall be due by May 2, 2025. In their preliminary injunction briefing, the parties are invited to brief the adequacy or burdensomeness of the Court's notice requirement, detailed above. The Court may or may not in its discretion and after considering those arguments, should the parties choose to advance them, revise such notice requirement, at the preliminary injunction stage. *See, e.g., Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1030 (9th Cir. 1985).

- Because this Court's prior order was issued pursuant to the Court's authority under the All Writs Act, *see* ECF No. 10, and the Court's instant Order is issued under Rule 65, the terms of this TRO expire on May 6, 2025. The Court may, in its discretion or at the urging of the parties, extend the terms of this TRO by good cause shown.

- Respondents shall file a response to Petitioners' class certification motion by April 28, 2025. Any reply shall be due by May 2, 2025. Following completion of the parties' class certification briefing, the Court will rule on whether Petitioners have shown that the class's provision certification is proper and thus certification is appropriate under Rule 23, or whether—as Respondents indicated at oral argument—class treatment of Petitioners' claims is improper.

- Petitioners are not ordered at this time to issue a security or bond, as determined by the Court in the exercise of its discretion.

- Given Petitioners "do not seek to enjoin the President," the terms of this TRO do not apply to him. *See* ECF No. 2 at 4 n.2 (citation omitted).

## IV.    CONCLUSION

Consistent with the above analysis, Plaintiffs-Petitioners' Emergency Motion for Temporary Restraining Order is GRANTED. ECF No. 2.


DATED this 22nd day of April 2025.

BY THE COURT:

Charlotte N. Sweeney
United States District Judge