# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF COLORADO

Civil Action No. 25-cv-1163-CNS

D.B.U. *et al.*,

      Petitioners-Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

      Respondents-Defendants.

---

## PETITIONERS-PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

## INTRODUCTION

This Court has already correctly held that the Proclamation is unlawful because the Alien Enemies Act ("AEA") is a wartime measure that cannot be used where, as here, there is neither an "invasion or predatory incursion" nor such an act perpetrated by a "foreign nation or government." ECF No. 35 ("Op.") 22-26. And even if it could be used against a non-military criminal "gang" during peacetime, targeted individuals must be provided with a meaningful chance to contest that they fall within the Proclamation's scope. *Id.* Recent developments further confirm this Court's ruling and highlight the stark dangers that Petitioners and class members face.

Specifically, the government recently made clear that its position is now that someone could be designated under the AEA and removed as soon as *12 hours* after the designation. *See* ECF No. 44, Exh. A ¶ 11. Moreover, not only has the government now stated that a mere 12 hours is the required notice, but it has continued to use the Notice form previously addressed by this Court that is written only in English and does not tell someone that they can contest their designation, much less tell them how to do so or even that they only have 12 hours to do so. *Id.* at 6 (Form AEA-21B); Op. 27-29. There is no conceivable way that such a process complies with what the Supreme Court has held is required: notice "within a reasonable time and in such a manner as will allow them to *actually* seek habeas relief." *Trump v. J.G.G.*, No. 24A931, 604 U.S. ----, 2025 WL 1024097, at *2 (U.S. Apr. 7, 2025) (per curiam) (emphasis added).

Also notable is the memo issued by the Attorney General from March 14, which became public after the TRO Opinion. In that memo, the Department of Justice ("DOJ") made clear its view of the unprecedented power to swiftly arrest and remove anyone it

deems an alien enemy. *See* Guidance for Implementing the Alien Enemies Act (Mar. 14, 2025).[1] As the memo states, once officers apprehend someone and designate them an alien enemy, the Attorney General has directed that "officers should commence arrangements to promptly remove" them. *Id.* at 4. And the detained person may be held in "any location deemed suitable" by DOJ or the Department of Homeland Security ("DHS"): class members could be in federal, state, or local custody, or in privately run detention facilities. *See id.* at 4 ("Step 6: Detention"). This means class members held in a range of detention facilities could be designated and whisked away within 12 hours, without any realistic chance to be heard in a court of law.[2]

For these and other reasons, Petitioners–Plaintiffs ("Petitioners") are likely to succeed on the merits. And the remaining factors also tip decidedly in Petitioners' favor. Without an injunction, the government will be free to send hundreds more individuals, including Petitioners and class members, to the notorious Salvadoran prison where they may be held incommunicado for the rest of their lives. The harm is only magnified by the government's position that mistakes cannot be remedied, and once an individual is in a foreign prison, they are stuck there. The government will suffer no comparable harm given that the injunction would not prevent it from prosecuting anyone who commits a criminal offense, detaining anyone, or even removing anyone under immigration laws.

## LEGAL AND FACTUAL BACKGROUND

On March 14, purporting to invoke the AEA, 50 U.S.C. §§ 21-24, the President signed a Proclamation announcing that Tren de Aragua ("TdA"), a Venezuelan gang, is

---

[1] https://perma.cc/N34A-Z45L.
[2] Remarkably, the memorandum also authorizes officers to enter the home of a suspected TdA member without even an administrative warrant, much less the required judicial warrant to enter a home.

"perpetrating, attempting, and threatening an invasion or predatory incursion" against the United States. *See* Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua (Mar. 15, 2025)("Proclamation").[3] Since that time, Respondents-Defendants ("Respondents") have used the AEA to summarily remove well over 100 people—many with pending removal proceedings—to El Salvador, where they potentially face lifetime incommunicado sentences in one of the most notorious prisons in the world. Exh. D, (Bishop Decl.) ¶ ¶ 21, 23, 25, 30; Exh. E (Goebertus Decl.) ¶ ¶ 3, 4. Many of those people were detained at ICE's Denver Contract Detention Facility ("Denver Facility") in Aurora before being transferred to Texas and summarily removed to El Salvador. ECF 31-2 (Sherman Decl.) ¶ 2; Exh. I (Sherman Decl.) ¶ 5. The government has engaged in and continues to engage in large-scale enforcement actions that it describes as targeting TdA in the District, and noncitizens from Venezuela who are or may be detained in Colorado are among those at imminent risk of wrongful designation, deportation, and disappearance under the Proclamation. *Id.*; Exh. J, (Hollithorn Decl.) ¶¶ 7-9;[4] Exh. I (Sherman Decl.) ¶ ¶ 1-2.

The Supreme Court has made clear that individuals "must receive notice" "that they are subject to removal under the Act," and such "notice must be afforded within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs." *J.G.G.*, 2025 WL 1024097, at *2. Respondents maintain that they can comply with this ruling by providing a notice written in English to designated individuals **only 12 hours** ahead of their scheduled removal and

---

[3] https://perma.cc/ZS8M-ZQHJ.
[4] The Court is familiar with additional background facts about AEA cases from the TRO filings, ECF Nos. 2, 31, and Petitioners incorporate that factual background here by reference.

allowing those who affirmatively indicate an intent to file habeas petitions 24 hours to do so. *See* ECF No. 44, Cisneros Decl. ¶ 11. The notice form does not inform the individual of any right to contest their designation, let alone what they must do to contest it. *See* ECF No. 44-1.

Without a meaningful opportunity to contest their designation under the AEA, Petitioners and the members of the provisionally certified class are at grave risk of erroneous removal. The named Petitioners vehemently contest their membership in TdA, as do others at the Denver Facility who have been labeled as TdA members by the government. ECF No. 2-1 (Barber Decl.) ¶ 6; ECF No. 2-2 (Hightower Decl.) ¶ 9; Exh. J (Hollithorn Decl.) ¶ 3. And evidence since the March 15 flights increasingly shows that many individuals previously removed under the AEA have no ties to TdA at all. In one instance, a professional makeup artist was designated solely on the basis of two crown tattoos, which accompany the words "Mom" and "Dad." *See* Exh. F (Reyes Decl.) ¶¶ 4-7, 21-23. A professional soccer player was sent to the Salvadoran prison based on a tattoo of a soccer ball with a crown—similar to the logo of his favorite soccer team, Real Madrid—and a social media post where he made a gesture that means "I love you" in sign language. Exh. G (Tobin Decl.) ¶ 7. And another man who was removed had a tattoo of the autism awareness ribbon with the name of his brother, who is autistic, on it. Exh. H (Sarabia Roman Decl.), at Exh. 10. And in habeas corpus proceedings in the Western District of Texas, a couple was detained and designated as alien enemies *for the second time*, despite the government having what amounted to "no evidence" of membership in TdA. *See Sanchez Puente v. Garite*, No. 3:25-cv-127-DB (W.D. Tex. April 25, 2025), ECF No. 27 at 32-33 (holding that TdA accusations were "completely and wholly

unsubstantiated by anything meaningful in the record" and ordering release).

These errors are unsurprising given that Respondents are relying on dubious evidence—if any evidence at all—to support their allegations. Respondents often point to an individual's tattoos as evidence of TdA membership. Exh. A (Hanson Decl.) ¶ 24. But experts who have spent decades studying TdA explain that the gang "has never had . . . identity marks such as tattoos that identify its members."  Exh. B (Antillano Decl.) ¶ 14; Exh. A (Hanson Decl.) ¶¶ 22, 24 ("Tattoos are not a reliable way to identify members of the group."); Exh. C (Dudley Decl.) ¶ 25 (tattoos are not a "reliable means" of identifying TdA).[5] Other characteristics that the government relies upon are equally likely to sweep in a broad swath of individuals with no substantial connection to TdA. *See generally* Exh. H (Sarabia Roman Decl.), at Exh. 1; *see also Sanchez-Puente*, No. 3:25-cv-127-DB (W.D. Tex. April 25, 2025), ECF No. 27 at 30, 32 (finding "shoddy affidavits and contradictory testimony" offered by the government for TdA designation that amounted to "no evidence.")

If Petitioners are illegally sent to a foreign country, the government will argue, as it already has, that this Court no longer has jurisdiction to remedy their unlawful use of the AEA. Indeed, Respondents have taken that precise position in *Abrego Garcia v. Noem*,

_____

[5] Documents from the government demonstrate the problems with using tattoos and dress as an identifier for TdA. For example, the Chicago Homeland Security Investigations office identified wearing a Chicago Bulls jersey, specifically a Michael Jordan jersey, as a TdA marker—never mind that the Bulls are the home team in Chicago and Michael Jordan remains one of Chicago's biggest stars. Exh. H (Sarabia Roman Decl.), at Exh. 2; *see also id.* at Exh. 13 ("The idea that a Jordan tattoo or jersey would be used to link someone with Tren de Aragua is close to laughable."); Exh. A (Hanson Decl.) ¶ 24 (same). In fact, the government's own intelligence is internally contradictory. *See, e.g.*, Exh. H (Sarabia Roman Decl.), at Exh. 3 ("EPT-HUMINT-Gang Unit collections determined that the Chicago Bulls attire, clocks, and rose tattoos are typically related to the Venezuelan culture and not a definite indicator of being a member or associate of the TDA.").

a case brought by a Maryland father who was, as the government has admitted, mistakenly deported to El Salvador despite having withholding of removal as to that country. *Abrego Garcia v. Noem*, No. 25-1404, 2025 WL 1135112, at *2 (4th Cir. Apr. 17, 2025) ("both the United States and the El Salvadoran governments disclaim any authority and/or responsibility to return" noncitizens wrongly deported). The same fate awaits this class absent a preliminary injunction.

Even if sent back to Venezuela, Petitioners have strong claims for relief under our immigration laws. For example, R.M.M. is afraid to return to Venezuela, which he fled because the TdA gang murdered his wife's father and uncle, and he fears that TdA will also murder him and his wife or children. ECF No. 2-2 (Hightower Decl.) ¶ 4. R.M.M. protested against the Maduro regime and has been harmed by groups aligned with the regime. D.B.U., too, has been physically attacked based on his protests against the Venezuelan government. ECF No. 2-1 (Barber Decl.) ¶ 3. Both seek asylum, withholding of removal, and protection under the Convention Against Torture based on their fear of persecution and torture if returned to Venezuela. ECF No. 2-1 (Barber Decl.) ¶ 5; ECF No. 2-2 (Hightower Decl.) ¶¶ 8-9.  The same is true of members of the provisionally certified class.  Exh. J (Hollithorn Decl.) ¶ 3.  The conditions Petitioners and members of the class would face in El Salvador are horrific. *See* Exh. D (Bishop Decl.); Exh E (Goebertus Decl.).

Finally, experts who have spent over a decade studying policing, violence, migration, prisons, and organized crime in Venezuela—and TdA in particular—submit declarations with this motion that provide a more accurate, comprehensive picture of TdA and its activities. TdA is a loose, decentralized group without a clear hierarchy or

membership. Exh. A (Hanson Decl.) ¶¶ 1, 27; Exh. B (Antillano Decl.) ¶ 10. TdA does not act as the de facto government in any region of Venezuela. Exh. A (Hanson Decl.) ¶¶ 13-16. Nor is there evidence of direct and stable links between the Maduro regime and TdA or that the gang is intertwined with the Maduro regime. Exh. A (Hanson Decl.) ¶¶ 1, 14, 17; Exh. B (Antillano Decl.) ¶ 13; Exh. C (Dudley Decl.) ¶¶ 2, 21, 23. Experts have also explained that TdA does not have a significant presence in the United States and that its activities here are not widespread or coordinated. Exh. A (Hanson Decl.) ¶¶ 19, 27; Exh. B (Antillano Decl.) ¶ 12; Exh. C (Dudley Decl.) ¶¶ 2, 24. There is no evidence to indicate that the Venezuelan government has directed TdA to enter the United States or that it controls TdA's activities within the United States. Exh. A (Hanson Decl.) ¶¶ 17, 20; Exh. B (Antillano Decl.) ¶13; Exh. C (Dudley Decl.) ¶¶ 2, 23-24. In fact, the government's own intelligence agencies circulated findings in February 2025 that contradict the assertions in the Proclamation. Exh. H (Sarabia Roman Decl.), at Exh. 12 (intelligence community assessment concluded that TdA "was not directed by Venezuela's government or committing crimes in the United States on its orders").

## LEGAL STANDARD

To obtain a preliminary injunction to preserve the status quo, as Petitioners seek, they "need[] to prove four things: (1) that [they are] substantially likely to succeed on the merits, (2) that [they will] 'suffer irreparable injury' if the court denies the injunction, (3) that [their] threatened injury (without the injunction) outweighs the opposing party's under the injunction, and (4) that the injunction isn't adverse to the public interest." *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (quoting *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070

(10th Cir. 2009)) (cleaned up).

## ARGUMENT

The Proclamation is unlawful for a host of substantive and procedural reasons. The Alien Enemies Act can only be used during military hostilities, against a foreign government or nation. Neither of those conditions is met here. And even if the Act could be used against a criminal gang during peacetime, Defendants' attempt to summarily remove people violates due process and the AEA itself, which both require notice and a meaningful opportunity to contest one's designation as an alien enemy. Defendants also may not remove people without following the INA's procedural requirements and obeying the INA's bar against removal to countries where a person faces persecution or torture. These claims are all justiciable, as the Supreme Court recognized.

## I.    Petitioners Have Standing and This Court Has Jurisdiction.

As this Court found in its April 23, 2025 Order (ECF 35), Petitioners have standing because they are at substantial risk of imminent removal.[6] *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 109–11 (10th Cir. 2024) ("[W]ith respect to an imminent . . . injury, a plaintiff need not wait for the harm to occur to satisfy the injury-in-fact requirement."); *cf. Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 902 (10th Cir. 2012) ("[T]he existence of a statute implies the threat of its enforcement."). Respondents have wrongly accused each of the Petitioners of membership in or association with TdA. ECF No. 2-2, ¶ 9 (Hightower Decl.); ECF No. 2-1, ¶ 6 (Barber Decl.); *see also Colo. Union of Taxpayers v. Griswold*, No. 22-1122, 2023 WL 5426581, at *4 (10th Cir. Aur. 23, 2023) (risk of enforcement "is

_____

[6] Petitioners explained in their TRO Reply that the Court properly has jurisdiction to hear their habeas cases. ECF No. 31 at 5; Op. 12-14 (so holding).

heightened" where enforcement authority is "diffuse or arbitrary"). That places Petitioners at substantial risk of removal. ECF No. 35 at 13. And at the April 21 TRO hearing, Respondents admitted they would seek to remove individuals within 24 hours of providing notice absent the person's affirmative indication of an intent to file a petition in habeas. *See* TRO Hr'g Tr. 29. Although it did not inform this Court at the April 21 hearing, it has now been revealed that the government claims that it can remove people with only 12 hours of notice.  ECF No. 44, Exh. A ¶ 11.

Moreover, Respondents have repeatedly refused to disavow an intention to invoke the AEA both against the class members and against Petitioners.  Op. 13-15. *Rocky Mountain*, 121 F.4th at 110–11 (concluding imminent injury element was satisfied where government defendant "ha[d] not disavowed any intention of invoking" the challenged law against the plaintiff); *United States v. Supreme Ct. of N.M.*, 839 F.3d 888, 901 (10th Cir. 2016) (same). And Respondents have already removed a number of similarly situated individuals from Colorado to CECOT, via Texas. (Sherman Decl. ¶ 5); *see also Bronson v. Swensen*, 500 F.3d 1099, 1108 (10th Cir. 2007) ("Past prosecution patterns matter, especially when they support the likelihood of future applications."); *see also Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003) (credible threats of future prosecution sufficient to establish standing, even absent past prosecution).[7]

The existing risk of AEA designation, near immediate and potentially irrevocable

_____

[7] Underscoring the dangers faced by anyone previously accused of being a TdA member, a couple whom the government had represented "it would not detain based on the present circumstances," after previously accusing them of TdA membership and status as alien enemies, was rearrested under the AEA. *See Sanchez-Puente*, 25-cv-127-DB (W.D. Tex., April 25, 2025), ECF No. 27 at 9, 30 (holding that the government "has no evidence" to substantiate TdA allegations); *see also id.* at 36 (noting "the Executive's unpredictable and inconsistent use of this [AEA] power").

removal, and indefinite incarceration in a foreign prison is sufficient to establish standing.

## II.    Petitioners' Claims Are Justiciable.

As this Court correctly concluded in its TRO opinion, the Court can resolve all of Petitioners' claims in this case. Op. 16-18. As the Supreme Court recently confirmed, courts can review not only whether an individual "'is, in fact, an alien enemy'" under the AEA, but also "'questions of interpretation and constitutionality' of the Act." *J.G.G.*, 2025 WL 1024097, at *2 (quoting *Ludecke v. Watkins*, 335 U.S. 160, 163, 172 n.17 (1948)). Thus, Petitioners' claims that the AEA's statutory predicates have not been met— because TdA is not a "nation or government," and is not engaged in an "invasion or predatory incursion"—are fully within this Court's jurisdiction.[8]

*Ludecke* itself reached the merits of the statutory question presented there: whether a "declared war" no longer existed within the meaning of the Act when "actual hostilities" had ceased—*i.e.*, the "shooting war" had ended. 335 U.S. at 166–70; *see also* Op. 17. The Supreme Court concluded, on the merits, that the statutory term "declared war" did not mean "actual hostilities," and that once Congress declares war, the war continues for purposes of the AEA until the political branches declare it over. *Id.* at 170 & n.15. The "political judgment" that *Ludecke* declined to revisit, *id.* at 170, was simply the decision of Congress and the President not to formally declare the war over, *id.* at 169. Nowhere did *Ludecke* suggest that questions of statutory interpretation are beyond the courts' competence. Indeed, four years later, the Court reversed a government World War II removal decision because "[t]he statutory power of the Attorney General to remove

---

[8] The Supreme Court also held that noncitizens subject to the AEA must receive certain procedural protections. *J.G.G.*, 2025 WL 1024097, at *1–2 (addressing plaintiffs' "due process rights"). Petitioners' procedural claims are therefore all justiciable, and the government does not appear to argue otherwise.

petitioner as an enemy alien ended when Congress terminated the war." *U.S. ex rel. Jaegeler v. Carusi*, 342 U.S. 347, 348 (1952).

Consistent with *Ludecke*'s recognition (twice in the opinion) that questions about the "construction," "interpretation," and "validity" of the AEA are justiciable, 335 U.S. at 163, 171, courts have reviewed a range of issues concerning the meaning and application of the AEA's terms. *See, e.g.*, *U.S. ex rel. Kessler v. Watkins*, 163 F.2d 140, 143 (2d Cir. 1947) (interpreting the meaning of "foreign nation or government"); *U.S. ex rel. Zdunic v. Uhl*, 137 F.2d 858, 860–61 (2d Cir. 1943) ("[t]he meaning of [native, citizen, denizen, or subject] as used in the statute . . . presents a question of law"; interpreting meaning of "denizen" and remanding for hearing on disputed facts); *U.S. ex rel. Gregoire v. Watkins*, 164 F.2d 137, 138 (2d Cir. 1947)(interpreting the meaning of "native"; discussing alternatives to attain a "logically consistent construction of the statute"); *U.S. ex rel. D'Esquiva v. Uhl*, 137 F.2d 903, 905–07 (2d Cir. 1943) (interpreting the meaning of "native" and reviewing executive branch's position on legal status of Austria); *U.S. ex rel. Schwarzkopf v. Uhl*, 137 F.2d 898, 903 (2d Cir. 1943) (interpreting the meaning of "citizen" and legal effects of Germany's annexation of Austria); *Bauer v. Watkins*, 171 F.2d 492, 493 (2d Cir. 1948) (holding that the government bears the burden of proof of establishing the citizenship of "alien enemy"); *Citizens Protective League v. Clark*, 155 F.2d 290, 292, 295 (D.C. Cir. 1946) (reviewing whether Proclamation was within "the precise terms" of the AEA, and whether AEA was impliedly repealed); *U.S. ex rel. Von Heymann v. Watkins*, 159 F.2d 650, 653 (2d Cir. 1947) (interpreting "within the United States"; requiring executive branch to show that the petitioner "refuse[d] or neglect[ed] to depart" under Section 21); *U.S. ex rel. Ludwig v. Watkins*, 164 F.2d 456, 457 (2d Cir. 1947)

(interpreting "refuse or neglect to depart" in Section 21 as creating a "right of voluntary departure" that functions as a "statutory condition precedent" to the government's right to deport enemy aliens); *U.S. ex rel. Hoehn v. Shaughnessy*, 175 F.2d 116, 117–18 (2d Cir. 1949) (interpreting "reasonable time" to depart under Section 22). These kinds of questions—concerning the "construction" and "interpretation" of the AEA, *Ludecke*, 335 U.S. at 163, 171—are squarely at issue here.

Nor does the "political question" doctrine pose any barrier to this Court interpreting the statutory terms of the AEA. The Supreme Court foreclosed that possibility in *J.G.G.* and *Ludecke*, by instructing courts to resolve questions of the AEA's "construction and validity" and "interpretation and constitutionality." *Ludecke*, 335 U.S. at 163, 171; *J.G.G.*, 2025 WL 1024097, at *2; *see also, e.g.*, *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *6–8 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring) (rejecting government's political-question arguments).

More generally, the political question doctrine is a "narrow exception" to courts' jurisdiction, *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012), and exists primarily to reinforce the separation of powers, *Baker v. Carr*, 369 U.S. 186, 210 (1962). But applying the doctrine here would undermine Congress's constitutional authority, because it would render the limits that Congress wrote into the statute unenforceable. Petitioners are not aware of any Supreme Court decision that has found a statutory claim non-justiciable. *See El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 855–56 (D.C. Cir. 2010) (en banc) (Kavanaugh, J., concurring) ("The Supreme Court has never applied the political question doctrine in a case involving alleged *statutory* violations."). Here, judicial review of Petitioners' challenge *preserves* the separation of powers by

ensuring that the President does not exceed the specific authority Congress delegated in the AEA. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637–38 (Jackson, J., concurring). Indeed, the AEA states that the President has the power to detain and remove alien enemies when there "is" a declared war or where there "is" an invasion or predatory incursion, thereby making clear that the President cannot simply *find* or *deem* there to be a war, invasion, or incursion. *Compare* 8 U.S.C. § 1182(f) (allowing the President to suspend entry of noncitizens into the country where *he* "finds" it not in the "interests of the United States").[9]

### III.    Petitioners Are Likely to Succeed on the Merits.

### A.    The Proclamation Violates the AEA and the Constitution.

The Proclamation is unprecedented, violating the AEA and the Constitution in three critical respects: there is no meaningful notice or process to contest whether an individual falls within the Proclamation; there is no invasion or predatory incursion; and there is no foreign government or nation within the meaning of the statute. When the government asserts "an unheralded power" in a "long-extant statute," courts "greet its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). That skepticism is well warranted here.

### 1.    Summary Removals Without Notice and a Meaningful Opportunity to Challenge "Alien Enemy" Designations Violate the AEA and Due Process.

As the Supreme Court has now made clear, both the AEA and Due Process require

---

[9] Petitioners do not seek to enjoin the President, but he remains a proper defendant because Petitioners may obtain declaratory relief against him. *See, e.g.*, *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) (concluding that court had jurisdiction to issue writ of mandamus against the President but "opt[ing] instead" to issue declaration). The Court's TRO expressly did not enjoin the President. Op. 35.

Respondents to provide Petitioners with notice and a meaningful opportunity to challenge their designation as alien enemies before removal is permissible under the Proclamation. *See J.G.G.*, 2025 WL 1024097, at *3 ("The notice must be afforded within a reasonable time and in such a manner as will allow [AEA detainees] to actually seek habeas relief in the proper venue before such removal occurs."); *see also J.G.G.*, 2025 WL 914682, at *14–15 (Millett, J., concurring) ("At its most basic, due process requires notice of adverse governmental action, an opportunity to be heard, and the right to an unbiased decisionmaker.").

Respondents just recently revealed what notice they believe is necessary under the Supreme Court's order—they claim the right to remove people within 12 hours if they do not affirmatively state an intent to file a writ of habeas corpus and within 24 hours even if they do, if they have not been able to file such writ within that time. ECF No. 44, Exh. A ¶ 11-12. That is patently insufficient. As during World War II, assuming arguendo the government can use the AEA, Defendants must provide notice to individuals at least 30 days before any attempt to remove them under the AEA. 10 Fed. Reg. 12,189 (Sept. 28, 1945). As this Court found in its TRO Order, notice must also be provided in writing in a language that the individual understands and must state that they may seek judicial review. Op. 34. It should also simultaneously be provided to undersigned class counsel. The notice should additionally include the factual basis for the individual's alien enemy designation. *See Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014) ("Both the Supreme Court and this Court have recognized that the right to know the factual basis for [government] action and the opportunity to rebut the evidence supporting that action are essential components of due process."). Especially given the

possibility that Defendants may seek to remove individuals with as little as 12 hours' notice, a preliminary injunction is warranted to ensure that Defendants do not remove individuals before they receive *adequate* notice and a *reasonable* opportunity to "actually" obtain judicial review, consistent with due process. *J.G.G.*, 2025 WL 102409, at *2 ("'It is well established that the Fifth Amendment entitles [noncitizens] to due process of law' in the context of removal proceedings.").

The notice requirement flows not only from due process but from the AEA itself. That is clear from the Supreme Court's understanding of the AEA in *Ludecke*, which recognized that individuals would have the opportunity to seek court review of their designation under the Act. *See, e.g.*, 335 U.S. at 171 n.17. And it is clear from the statute, which affords individuals designated as alien enemies an opportunity to voluntarily depart the United States and to settle their affairs. *See* 50 U.S.C. §§ 21–22. Among other things, the President may lawfully remove noncitizens under the AEA only when those designated noncitizens "refuse or neglect to depart" voluntarily. *See J.G.G.*, 2025 WL 89040130, at *14 (citing 50 U.S.C. § 21). Indeed, even during World War II, courts interpreting the AEA consistently recognized that "alien enemies" retained the right to voluntary departure. *See U.S. ex rel. Ludwig*, 164 F.2d at 457 (Section 21 establishes a "right of voluntary departure"); *U.S. ex rel. Von Heymann v. Watkins*, 159 F.2d 650, 653 (2d Cir. 1947); *United States ex rel. Dorfler v. Watkins*, 171 F.2d 431, 432 (2d Cir. 1948) ("An alien must be afforded the privilege of voluntary departure before the Attorney General can lawfully remove him against his will."). Under Section 21, there is no exception to the general right of voluntary departure; it is a "statutory condition precedent" to removal. *U.S. ex rel. Ludwig*, 164 F.2d at 457. Section 22 establishes separate rights

concerning the particular conditions for departure, with an exception for those "chargeable with actual hostility, or other crime against public safety." 50 U.S.C. § 22. However, that exception cannot be invoked categorically. It instead requires individualized assessments: each noncitizen must specifically be "chargeable" to lose eligibility for the rights described in Section 22. Defendants have made no such individualized assessments here—much less provided any opportunity to contest such findings.

### 2. The Proclamation Does Not Fall within the Statutory Bounds of the AEA.

The AEA has only ever been invoked in times of declared war: the War of 1812, World War I, and World War II. The government seeks to invoke this limited wartime authority to execute removals wholly untethered to any actual or imminent war or to the specific conditions Congress placed in the statute.

*First*, as both this Court and Judge Henderson explained, Op. 22-24; *J.G.G.*, 2025 WL 914682, at *8-10, there is no "invasion" or "predatory incursion" upon the United States. Starting with contemporaneous dictionary definitions, as this Court and Judge Henderson did, it is clear that Congress understood those terms to mean a military intrusion into the territory of the United States. *See Bartenwerfer v. Buckley*, 598 U.S. 69, 74 (2023) ("We start where we always do: with the text of the statute."); *see also* Webster's Dictionary, Invasion (1828) (underscoring that "invasion" is "particularly, the entrance of a hostile army into a country for purpose of conquest or plunder, or the attack of a military force"); Johnson's Dictionary, *Invasion* (1773) ("invasion" is a "[h]ostile entrance upon the right or possession of another; hostile encroachment" such as when "William the Conqueror invaded England"); Webster's Dictionary, *Predatory* (1828) ("predatory" underscores that the purpose of a military party's "incursion" was "plundering"

or "pillaging"); Johnson's Dictionary, *Incursion* (1773) ("[a]ttack" or "[i]nvasion without conquest"). *See* Op. 23 ("These words, fundamentally, demand military and wartime action.")

Other contemporary founding era usages of the terms are in accord. The Founders frequently used both "invasion" and "predatory incursion" in the military sense. *See, e.g.*, Letter from Timothy Pickering to Alexander Hamilton (June 9, 1798) (reporting that "predatory incursions of the French" might result in "great destruction of property" but that militia could repel them);[10] Letter from George Washington to Thomas Jefferson (Feb. 6, 1781) (describing a British raid that destroyed military supplies and infrastructure in Richmond as a "predatory incursion");[11] Letter from George Washington to Nathanael Greene (Jan. 29, 1783) ("predatory incursions" by the British could be managed with limited cavalry troops);[12] John Jay, Con't Cong., Draft of an Address of the Convention of the Representatives of the State of New York to Their Constituents (Dec. 23, 1776) (describing the goal of British invasion as "the conquest of America").[13]  Courts did the same. *Huidekoper's Lessee v. Douglass*, 7 U.S. (3 Cranch) 1, 11 (1805) ("predatory incursions" by Native American nation led to "an Indian war"); *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 10 (1831) ("incursions" by Native American nations led to retaliatory "war of extermination"); *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 545 (1832) (explaining that Pennsylvania's royal charter included "the power of war" to repel "incursions" by "barbarous nations").  And "*in every instance*" that the term "invasion" or "invade" appears in the Constitution, it "is used in the military sense." *J.G.G.*, 2025 WL

---

[10] https://perma.cc/H2UY-XTTK.

[11] https://perma.cc/6UBY-6PRB.

[12] https://perma.cc/TY8Y-MTMA.

[13] https://perma.cc/K4SX-4KYB.

914682, at *20 (Henderson, J., concurring).

The interpretive canon of *noscitur a sociis* confirms Petitioners' interpretation. That canon "avoid[s] ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." *Yates v. United States*, 574 U.S. 528, 543 (2015) (internal quotation marks omitted). Courts thus look to "[t]he words immediately surrounding" the language to be interpreted to ascertain the "more precise content" of that language. *Id.* (internal quotation marks omitted). Accordingly, in this case, "invasion" and "predatory incursion" should be read in light of the immediately neighboring term, "declared war." *See Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961). Doing so highlights the express military nature of their usage here—they are more specific than just any hostile entrance. *Cf.* Office of Legislative Affairs, Proposed Amendment to AEA, at 2 n.1 (Aug. 27, 1980)) (AEA contemplates use by the President only "in situations where war is imminent"). This also comports with the common law understanding of the term "alien enemy" as subject of a foreign state at war with the United States. *See Johnson v. Eisentrager*, 339 U.S. 763, 769 n.2 (1950) (collecting cases).

Indeed, the same Congress that passed the AEA also passed another law with strikingly similar statutory bounds. In response to concerns about impending war with France, the 1798 Congress authorized the President to raise troops "in the event of a declaration of war against the United States, or of an actual invasion of their territory, by a foreign power, or of imminent danger of such invasion." Act of May 28, 1798, ch. 47, 1 Stat. 558. This language, which, as Judge Henderson noted, "bears more than a passing resemblance to the language of the AEA," *J.G.G.*, 2025 WL 914682, at *9, makes plain

that Congress was concerned about military incursions by the armed forces of a foreign nation.

Tellingly, the AEA requires that the predicate invasion or predatory incursion be "against the territory of the United States." 50 U.S.C. § 21. And at the time of founding, actions "against the territory of the United States" were expressly understood to be military in nature. *See Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 131 (1807) (describing levying war against the United States as "a military enterprize [sic] . . . against any of the territories of the United States"); *Wiborg v. United States*, 163 U.S. 632, 633 (1896) (explaining that a group of seamen were charged with preparing for a "military expedition . . . against the territory and dominions of a foreign prince").

If any doubt were left about the military nature of the terms, the historical context dispels it. Op. 25; *see Truck Ins. Exch. v. Kaiser Gypsum Co., Inc.*, 602 U.S. 268, 279 (2024) (considering the "historical context" of statute for purposes of interpretation). At the time of passage, the United States was preparing for possible war with France and already under attack in naval skirmishes. French ships were attacking U.S. merchant ships in United States waters. *See, e.g.*, 7 Annals of Cong. 58 (May 1797) (promoting creation of a Navy to "diminish the probability of . . . predatory incursions" by France while recognizing that distance from Europe lessened the chance of "invasion"). Congress worried that these attacks against the territory of the United States were the precursor to all-out war with France. *J.G.G.*, 2025 WL 914682, at *1 (Henderson, J., concurring) ("In 1798, our fledgling Republic was consumed with fear . . . of external war with France."). This "predatory violence" by a sovereign nation led, in part, to the AEA. *See Act of July 7, 1798, ch. 67, 1 Stat. 578, 578 ("[W]hereas, under authority of the French government,

there is yet pursued against the United States, a system of predatory violence").

Under the statutory text, canons of construction, and historical context, then, "invasion" or "predatory incursion" are military actions by foreign governments that constitute or imminently precede acts of war. "Mass illegal migration" or criminal activities, as described in the Proclamation, plainly do not fall within the statutory boundaries. On its face, the Proclamation makes no findings that TdA is acting as an army or military force. Nor does the Proclamation assert that TdA is acting with an intent to gain a territorial foothold in the United States for military purposes. And the Proclamation makes no suggestion that the United States will imminently be at war with Venezuela. The oblique references to the TdA's ongoing "irregular warfare" within the United States do not suffice because the Proclamation makes clear that it is referring to "mass illegal migration" and "crimes"—neither of which constitute war within the founding era understanding. The Proclamation asserts that TdA "commits brutal crimes" with the goal of "harming United States citizens, undermining public safety, and . . . destabilizing democratic nations."  But these military actions are simply not "against the territory" of the United States. Indeed, if mass migration or criminal activities by some members of a particular nationality could qualify as an "invasion," then virtually any group, hailing from virtually any country, could be deemed enemy aliens.

*Second*, by no stretch of the statutory language can TdA be deemed a "foreign nation or government." Those terms refer to an entity that is defined by its possession of territory and legal authority.  *See* Johnson's Dictionary, *Nation* (1773) ("A people distinguished from another people; generally by their language, original, or government."); Webster's Dictionary, *Nation* (1828) ("A body of people inhabiting the same country or

united under the same sovereign government; as the English nation"); Johnson's Dictionary, *Government* (1773) ("An established state of legal authority."). Applying the whole-text canon again, *see supra*, confirms that Congress had in mind state actors. First, the AEA presumes that a designated nation possesses treaty-making powers. *See* 50 U.S.C. § 22 ("stipulated by any treaty . . . between the United States and the hostile nation or government"). Nations—not criminal organizations—are the entities that enter into treaties. *See, e.g.*, *Medellin v. Texas*, 552 U.S. 491, 505, 508 (2008) (treaty is "a compact between independent nations" and "agreement among sovereign powers") (internal quotation marks omitted); *Holmes v. Jennison*, 39 U.S. 540, 570-72 (1840) (similar). Second, when a "nation or government" is designated under the AEA, the statute unlocks power over that nation or government's "natives, citizens, denizens, or subjects." 50 U.S.C. § 21. *Countries* have "natives, citizens, denizens, or subjects." By contrast, criminal organizations, in the government's own view, have "members." Proclamation § 1 ("members of TdA").

Historical context also reflects Congress's intent to address conflicts with foreign sovereigns, not criminal gangs. *See* 5 Annals of Cong. 1453 (Apr. 1798) ("[W]e may very shortly be involved in war . . ."); John Lord O'Brian, Special Ass't to the Att'y Gen. for War Work, N.Y. State Bar Ass'n Annual Meeting: Civil Liberty in War Time, at 8 (Jan. 17, 1919) ("The [AEA] was passed by Congress . . . at a time when it was supposed that war with France was imminent."). This comports with the founding-era, common law understanding of the term "alien enemy" as subject of a foreign state at war with the United States. *See Johnson v. Eisentrager*, 339 U.S. 763, 769 n.2 (1950) (collecting cases).

On this statutory element, the Proclamation again fails on its face. It never asserts that TdA is a foreign "nation" or "government." Op. 26. For good reason. As a criminal gang, TdA possesses neither a defined territory nor any legal authority. Exh. A (Hanson Decl.) ¶¶ 13, 16; Exh. B (Antillano Decl.) ¶¶ 11, 13; Exh. C (Dudley Decl.) ¶¶ 22–23. The Proclamation asserts that "[o]ver the years," the Venezuelan government has "ceded ever-greater control over their territories to transnational criminal organizations."  But the Proclamation notably does *not* say that TdA operates as a government in those regions. In fact, the Proclamation does not even specify that TdA currently controls *any* territory in Venezuela. And even as the Proclamation singles out certain Venezuelan nationals, it does not claim that *Venezuela* is invading the United States.[14]

Moreover, the Proclamation designates TdA "members" as subject to AEA enforcement—but "members" are not "natives, citizens, denizens, or subjects" within the meaning of the statute. That glaring mismatch underscores that Defendants are attempting not only to use the AEA in an unprecedented way, but in a way that Congress never permitted—as a mechanism to address, in the government's own words, a *non*-state actor. *Venezuela* has natives, citizens, and subjects, but TdA (not Venezuela) is designated under the proclamation. No amount of wordplay can avoid the obvious fact that *Venezuela* is the relevant country for statutory purposes here—and TdA is a non-

---

[14] And, as the President's own CIA Director recently testified, the intelligence community has no assessment that says the U.S. is at war with or being invaded by Venezuela. *See National Security and Intelligence Officials Testify on Global Threats* at 57:59–58:10, C-SPAN (Mar. 26, 2025), https://www.cspan.org/program/house-committee/national-security-and-intelligence-officials-testify-on-globalthreats/657380 (Q: "Does the intelligence community assess that we are currently at war or being invaded by the nation of Venezuela?" A: "We have no assessment that says that."); *also available at* https://www.cspan.org/program/house-committee/national-security-and-intelligence-officials-testify-on-globalthreats/657380.

state criminal organization.

The Court need go no further than finding that the Proclamation fails on its face. But even if this Court were going to look at the Proclamation's conclusory "findings," those findings cannot survive even the most minimally searching inquiry because they are simply incorrect as a factual matter.[15] Experts who have spent years studying TdA are in accord that Venezuela is not directing, controlling, or otherwise influencing TdA's actions in the United States.  Exh. A (Hanson Decl.) ¶ 17 ("absolutely implausible" that Maduro regime controls TdA or that the two are intertwined); Exh. B (Antillano Decl.) ¶ 13 (no evidence that TdA "maintains stable connections with the Venezuelan state or that the Maduro regime directs its actions toward the United States"); Exh. C (Dudley Decl.) ¶ 23 ("no evidence that the Maduro regime has directed Tren de Aragua to migrate to the United States or to commit any crimes within the United States"). As one expert who has done numerous projects for the U.S. government, including on the topic of TdA, explained, the Proclamation's characterization of the relationship between the Venezuelan state and TdA with respect to TdA's activities in the United States is "simply incorrect." Exh. C (Dudley Decl.) ¶¶ 5, 17-18. The President's own intelligence agencies reached that same conclusion prior to his invocation of the AEA. *See* Exh. H (Sarabia

---

[15] Where necessary, courts during World War II routinely examined the facts to ensure that the AEA's statutory limits on presidential power were observed. *See, e.g.*, *U.S. ex rel. Kessler*, 163 F.2d at 143 (reviewing petitioner's factual contention that the German government had ceased to exist after it surrendered and thus was no longer a "foreign nation or government" under the AEA); *United States ex rel. D'Esquiva*, 137 F.3d at 905–07 (reviewing the U.S. government's full course of conduct to ascertain whether and when it had officially recognized Austria's annexation by Germany; remanding for additional factfinding); *U.S. ex rel. Zdunic*, 137 F.2d at 860–61 (remanding for factfinding on statutory predicate; *cf. Al-Alwi v. Trump*, 901 F.3d 294, 298–300 (D.C. Cir. 2018) (evaluating whether "active hostilities" continued under the AUMF after 9-11; concluding that "[t]he record so manifests here").

Roman Decl.), at Exh. 12 ("shared judgment of the nation's spy agencies" is "that [TdA] was not controlled by the Venezuelan government").

The courts' role in enforcing the bounds of congressional statutory predicates, like "predatory invasion" and "incursion" is critical. Congress passed the AEA within weeks of the Alien Friends Act ("AFA"). That second law gave the President broader discretion to deport any noncitizen who he considered "dangerous to the peace and safety of the United States," regardless of whether an invasion or war had occurred. An Act Concerning Aliens § 1, 1 Stat. 571. As such, the 1798 Congress clearly meant to grant the President two distinct powers—the power to remove the nationals of foreign enemy sovereign countries in times of a war or imminent war, and the power to remove particular dangerous noncitizens in times of war or peace. The government's preferred interpretation of the AEA—where the President can remove allegedly dangerous people by deciding that virtually anything qualifies as a predatory incursion or invasion and any entity qualifies as a foreign nation or government, and no court can review those determinations—conflates the different statutory powers Congress conferred separately in the AEA and the AFA. But it would have made little sense for Congress to pass two laws within weeks of each other, unless those laws were meaningfully different. And the critical difference is, of course, the statutory limitations on when the President can use the AEA—it is a particular tool for a particular situation, namely the presence of nationals of a belligerent country during wartime, which simply does not apply to present circumstances. Moreover, treating the AEA like the AFA is especially untenable given that the AFA was "widely condemned as unconstitutional by Madison and many others" and quickly allowed to lapse. *Sessions v. Dimaya*, 584 U.S. 148, 185 (2018) (Gorsuch, J.,

concurring) (the AFA "is one of the most notorious laws in our country's history"); *see also* *J.G.G.*, 2025 WL 914682, at *1 (Henderson, J., concurring) (AFA was "widely derided as unconstitutional").

Finally, the government cannot elide these statutory bounds by pointing to the President's inherent Article II power. The President has no constitutional power to unilaterally remove people. Under Article I, Congress holds plenary power over immigration, *INS v. Chadha*, 462 U.S. 919, 940 (1983). The AEA operates as a specific delegation of authority from Congress to the President, a delegation that Congress limited to instances of war or imminent war by a foreign nation or government. *Cf. Youngstown*, 343 U.S. at 635–38. The President is not at liberty to exceed those statutory powers.

Under Justice Jackson's *Youngstown* framework, the President is taking measures incompatible with the expressed will of Congress, and accordingly, he is acting as his "lowest ebb" of power. *Youngstown*, 343 U.S. at 637. Because he has no inherent constitutional power to unilaterally remove people, Congress's powers prevail. Courts "can sustain exclusive Presidential control in such a case only by disabling the Congress from acting upon the subject." *Id.* at 637–38. But there is simply no ground for ignoring the statutory constraints that Congress has established, nor for disabling Congress's constitutional authority to legislate with respect to immigration and its own war powers. *See Chadha*, 462 U.S. at 940; *Hamdan v. Rumsfeld*, 548 U.S. 557, 591 (2006) (discussing Congress's distinct war powers).

**B.    The Proclamation Violates the Specific Protections that Congress Established under the INA for Noncitizens Seeking Humanitarian Protection.**

Summary removal under the AEA is unlawful for an additional independent reason: it fails to provide designated individuals with an opportunity to seek protection from persecution and torture. Congress enacted the Foreign Affairs Reform and Restructuring Act ("FARRA") to codify the United Nations Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT") and to ensure that noncitizens have meaningful opportunities to seek protection from torture. *See* U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20, at 20 (1988); Foreign Affairs Reform and Restructuring Act of 1998 § 2242(a), Pub. L. No. 105-277, Div. G. Title XXI, 112 Stat. 2681 (1998) (codified at 8 U.S.C. § 1231 notes) (implementing CAT); C.F.R. §§ 208.16 to 208.18 (FARRA procedure). CAT categorically prohibits returning a noncitizen to any country where they would more likely than not face torture. *See* 8 U.S.C. §1231 note. These protections apply regardless of the mechanism for removal.

The D.C. Circuit recently addressed a similar issue in *Huisha-Huisha v. Mayorkas*, reconciling the Executive's authority under a public-health statute, 42 U.S.C. § 265, with CAT's anti-torture protections. 27 F.4th 718 (D.C. Cir. 2022). That case is "on all fours" with this one. *J.G.G.*, 2025 WL 890401, at *14. The D.C. Circuit held that because § 265 was silent about where noncitizens could be expelled, and CAT explicitly addressed that question, no conflict existed. Both statutes could—and therefore must—be given effect. 27 F.4th at 721, 731-32 (citing *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) ("When . . . confronted with two Acts of Congress allegedly touching on the same topic," a court "must strive to give effect to both.") (cleaned up)).

The AEA can similarly be harmonized with other subsequently enacted statutes

specifically designed to protect noncitizens seeking asylum and withholding because of feared persecution. *See* Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980) (asylum and withholding); 8 U.S.C. §§ 1158 (asylum), 1231(b)(3) (withholding of removal). Congress has unequivocally declared that "[a]ny alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum." 8 U.S.C. § 1158(a)(1). Similarly, the withholding of removal explicitly bars returning a noncitizen to a country where their "life or freedom" would be threatened based on a protected ground. *Id.* § 1231(b)(3)(A). "In understanding this statutory text, 'a page of history is worth a volume of logic.'" *Jones v. Hendrix*, 599 U.S. 465, 472 (2023) (quoting *New York Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921)). These humanitarian protections were enacted in the aftermath of World War II, when the United States joined other countries in committing to never again turn our backs on people fleeing persecution and torture. Sadako Ogata, U.N. High Comm'r for Refugees, Address at the Holocaust Memorial Museum (Apr. 30, 1997).[16] A President invoking the AEA cannot simply sweep away these protections.

Indeed, the AEA *must* be read in the context of the INA. Since the last invocation of the AEA more than eighty years ago, Congress carefully specified the procedures by which noncitizens may be removed from the United States. And the INA leaves little doubt that its procedures must apply to every removal, unless otherwise specified by that statute. *See NLRB v. SW Gen., Inc.*, 580 U.S. 288, 305 (2017) ("specific governs the general" in statutory construction). It directs: "Unless otherwise specified in this chapter," the INA's comprehensive scheme provides "the sole and exclusive procedure for

_____

[16] https://perma.cc/X5YF-K6EU.

determining whether an alien may be admitted to the United States, or if the alien has been so admitted, removed from the United States." 8 U.S.C. § 1229a(a)(3); *see also United States v. Tinoso*, 327 F.3d 864, 867 (9th Cir. 2003) ("Deportation and removal must be achieved through the procedures provided in the INA."). This language makes clear that Congress intended for the INA to "supersede all previous laws with regard to deportability." S. Rep. No. 82-1137, at 30 (Jan. 29, 1952).[17]

Congress enacted these procedures with the full awareness that alien enemies were subject to removal in times of war or invasion—in fact, the AEA had been invoked just a few years prior to passage of the 1952 INA. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) (courts presume Congress drafts statutes with full knowledge of existing law). But Congress declined to carve out AEA removals as an exception from standard immigration procedures, even as it expressly provided exceptions for other groups of noncitizens, including noncitizens who pose security risks. *See, e.g.*, 8 U.S.C. § 1531 *et seq.* (establishing fast-track proceedings for noncitizens posing national security risks).

Ignoring the INA's role as the "sole and exclusive" procedure for determining whether a noncitizen may be removed, Respondents have refused to commit to providing class members—many of whom have strong claims—with an opportunity to assert their rights under any humanitarian statute, as required under the INA. *See, e.g.*, *G.F.F. v.*

---

[17] One of the processes otherwise specified in the INA is the Alien Terrorist Removal Procedure at 8 U.S.C. § 1531 *et seq.* The Attorney General may opt to use these proceedings when he or she has classified information that a noncitizen is an "alien terrorist." *Id.* § 1533(a)(1). But even that process requires notice, a public hearing, provision of counsel for indigents, the opportunity to present evidence, and individualized review by an Article III judge. *Id.* § 1532(a), 1534(a)(2), (b), (c)(1)-(2). And the government bears the burden of proving, by a preponderance of the evidence, that the noncitizen is subject to removal as an "alien terrorist." *Id.* § 1534(g).

*Trump*, No. 1:25-cv-2886, ECF No. 41 at *1 ("Petitioners are not entitled to seek asylum, statutory withholding of removal, or voluntary departure, and this Court cannot review a determination that removal will not violate the Convention Against Torture."). And even if Petitioners could apply, the opportunity is meaningless insofar as Respondents withhold information about the country to which they will be removed. *See J.G.G.*, 2025 WL 890401, at *15. But summary removals to the horrific conditions in Salvadoran prisons are precisely what Congress enacted these protections to prevent.

### IV.    The Administration's Abuse of the Alien Enemies Act Has Caused and Will Continue to Cause Petitioners Irreparable Harm.

This Court already correctly held that Petitioners "face immediate, irreparable harm." Op. 30. In the absence of preliminary relief, Petitioners and members of the class can be summarily removed to places, such as El Salvador, where they face life-threatening conditions, persecution and torture. *J.G.G.*, 2025 WL 1024097, at *5 (Sotomayor, J., dissenting) ("[I]nmates in Salvadoran prisons are 'highly likely to face immediate and intentional life-threatening harm at the hands of state actors.'"). And while removal does not by itself necessarily constitute irreparable harm, *Nken v. Holder*, 556 U.S. 418, 435 (2009), these are hardly run-of-the-mill removals. Petitioners' removals constitute grave and immediate irreparable harm because of what awaits them in a Salvadoran prison. *See generally* Exh. D (Bishop Decl.); Exh. E (Goebertus Decl.). Prison conditions in El Salvador are "harsh and life threatening." Bishop Decl. ¶¶ 14, 21; *see also* Exh. E (Goebertus Decl.) ¶ 4. Prison officials there engage in widespread physical abuse, including waterboarding, electric shocks, using implements of torture on detainees' fingers, forcing detainees into ice water for hours, and hitting or kicking detainees so severely that it causes broken bones or ruptured organs. Exh. D (Bishop

Decl.) ¶¶ 21, 33, 37, 39, 41; Exh. E (Goebertus Decl.) ¶¶ 8, 10, 17.

People in detention in El Salvador also face psychological harm, including solitary confinement in pitch dark cells or being forced to stay in a cell with the body of a fellow prisoner who was recently beaten to death. Exh. E (Goebertus Decl.) ¶ 3; Exh. D (Bishop Decl.) ¶ 39. In fact, El Salvador creates these horrific conditions intentionally to terrify people. Exh. D (Bishop Decl.) ¶ 22; *See also Tesfamichael v. Gonzales*, 411 F.3d 169, 178 (5th Cir. 2005); ("irreparable harm" where petitioners face "forced separation and likely persecution" "if deported"); *Huisha-Huisha*, 27 F.4th at 733 (irreparable harm exists where petitioners "expelled to places where they will be persecuted or tortured"); *Leiva-Perez v. Holder*, 640 F.3d 962, 969 (9th Cir. 2011) (holding that removal to a country where one faces harm constitutes irreparable injury); *Demjanjuk v. Holder*, 563 F.3d 565, 565 (6th Cir. 2009) (granting stay for noncitizen who asserted removal would violate CAT). And Petitioners may never get out of these prisons. *See* Nayib Bukele, X.com, (Mar. 16, 2025, 5:13AM ET);[18] *see also* Exh. E (Goebertus Decl.) ¶ 3 (quoting the Salvadorean government that people held in CECOT "will never leave"); *id.* ("Human Rights Watch is not aware of any detainees who have been released from that prison.").

And even if the government instead removes Petitioners to Venezuela, they face serious harm there, too. In fact, both Petitioners fled Venezuela for the very purpose of escaping the persecution they faced there and have pending asylum cases on that basis. ECF No. 2-1 (Barber Decl.) ¶ 5; ECF No. 2-2 (Hightower Decl.) ¶¶ 8-9. And returning to Venezuela labeled as a gang member by the United States government only increases the danger, as they will face heightened scrutiny from Venezuela's security agency, and

---

[18] https://perma.cc/52PT-DWMR.

possibly even violence from rivals of TdA. Exh. A (Hanson Decl.) ¶ 28.

## V.    The Balance of Equities and Public Interest Weigh Decidedly in Favor of a Preliminary Injunction Order.

The balance of equities and the public interest factors merge in cases against the government. *Nken*, 556 U.S. at 435. Here, the balance of hardships overwhelmingly favors Petitioners. The public has a critical interest in preventing wrongful removals to places where individuals will face persecution and torture. *Id.* at 436 (describing the "public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm"); *Nunez v. Boldin*, 537 F. Supp. 578, 587 (S.D. Tex. 1982) (protecting people who face persecution abroad "goes to the very heart of the principles and moral precepts upon which this country and its Constitution were founded"). Indeed, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012). Conversely, the government can make no comparable claim to harm from an injunction. *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (the government "cannot suffer harm from an injunction that merely ends an unlawful practice"); *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (describing the "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations" (citation omitted)). Defendants, moreover, will retain the ability to prosecute criminal offenses, detain noncitizens, and remove noncitizens under existing statutory immigration laws.

## VI.    Preliminary Class-Wide Relief Is Proper.

For all the reasons stated in the Petitioners' Motion for Class Certification, the provisionally certified class meets the requirements for certification pursuant to Federal

Rules of Civil Procedure 23(a) and 23(b)(2) and this Court should include class-wide relief in its preliminary injunction, as it did in the TRO Order. Alternatively, the Court can use Rule 23 as a guidepost to provide class-wide relief and certify a class under the All Writs Act and principles of habeas jurisdiction and equity. Only class-wide relief will prevent the government from continuing the "shell game" that it has played in an effort to prevent meaningful judicial review. *J.G.G.*, 2025 WL 914682, at \*14–15 (Millett, J., concurring).

The Tenth Circuit, like every other circuit that has addressed the issue, has found that a class habeas action may be maintained. *Napier v. Gertrude*, 542 F.2d 825, 827 & n.5 (10th Cir. 1976) (noting "class treatment" could be available by the court "apply[ing] an analogous procedure by reference to Rule 23"); *see also*, *e.g.*, *U.S. ex rel. Sero v. Preiser*, 506 F.2d 1115, 1125–26 (2d Cir. 1974); *Bijeol v. Benson*, 513 F.2d 965, 967 (7th Cir. 1975); *Williams v. Richardson*, 481 F.2d 358, 361 (8th Cir. 1973); *Mead v. Parker*, 464 F.2d 1108, 1112–13 (9th Cir. 1972); *LoBue v. Christopher*, 82 F.3d 1081, 1085 (D.C. Cir. 1996). For instance, in *Sero*, the Second Circuit relied on the Supreme Court's decision in *Harris v. Nelson*, 394 U.S. 286 (1969), to "confirm[] the power of the judiciary, under the All Writs Act . . . to fashion for habeas actions 'appropriate modes of procedure, by analogy to existing rules or otherwise in conformity with judicial usage,'" and held that "unusual circumstances" provided "compelling justification for allowing a multi-party proceeding similar to the class action authorized by the Rules of Civil Procedure." 506 F.2d at 1125 (citing *Harris*, 394 U.S. at 299). Adopting a similar approach in *Bijeol*, the Seventh Circuit found a class habeas appropriate where all prisoners raised an "identical" issue of law, and the number of prisoners was "too great for joinder of all to be practical." 513 F.2d at 968. Likewise, the Eighth and Ninth Circuits reversed district court decisions,

holding that a habeas corpus petition may seek relief for an appropriate class. *See Mead*, 464 F.2d at 1113 ("where the relief sought can be of immediate benefit to a large and amorphous group . . . a class action may be appropriate"); *Williams*, 481 F.2d at 361 (agreeing with *Mead*); *LoBue*, 82 F.3d at 1085 (noting that "courts have in fact developed such equivalents" of "class actions in habeas").

Although it has not addressed the availability of class habeas, the Supreme Court has ruled on the merits in multiple class habeas cases, including several recent ones involving immigration detention. *See, e.g., Johnson v. Guzman Chavez*, 594 U.S. 523, 532 (2021) (class of noncitizens detained in Virginia); *Nielsen v. Preap*, 586 U.S. 392, 400 (2019) (two classes of noncitizens, one detained in California and the other in the Western District of Washington); *Jennings v. Rodriguez*, 583 U.S. 281, 290 (2018) (class of noncitizens in the Central District of California, with subclasses for different detention authorities).

The reasoning of these cases confirms why class-wide relief is not only appropriate but necessary here. Threshold questions of law about the validity of the Proclamation and the process due to individuals designated thereunder—on which Petitioners are likely to succeed on the merits—are common to every member of the proposed class. Preliminary injunctive relief on a class-wide basis is necessary to prevent irreversible and irreparable harm.

## VII.    The Court Should Extend the Notice Requirements Ordered in the TRO but Reserve Judgment on the Issue of the Proper Habeas Procedures.

Petitioners respectfully request that the Court extend the notice period to 30 days notice, the notice period given during World War II to allow people designated under the AEA to voluntarily depart the country.10 Fed. Reg. 12,189 (Sept. 28, 1945). Adequate

time to respond to a notice is particularly important for the 85% of people detained at the Denver Facility that are unrepresented and who are likely to struggle to understand the notice, navigate the complexities of preparing a habeas petition, and timely file one. Exh. I (Sherman Decl.) ¶¶ 10, 14. The notice should also provide that individuals have the right to voluntarily depart, as the AEA provides.  50 U.S.C. § 21 (allowing for removal of those who "refuse or neglect to depart therefrom").

The Court also should extend the notice requirements to include a requirement that notice contain the factual basis for the individual's alien enemy designation. *See Ralls Corp*, 758 F.3d at 318 (D.C. Cir. 2014); *see also Mattox v. Disciplinary Panel*, 758 F.2d 1362, 1369 (10th Cir. 1985) (finding that in a civil proceeding regarding an attorney's admission to the district court bar, the applicant was entitled to notification of "the reasons" that she was denied).

Finally, Petitioners respectfully request that the Court clarify that its order requires notice to be provided to class counsel. Currently, the order requires notice to be provided "to the provisionally certified class." Petitioners understand this to include class counsel but respectfully request that be made explicit.

### VIII.    The Court Should Not Require Petitioners to Provide Security Prior to the Preliminary Injunction Order.

The Court properly exercised its discretion not to require a bond under Federal Rule of Civil Procedure 65(c). *See Continental Oil Co. v. Frontier Refining Co.*, 338 F.2d 780, 782 (10th Cir. 1964).


Dated: April 25, 2025

Respectfully submitted,

*/s/ Sara R. Neel*
Timothy R. Macdonald
Sara R. Neel
Emma Mclean-Riggs
Anna I. Kurtz
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF COLORADO
303 E. 17th Avenue
Denver, CO 80203
(303) 777-5482
tmacdonald@aclu-co.org
sneel@aclu-co.org
emcleanriggs@aclu-co.org
akurtz@aclu-co.org

Lee Gelernt
Daniel Galindo
Ashley Gorski*
Patrick Toomey*
Sidra Mahfooz*
Omar Jadwat
Hina Shamsi*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
dgalindo@aclu.org
agorski@aclu.org
ptoomey@aclu.org
smahfooz@aclu.org
odjadwat@aclu.org
hshamsi@aclu.org

Noelle Smith*
Oscar Sarabia Roman*
My Khanh Ngo*
Cody Wofsy*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
nsmith@aclu.org

osarabia@aclu.org
mngo@aclu.org
cwofsy@aclu.org

Tamara F. Goodlette
Laura P. Lunn
Monique R. Sherman
Rocky Mountain Immigrant Advocacy Network
7301 Federal Blvd., Suite 300
Westminster, CO  80030
(303) 433-2812
tgoodlette@rmian.org
llunn@rmian.org
msherman@rmian.org

*Attorneys for Petitioners-Plaintiffs*
*\* Attorney not yet admitted to the District of Colorado*

## CERTIFICATE OF SERVICE

I hereby certify that on April 25, 2025, I electronically filed the foregoing

**PETITIONERS-PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** with the

Clerk of the Court using the CM/ECF system, and that in accordance with Fed. R. Civ.

P. 5, all counsel of record shall be served electronically through such filing.

*/s/ Sara R. Neel*
Sara R. Neel