**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 25-cv-01163-CNS

D.B.U., and
R.M.M., on behalf of themselves and others similarly situated,

      Petitioners-Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States,
PAMELA BONDI, in her official capacity as Attorney General of the United States
KRISTI NOEM, in her official capacity as Secretary of the U.S. Department of Homeland Security,
U.S. DEPARTMENT OF HOMELAND SECURITY,
TODD LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement,
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,
MARCO RUBIO, in his official capacity as Secretary of State,
U.S. STATE DEPARTMENT,
ROBERT GUADIAN, in his official capacity as Director of the Denver Field Office for U.S. Immigration and Customs Enforcement, and
DAWN CEJA, in her official capacity as Warden, Denver Contract Detention Facility,

      Respondents-Defendants.

---

**RESPONDENTS' OPPOSITION TO PETITIONERS' MOTION FOR A
PRELIMINARY INJUNCTION
(ECF No. 45)**

---

In accordance with the Court's April 22, 2025 Order, ECF No. 35, Respondents request that Petitioners' motion for preliminary injunction, ECF No. 45 (filed 4/25/2025), be denied for the reasons provided below.

## **INTRODUCTION**

Petitioners' motion for a preliminary injunction must be denied because they lack standing and cannot demonstrate a likelihood of success on the merits. Petitioners are not subject to the President's Proclamation, and thus have suffered no cognizable injury that would entitle them to injunctive relief; as a result, this Court lacks jurisdiction to review the President's findings or the satisfaction of the statutory preconditions under the Alien Enemies Act ("AEA"). Even assuming arguendo that Petitioners may challenge the Proclamation in spite of not being subject to it, the President's determinations regarding Tren de Aragua ("TdA")—including its hostile activities, ties to the Maduro regime, and territorial influence-are well within the scope of the AEA and supported by the administrative record.

Moreover, Petitioners are detained under Title 8, and the Immigration and Nationality Act ("INA") expressly bars this Court from enjoining the transfer of aliens detained under Title 8, precluding this Court from restraining the transfer of Petitioners pursuant to Title 8. Petitioners' remaining claims are equally meritless: they have been afforded all process due under law under the INA, and there is no basis to suggest the INA has implicitly repealed the AEA, as both statutes operate independently within their respective domains. In sum, Petitioners have failed to satisfy any of the requirements for preliminary injunctive relief, and their motion should be denied in its entirety.

# BACKGROUND

I.    **Tren de Aragua's designation as a foreign terrorist organization and under the Alien Enemies Act**

Tren de Aragua is a transnational criminal organization that originated in Venezuela and has "conducted kidnappings, extorted businesses, bribed public officials, and authorized its members to attack and kill U.S. law enforcement." Office of the Spokesperson, Dep't of State, Designation of International Cartels (Feb. 20, 2025); *see also* Valdez Decl., ECF No. 26-1, at ¶¶ 3-4; Elliston Decl., ECF No. 26-2, at ¶ 5. The President has found that TdA operates "both within and outside the United States" and that its "extraordinarily violent" campaign of terror presents "an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." Exec. Order No. 14,157, 90 Fed. Reg. 8439, 8439 (Jan. 29, 2025). On the first day of his term, the President declared a national emergency to respond to that threat. *Id.*

The threat is so severe and pervasive that, on February 20, 2025, the Secretary of State designated TdA a Foreign Terrorist Organization. 90 Fed. Reg. 10,030 (Feb. 20, 2025). The immigration laws authorize such a designation when a foreign organization engages in "terrorist activity" or "retains the capability and intent" to do so, thereby threatening "the national security of the United States." 8 U.S.C. § 1189(a)(1), (d)(4); *see Holder v. Humanitarian Law Project*, 561 U.S. 1, 9 (2010). On March 14, 2025, the President signed a proclamation, invoking his authority under the Alien Enemies Act, 50 U.S.C. §§ 21–24, against TdA members. See Proclamation No. 10,903, 90 Fed. Reg. 13,033, 13,034 (Mar. 20, 2025) (the "Proclamation").

The Proclamation outlines the President's findings that TdA members meet the statutory criteria for removal under the AEA. The President found that TdA, which

"commits brutal crimes" including murder and kidnapping, is "conducting irregular warfare and undertaking hostile actions against the United States." *See* 90 Fed. Reg. at 13,033. The President further found that TdA has "engaged in and continues to engage in mass illegal migration" to further TdA's objectives: "harming United States citizens, undermining public safety, and supporting the Maduro regime's goal of destabilizing democratic nations in the Americas, including the United States." *Id.* And the President found that TdA works with the Maduro-sponsored Cártel de los Soles to use "illegal narcotics as a weapon to 'flood' the United States." *Id.*

The President additionally found that TdA and other criminal organizations have taken control over some Venezuelan territory. *Id.* Moreover, TdA is "closely aligned with" Maduro's regime in Venezuela, and has "infiltrated" the regime's "military and law enforcement apparatus." *Id.* The resulting "hybrid criminal state" "is perpetrating, attempting, and threatening an invasion or predatory incursion against the territory of the United States," posing "a substantial danger." *Id.* at 13,033–34. Based on those findings, the President proclaimed that "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies" under 50 U.S.C. § 21. *Id.* at 13,034. Further, the President found "all such members of TdA . . . chargeable with actual hostility against the United States" and "a danger to the public peace or safety of the United States." *Id.*

All such TdA members "are subject to immediate apprehension, detention, and removal." *Id.* To that end, the President directed the Attorney General and the Secretary

of Homeland Security to, "consistent with applicable law, apprehend, restrain, secure, and remove every Alien Enemy described" above. *Id.*

## II.    The *J.G.G.* case

On March 15, 2025, five aliens, nationals of Venezuela asserting fear of removal under the Proclamation (including the two named Petitioners here), filed a putative class-action complaint along with a motion for a temporary restraining order ("TRO") in the District of Columbia, pursuing claims based on the Administrative Procedure Act. *J.G.G. v. Trump*, No. 25-cv-00766 (D.D.C.). After relief was granted, and on motion for a stay pending appeal, the Supreme Court rejected this effort, holding that because the aliens' claims "fall within the 'core' of the writ of habeas corpus and thus must be brought in habeas," "jurisdiction lies in only one district: the district of confinement." *Trump v. J.G.G.*, 604 U.S. ⸺, No. 29A931, 2025 WL 1024097, at *1 (Apr. 7, 2025) (per curiam) (quoting *Rumsfeld v. Padilla*, 542 U.S. 426, 443 (2004)). The Court further held that the aliens are "entitled to notice and opportunity to be heard 'appropriate to the nature of the case,'" including notice "that they are subject to removal under" the AEA, "within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs." *Id.* at *2.

## III.    Instant litigation

The two Petitioners—D.B.U. and R.M.M. —are Venezuelan nationals currently detained at the ICE Denver Contract Detention Facility pending removal proceedings under the INA. *See* ECF No. 26-1, at ¶¶ 6, 10-12, 18-20. Both entered through Texas and were apprehended during ICE investigations.  *Id.* ¶¶ 18-19. Both petitioners remain in removal proceedings before the immigration court. *Id.* ¶¶ 12, 20. ICE has determined that

neither D.B.U. nor R.M.M. is currently subject to the Proclamation governing removals related to TdA. *Id.* ¶¶ 14, 24.

On April 12, 2025, Petitioners filed the instant petition for a writ of habeas corpus under 28 U.S.C. § 2241, ECF No. 1, a class-certification motion, ECF No. 4, and an emergency TRO motion, TRO Mot., ECF No. 2. This Court entered an order that "prohibits the removal from this jurisdiction of Petitioners and the class they proposed to represent[]." ECF No. 14. This Court also provisionally certified a class of "[a]ll noncitizens in custody in the District of Colorado who were, are, or will be subject to the March 2025 Presidential Proclamation." *Id.* This Court also issued a TRO, prohibiting removal or transfer to members of the provisional class and requiring notices under the AEA. ECF No. 35. The Tenth Circuit declined to stay the TRO, reasoning the government had not established irreparable harm during the short period the TRO would remain in effect.

## IV.    DHS's notice procedure

In accordance with the Supreme Court's decision in *J.G.G.*, the government has developed general procedures for aliens newly subject to the Proclamation. ECF No. 26-2, at ¶ 7. Those general procedures include notice, in a language the alien will understand, and time to request and seek habeas review, which is both adequate and appropriate to follow in this context—but for this Court's current TRO.[1]    *Id.* ¶ 8. The general notice process is more fully described in the Declaration provided by Assistant Field Office Director Carlos D. Cisneros ("Cisneros Decl.").    *See* ECF No. 44-1.[2] .

---

[1] The government recognizes that the Court's TRO (ECF No. 35) mandates a specific notice process in the District of Colorado, which is being implemented in this district.

[2] In the Notice of Cisneros Declaration, Petitioners alerted the Court that the government disclosed new information in an April 23, 2025 declaration (filed under seal in *J.A.V. v. Trump*, No. 1:25-cv-072 (S.D. Tex. filed Apr. 23, 2025), ECF No. 45, Exhibit D) concerning

**LEGAL STANDARD**

Emergency injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the [petitioner] is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). The danger of a mistaken ruling on an incomplete record is heightened when, as here, the "requested immediate injunctive relief deeply intrudes into the core concerns of the executive branch." *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978); *Sampson v. Murray*, 415 U.S. 61, 83–84 (1974) (A court is "quite wrong in routinely applying . . . the traditional standards governing more orthodox 'stays'" in an area to which "the Government has traditionally been granted the widest latitude.").

Petitioners must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20. The latter two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). This Court must ensure that each factor is satisfied before an injunction may issue. *Free the Nipple-Ft. Collins v. City of Ft. Collins*, Colorado, 916 F.3d 792, 797 (10th Cir. 2019).

**ARGUMENT**

**I.    This Court lacks jurisdiction over Petitioners' claims.**

**A.    Petitioners have not demonstrated the imminent threat of injury as they lack standing.**

Petitioners have not, as they must, "b[orne] the burden of establishing standing" necessary for injunctive relief. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Carney*

_____

notice periods under the AEA, which was unsealed by that court on April 24, 2025 (ECF No. 49). ECF Nos. 44 (Notice), 44-1 (Cisneros Decl.).

*v. Adams*, 592 U.S. 53, 59 (2020)). Because they "must support each element of standing 'with the manner and degree of evidence required at the successive stages of the litigation,'" *id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)), "[a]t the preliminary injunction stage, then, [Petitioners] must make a 'clear showing' that [they are] 'likely' to establish each element of standing." *Id.* (quoting *Winter*, 555 U.S. at 22); *see also Does 1-11 v. Bd. of Regents of U. of Colorado*, 100 F.4th 1251, 1262 (10th Cir. 2024) ("A plaintiff must have standing to invoke the district court's jurisdiction 'at the commencement of the litigation,' and she must 'demonstrate standing for each form of relief sought'—here, a preliminary injunction.") (quoting *W. Watersheds Project v. Interior Bd. of Land Appeals*, 62 F.4th 1293, 1296 (10th Cir. 2023)).

As a threshold matter, Petitioners here failed to establish that they are subject of the President's Proclamation. Specifically, prior to April 12, 2025, ICE reviewed the facts of D.B.U.'s case and concluded that *he is not* subject of the President's Proclamation. ECF No. 26-1, ¶¶ 11-14. ICE made a similar determination with respect to R.M.M.'s case. *Id.*, ¶¶ 19-22.  Hence, Petitioners have not shown that they are under an "actual and imminent" threat of suffering a "concrete and particularized" injury-in-fact as it relates to enforcement of the President's Proclamation. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Their claim of injury caused by the government's AEA notice policy is further undermined by the fact that Petitioners have already filed a habeas claim and any notice policy therefore cannot cause them harm. *See J.G.G.*, 2025 WL 1024097, at *1 (notice needed that "will allow them to actually seek habeas relief in the proper venue before such removal occurs")

While the relevant question is Petitioners' standing, not that of possible class members, in light of the TROs that were filed throughout the country, *see, e.g., J.G.G.*, 1:25-cv-00766 (main district court case challenging removal of Venezuelan natives under AEA, TRO issued March 15, 2025), any putative class member in Colorado has had ample notice and opportunity to file their own individual habeas petition. *See J.A.V. v. Trump,* No. 1:25-cv-072 (S.D. Tex., TRO issued April 25, 2025); *A.S.R. v. Trump*, No. 3:25-cv-00113 (W.D. Pa, TRO issued Apr. 15, 2025).

**B.    The Court has no jurisdiction to review the President's Proclamation here because Petitioners currently are not subject to the AEA.**

Petitioners urge this Court to decide whether the Proclamation falls within the statutory boundaries of the AEA. PI Mot. at 16-25. This Court, however, lacks jurisdiction to review the Proclamation or enjoin the President's exercise of authority under Article II and the AEA. The Supreme Court has long recognized that courts cannot issue an injunction purporting to supervise the President's performance of his duties. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867) (courts have "no jurisdiction . . . to enjoin the President in the performance of his official duties"); *Trump v. United States*, 603 U.S. 593, 607 (2024) (recounting that the President "has important foreign relations responsibilities: [including] . . . recognizing foreign governments . . . overseeing international diplomacy and intelligence gathering, and managing matters related to terrorism . . . and immigration"); *see also Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him.").

Consistent with that general rule, courts have held for over a century that the President's authority and discretion under the AEA is not a proper subject for judicial scrutiny: "The authority of the President to promulgate by proclamation or public act 'the

manner and degree of the restraint to which they (alien enemies) shall be subject, and in what cases,' is, of course, plenary and not reviewable." *Ex parte Gilroy*, 257 F. 110, 112 (S.D.N.Y. 1919) (emphasis added); *see also id.* ("Once the person is an alien enemy, obviously the course to be pursued is essentially an executive function, to be exercised in the discretion of the President."); *see also, e.g., Ludecke v. Watkins*, 335 U.S. 160, 163–64 (1948) (reasoning, on appeal from "[d]enial of a writ of habeas corpus," that "some statutes 'preclude judicial review'" and "the Alien Enemy Act of 1798 is such a statute," as demonstrated by the clear text and "controlling contemporary construction"); *id.* at 164–65 (noting that "every judge before whom the question has since come has held that the statute barred judicial review"); *United States ex rel. Schlueter v. Watkins*, 67 F. Supp. 556, 565 (S.D.N.Y. 1946) (reviewing habeas petition challenging detention as an alien enemy and explaining "courts are without power to review the action of the executive in ordering removal of an alien enemy . . . except with respect to . . . whether the relator is an enemy alien"), *aff'd*, 158 F.2d 853 (2d Cir. 1946); *United States ex rel. Schwarzkopf v. Uhl*, 137 F.2d 898, 900 (2d Cir. 1943) (similar).

Ultimately, "[t]he very nature of the President's power to order the removal of all enemy aliens rejects the notion that courts may pass judgment upon the exercise of his discretion." *Ludecke*, 335 U.S. at 164. For that reason, it has long been established that "[u]nreviewable power in the President . . . is the essence of the" AEA. *Citizens Protective League v. Clark*, 155 F.2d 290, 296 (D.C. Cir. 1946).

This Court lacks power to review the President's Proclamation for another reason as well: Whether the AEA's preconditions are satisfied is a political question committed to the President's discretion, no different from the President's determination to trigger the

Constitution's Invasion Clause (Article IV, section 4). *See United States v. Abbott*, 1110 F.4th 700, 728 (5th Cir. 2024) (Ho, J., concurring) (observing that "[c]ourts across the country have held that determining whether an invasion has occurred for purposes of Article IV, section 4 is a nonjusticiable political question," and collecting cases); *see also California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997) (collecting cases); *Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1031 (10th Cir. 2001) (holding that the political question doctrine bars judicial second-guessing of the FAA's determination that airspace designations were necessary for military training, as such decisions fall within the executive's constitutional authority over national defense). Any challenge to that determination is therefore foreclosed.

The Supreme Court has held that the political-question doctrine is "essentially a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 217 (1962). To guide courts in determining when such a question is raised, the Supreme Court identified six factors that indicate a question has been committed to the political branches. *See, e.g.*, *id.* at 217; *Schroder v. Bush*, 263 F.3d 1169, 1173 (10th Cir. 2001). The President's determination under the AEA implicates at least two independently sufficient factors.

*First*, the determination that an "invasion" or "predatory incursion" is being perpetrated sits at the intersection of two areas the Constitution commits to the political branches: (1) foreign affairs, *see Barclays Bank PLC v. Franchise Tax Bd.*, 512 U.S. 298, 327–28 (1994); and, (2) immigration policy, *see Mathews v. Diaz*, 426 U.S. 67, 81 (1976). Indeed, "any policy towards aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively

entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952). Similarly, the power to recognize foreign states and governments "resides in the President alone." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 28 (2015).

*Second*, even without the clear textual commitment to the Executive of the constitutional responsibilities undergirding issuance of the Proclamation, there are no manageable standards permitting courts to assess exactly when hostile entry and criminal and violent acts constitute an "invasion" or "predatory incursion" for AEA purposes. See *Martin v. Mott*, 25 U.S. 18, 31–32 (1827) (Story, J.). Thus there is no basis for second-guessing the Executive's policy judgment that such an "invasion" or "predatory incursion" is occurring. *See Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) ("The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports neither are nor ought to be published to the world. It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret."); *see also Schroder, 263 F.3d at 1176* (noting that he Supreme Court has held that it will not review or second-guess the political branches' determination of when a war or national emergency has ended, recognizing such questions as nonjusticiable political questions reserved for the executive and legislative branches).

AEA proclamations are thus conclusive and preclusive. As for whether the Act's preconditions are satisfied, that is the President's call alone; the federal courts have no role to play.

**C.    This Court is without jurisdiction to consider Petitioners' CAT arguments.**

Petitioners' claims under CAT, as codified by the Foreign Affairs Reform and Restructuring Act ("FARRA"), *see* PI Mot. at 26-29, are also not cognizable.  To be sure, the United States abides by its CAT obligations.  *Munaf v. Geren*, 553 U.S. 674 (2008).  But such a claim is not judicially cognizable because a CAT claim may only be made in removal proceedings ECF No. 26-1

Title 8 U.S.C. § 1252(a)(4) *expressly* deprives federal district courts of jurisdiction to adjudicate CAT claims in habeas proceedings (or in any proceeding outside a Title 8 removal proceeding), a limitation the Supreme Court has unequivocally affirmed.  *See Nasrallah v. Barr*, 590 U.S. 573, 580–81 (2020) ("The REAL ID Act also provided that CAT orders likewise may not be reviewed in district courts, even via habeas corpus, and may be reviewed only in the courts of appeals[]") (citing to 8 U.S.C. § 1252(a)(4)); *Kapoor v. DeMarco*, — F.4th ——, No. 22-2806, 2025 WL 908234, at *11 (2d Cir. Mar. 26, 2025); *Omar v. McHugh*, 646 F.3d 13, 18 (D.C. Cir. 2011); *Mironescu v. Costner*, 480 F.3d 664, 676-77 (4th Cir. 2007); *but see Trinidad y Garcia v. Thomas*, 683 F.3d 952, 956-57 (9th Cir. 2012) (REAL ID Act can be "construed as being confined to addressing final orders of removal, without affecting federal habeas jurisdiction," allowing exceedingly narrow habeas review of CAT claims to confirm that the claim was actually considered and necessary finding was made); *see also Benitez-Garay v. DHS*, No. SA-18-CA-422-XR, 2019 WL 542035, at *7 (W.D. TECF No. 26-2019) ("[T]o the extent Petitioner contends that his removal would violate the CAT, section 1252(a)(4) expressly divests this Court of jurisdiction to review any cause or claim under the CAT.").  Hence, this Court has no jurisdiction to consider Petitioners' CAT arguments.

###### D. This Court is without jurisdiction to enjoin the transfer of Petitioners or putative class members outside of this District.

The government may detain aliens pending removal proceedings under 8 U.S.C. § 1226(a) and removable aliens under § 1231(a). And the government *must* detain aliens who are inadmissible or removable under certain provisions. *See id.* §§ 1226(c)(1), 1231(a)(2)(A). Here, ICE placed Petitioners in removal proceedings pursuant to its authority found in 8 U.S.C. § 1226. ECF No. 26-1, at ¶¶ 11, 19. Hence, this Court's temporary restraining order, ECF No. 35, TRO at 34, is overbroad insofar as it restrains the government from acting according to those authorities for aliens detained under Title 8, which provides separate sources of authority from the AEA for detention and removal. *See J.G.G.*, 2025 WL 825116. A preliminary injunction that precludes detention activity pursuant to Title 8 would violate multiple provisions of the INA.

Indeed, the INA bars this Court from entering injunctive relief with respect to transfers in three different ways for those aliens detained under Title 8. *First*, under 8 U.S.C. § 1231(g)(1), the Executive has complete discretion in deciding where to detain Petitioners. The INA precludes review of "any . . . decision or action of the Attorney General . . . the authority for which is specified under this subchapter to be in the discretion of the Attorney General . . . ." 8 U.S.C. § 1252(a)(2)(B)(ii). Therefore, § 1252(a)(2)(B)(ii) bars relief that would impact where and when to detain Petitioners. *See Van Dinh v. Reno*, 197 F.3d 427, 433–35 (10th Cir. 1999) (finding that judicial review of decision to transfer a detainee is inappropriate due to lack of jurisdiction); *Zepeda v. Terry*, No. CV 11-909 MCA/LFG, 2012 WL 13081892, at *4-6 (D.N.M. Feb. 15, 2012) (holding that the court lacked jurisdiction over a petitioner's venue and transfer claims because they were directly tied to his removal proceedings and thus barred by 8 U.S.C.

§ 1252(a)(2)(B)(ii) and distinguishing them from collateral substantive due process claims that some other circuits have found reviewable) (citing *Van Dihn*, 197 F.3d at 435). This Court's TRO thus improperly second-guessed the government's decision where to detain Petitioners—Congress has specifically barred such judicial intervention.

*Second*, 8 U.S.C. § 1252(g) also bars enjoining transfers under Title 8. It prohibits district courts from hearing challenges to decisions and actions about whether, when, and where to commence removal proceedings. Reading the discretionary language in Sections 1231(g)(1) and 1252(g) together confirms that Congress foreclosed piecemeal litigation over *where* a detainee may be placed into removal proceedings. *See Glushchenko v. DHS*, 566 F. Supp. 3d 693, 701-04 (W.D. Tex. 2021) (distinguishing between unreviewable discretionary detention determinations and statutory and constitutional challenges to immigration detention); *see also Liu v. INS*, 293 F.3d 36, 41 (2d Cir. 2002) (habeas petition "must not be construed to be 'seeking review of any discretionary decision'" (quoting *Chmakov v. Blackman*, 266 F.3d 210, 215 (3d Cir. 2001))), *superseded by statute on other grounds as recognized by Ruiz-Martinez v. Mukasey*, 516 F.3d 102, 113 (2d Cir. 2008); *Jimenez-Angeles v. Ashcroft*, 291 F.3d 594, 599 (9th Cir. 2002); *Tercero v. Holder*, 510 F. App'x 761, 766 (10th Cir. 2013) (Attorney General's discretionary decision to detain aliens is not reviewable by way of habeas.).

*And finally*, this Court lacks jurisdiction "to enjoin or restrain the operation of" 8 U.S.C. §§ 1221–32 "other than with respect to the application of such provisions to *an individual alien* against whom proceedings under such [provisions] have been initiated." 8 U.S.C. § 1252(f)(1) (emphasis added). Thus, this Court has no authority to prevent the government's transfer of any putative class member, not named in this action on an

individual basis, to a place of its discretion under 8 U.S.C. § 1231(g). *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022) ("§ 1252(f)(1) 'prohibits federal courts from granting classwide injunctive relief' but 'does not extend to individual cases.'" (quoting *AADC*, 525 U.S. at 481–82).

###### E.    The Court has no jurisdiction over Petitioners' habeas petition under 28 U.S.C. § 2241 based on their claim of future restraint.

Petitioners' failure to establish habeas jurisdiction under 28 U.S.C. § 2241 is fatal to their claims. Petitioners cannot establish Article III standing because it is a basic principle of Article III that speculation of future harm cannot give rise to the sort of injury in fact that allows a federal court to weigh in, because injury here is not "certainly impending." *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013) ("Allegations of possible future injury are not sufficient") (emphasis in original).  There is a more fundamental problem in a habeas case, which requires *current* detention stemming from the challenged legal basis of custody, not the speculative possibility of future custody under a different legal authority. Habeas corpus requires a petitioner to be "in custody" under the specific conviction or restraint being challenged at the time of filing. *See Maleng v. Cook*, 490 U.S. 488, 492 (1989) ("[A] habeas petitioner suffers no present restraint from a conviction" once the sentence expires, even if it enhances future sentences). Petitioners here seek to challenge a hypothetical detention not yet imposed—akin to the speculative risk of incarceration rejected in *Calhoun v. Att'y Gen. of Colorado*, 745 F.3d 1070, 1073–74 (10th Cir. 2014) (no habeas jurisdiction for fear of future custody under sex-offender registration laws). And, while *Maleng* does permit challenges to existing future sentences (*e.g.*, a state detainer ensuring custody after a federal term), it does not extend to purely speculative restraints. 490 U.S. at 493 (jurisdiction exists where a detainer ensures future

custody under an already imposed sentence). Petitioners here challenge no such concrete, impending custody. Rather, they conflate a formalized legal obligation (*e.g.*, an actual detainer) with hypothetical future detention under AEA, which is entirely speculative and lacks the requisite immediacy.

## II.    Petitioners cannot succeed on the merits of their claims.

### A.    The Proclamation comports with the statutory requirements.

In all events, the Proclamation and its implementation are lawful. As the Supreme Court has expressly held, the AEA grants the President virtually unreviewable discretion to issue a proclamation directing the apprehension, restraint, and removal of alien enemies when two conditions are met. The President is also charged with making the relevant judgments leading to those two findings and those judgments may not be reviewed. Thus, the President acted well within his authority in finding that there is a "predatory incursion" by TdA that is "perpetrated," "attempted," or "threatened against the territory of the United States" and that TdA is part of a "foreign nation" or "government." 50 U.S.C. § 21.

#### 1.    TdA's actions in the United States constitute an invasion or predatory incursion.

As to the first prerequisite, the President determined that TdA is perpetrating an invasion *or* a predatory incursion into the United States. Although the word "invasion" includes a military entry and occupation of a country, the accepted definition of that term is far broader, as definitions contemporaneous with the passage of the AEA make clear. "Invasion" was defined to include a "hostile entrance," *see*, *e.g.*, 1 John Ash, *The New and Complete Dictionary of the English Language* (1775), or a "hostile encroachment" on another's territory, *see* Thomas Sheridan, *A Complete Dictionary of the English Language*

(2d ed. 1789). Nor is there any requirement that the purpose of the incursion be to possess or hold territory. *See*, *e.g.*, *United States v. Texas*, 719 F. Supp. 3d 640, 681 (W.D. TECF No. 26-2024). Here, the actions of TdA fit accepted conceptions of an invasion. TdA's illegal entry and continued unlawful presence is an encroachment on U.S. territory that entails hostile acts contrary to the rights of citizens to be free from criminality and violence.

At a minimum, the actions of TdA constitute a "predatory incursion" that justifies invocation of Section 21. The phrase "predatory incursion" encompasses (1) an entry into the United States (2) for purposes contrary to the interests or laws of the United States. *See*, *e.g.*, *Amaya v. Stanolind Oil & Gas Co.*, 62 F. Supp. 181, 189–90 (S.D. Tex. 1945) (noting use of the phrase to describe raids during hostilities with Mexico falling well short of "invasion"); *see also Davrod Corp. v. Coates*, 971 F.2d 778, 785 (1st Cir. 1992) (using the phrase to refer to foreign fishing fleets unlawfully fishing in territorial waters); *Bas v. Tingy*, 4 U.S. (4 Dall.) 37 (1800) (broadly defining "enemy" and "war"). Here, there is no question that TdA members, which are aligned with Nicolas Maduro regime, have entered into the United States with nefarious goals: trafficking in substances and people, committing violent crimes, subverting public safety, and conducting its business with interests antithetical to those of the United States. *See* 90 Fed. Reg. at 13,034.

Petitioners' main contention is that "invasion" and "predatory incursion" both *necessarily* entail military actions by foreign governments or the opening salvo of war meant to displace a government or conquer territory. *See generally* PI Mot. 16-20. There is no question that definitions of both terms include military actions, but both unquestionably have broader meanings that are not foreclosed by any source cited by

Petitioners. In fact, many of the sources relied on by Petitioners contain definitions supportive of the government's argument. *See Webster's Dictionary*, "Invasion" (1828) ("[a] hostile entrance into the possessions of another); *id.*, "Incursion" ("entering into a territory with hostile intention"). In short, both definitions *include* military action, but neither is *limited to* such action. *See also New York Cent. R. Co. v. Lockwood*, 84 U.S. 357, 375 (1873) (noting that "incursion" can also be committed by "predatory band of armed men" against a carrier of goods in context of responsibility imposed on common carries for loss of their cargo); *cf. Huidekoper's Lessee v. Douglass*, 7 U.S. (3 Cranch) 1, 11 (1805) ("predatory incursions" by warring local native tribes on early frontier settlements).

### 2. TdA should be treated as a foreign nation or government under 50 U.S.C. § 21.

The Proclamation makes clear that TdA qualifies as a "foreign nation or government" for at least two independent reasons. First, TdA's infiltration of key elements of the Venezuelan state make it indistinguishable from Venezuela. *See* Proclamation. TdA's growth itself can be attributed to promotion via the actions of former Governor of Aragua Tareck El Aissami, who was later appointed Vice President in the Maduro regime. 90 Fed. Reg. at 13,033. And Maduro's connections to the group, via the regime-sponsored narco-terrorism enterprise Cártel de los Soles, are also clear. *Id.* The Cártel de los Soles "coordinates with and relies on TdA . . . to carry out its objective of using illegal narcotics as a weapon to 'flood' the United States." *Id.* Given how significantly TdA is intertwined in the fabric of Venezuela's structures, it functions as a governing entity. And through those ties, TdA has become indistinguishable from the Venezuelan state. Although Petitioners try to depict this invocation of the AEA as novel, the United States has a long history of using war powers against formally nonstate actors. Historically, the

United States authorized the use of force against "slave traders, pirates, and Indian tribes." Curtis A. Bradley & Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 Harv. L. Rev. 2047, 2066 (2005). It has engaged militarily, during broader armed conflicts, with "opponents who had no formal connection to the state enemy," including during the Mexican–American and Spanish–American Wars. *Id.* at 2066–67. President Wilson famously "sent more than seven thousand U.S. troops into Mexico to pursue Pancho Villa, the leader of a band of rebels opposed to the recognized Mexican government." *Id.* at 2067. And more recently, President Clinton authorized missile strikes on al Qaeda targets in Africa and elsewhere. *See generally El-Shifa*, 607 F.3d 836.

This history is important because statutes must be read "not in a vacuum, but with reference to the statutory context, 'structure, history, and purpose.'" *Abramski v. United States*, 573 U.S. 169, 2267 (2014) (quoting *Maracich v. Spears*, 570 U.S. 48, 76 (2013)). The AEA is a war powers statute and thus must be read in light of the United States' robust history of employing its war powers against nonstate actors.

In all events, TdA also acts as a governing authority in the areas where it operates. As the Proclamation recognizes, "Venezuelan national and local authorities have ceded ever-greater control over their territories to transnational criminal organizations, including TdA." 90 Fed. Reg. at 13,033. In those areas where it operates, TdA acts as a criminal governing entity, independent or in place of the normal civil society and government. *See id.* Given TdA's governance and organizational structure, as well as its *de facto* control over parts of Venezuela where it operates with impunity, it is well within the President's

discretion to determine it constitutes a foreign "government" for purposes of invoking Section 21.

Petitioners' contrary arguments lack merit. They miss the point: the government is not arguing that TdA is itself a "nation." But the control and authority TdA exercises in Venezuela is consistent with founding-era definitions of "government." *See* Thomas Dyche & William Pardon, *A New General English Dictionary* (1754) ("the power or authority that one person exercises over another, or many"). Additionally, although the AEA references the possibility that a covered entity *may* be able to enter a treaty governing certain aspects of relations between it and the United States, the statute does not in any way establish treaty-making authority as a prerequisite to inclusion. *See* 50 U.S.C. § 22 (contemplating circumstances "where no such treaty exists"). Nor is there any reason that specific terminology used in the Proclamation should weigh against the President's determination, TRO Mot. 16–17; members of TdA are clearly "subject" to the authority of that criminal organization and the governance it wields. *See* Dyche & Pardon, *supra* ("under the command, or at the disposal of another").

Fundamentally, Petitioners argue that other individuals do not agree with the President's determination that TdA and the state of Venezuela are sufficiently intertwined to justify invocation of the AEA. *See* PI Mot. 20-21. Yet the President is entitled to examine the available evidence, including intelligence not available to others, and make a final determination based on his *own* assessment of that evidence. *See Zemel v. Rusk*, 381 U.S. 1, 17 (1965) (noting "the changeable and explosive nature of contemporary international relations, and the fact that the Executive is immediately privy to information" unavailable to others); *cf. United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319

(1936) ("[T]he President alone has the power to speak or listen as a representative of the nation."). It is not the role of this Court to second-guess those determinations based on nothing more than a handful of declarations by individuals not involved with the assessment of evidence or decision-making culminating in the Proclamation. *See Chi. & S. Air Lines*, 333 U.S. at 111.

### B.    The AEA notice procedures comport with due process.

The AEA is a wartime authority designed to allow quick expulsion of enemies from U.S. territory and does not impose any specific notice or timing requirements.  The habeas statute also requires no specific notice or timing requirements.   Because aliens are entitled only to the process set forth by Congress, Petitioner's process claim cannot succeed given these statutory authorities.  Even if Plaintiffs are entitled to some due process, what is owed is "flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). The government's general notice process is sufficient under any plausible standard that would be applied in this context—the wartime removal of enemy aliens who have no right to be in the United States under the governing statutes.

The AEA process is at least as robust as the process Congress provided in the expedited removal statute.  See 8 U.S.C. § 1225(b).  The entire purpose of that statute was to "substantially shorten and speed up the removal process" for those "who [are] arriving in the United States[,]" or have not shown that they were "physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility." *Make The Rd. New York v. Wolf*, 962 F.3d 612, 618–19 (D.C. Cir. 2020) (quoting 8 U.S.C. § 1225(b)(1)(A)(i), (iii)). If an immigration officer

determines that an alien is inadmissible because they do not have valid entry documents, the "officer shall order the alien removed … without further hearing or review unless the alien indicates either an intention to apply for asylum … or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i). Even if the individual claims asylum or a fear of persecution, the "process is scarcely more involved" because the immigration officer can quickly deny the claim. *Make The Rd. New York*, 962 F.3d at 618–19 (citing 8 U.S.C. § 1225(b)(1)(B)(iii)(III)). In fact, Congress was explicit on how fast this process was supposed to be: "Review shall be concluded as expeditiously as possible, to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination under subclause (I)." id. § 1225(b)(1)(B)(iii)(III). If someone believes they were incorrectly subject to the expedited removal statute, they may seek habeas review, 8 U.S.C. § 1225(e)(2), but there is no requirement to pause the removal to allow the filing of such a request.

The D.C. Circuit has held that this suffices for due process. *See Am. Immigr. Laws. Ass'n v. Reno*, 18 F. Supp. 2d 38, 58 (D.D.C. 1998), *aff'd*, 199 F.3d 1352, 1357 (D.C. Cir. 2000). This was because the Supreme Court has been clear that "the power to expel or exclude aliens is a fundamental sovereign attribute exercised by the Government's political departments, largely immune from judicial control." *Id.* (*quoting Fiallo v. Bell*, 430 U.S. 787, 792 (1977)). That logic applies equally here: "[w]hatever the procedure authorized by Congress is, it is due process." *DHS v. Thuraissigiam*, 591 U.S. 103, 139 (2020) (quoting *Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950)) (holding that expedited removal does not violate the Suspension Clause for similar reasons). Indeed, much like the Aliens Enemies Act, the executive branch is given wide "sole and

unreviewable discretion" to determine who is subject to the 2-year period for expedited removal. 8 U.S.C. § 1225(b)(1)(A)(iii)(I). And similar to this case, "'[j]udicial review' of expedited removal orders is only 'available in habeas corpus proceedings.'" *I.M.*, 67 F.4th at 437–38 (quoting 8 U.S.C. § 1252(e)(2)). So if 24 hours suffices to satisfy due process for someone who may have resided in the United States for two years, then surely it is sufficient for those who have been designated enemies of the nation by the Commander in Chief. Indeed, it would be perverse to hold otherwise. So at most, if the government provides 24 hours of notice there is no due process issue.

Petitioners' assertion that the government's notice procedure is inadequate is incorrect and inconsistent with the many habeas cases we have seen filed by people subject to the AEA, all of which were filed within twenty-four hours of the alien's designation. *See Sanchez Puentes v. Garite*, 25-cv-0127 (W.D. Tex.); *Gutierrez Mejias v. Trump*, 25-v-061 (N.D.Tex.); *Matos v. Noem*, 25-cv-57 (S.D. Tex.). This is true despite the presence of several ongoing classwide stay orders that have afforded many detainees days or weeks of notice prior to their removals. *See, e.g., G.F.F. & J.G.O. v. Trump*, No. 25-cv-2886 (S.D.N.Y. Apr. 8, 2025); *J.A.V. v. Trump*, No. 25-cv-72 (S.D. Tex. Apr. 8, 2025); *A.S.R. v. Trump*, No. 25-cv-133 (W.D. Pa. Apr. 15, 2025).

As an initial matter, the AEA permits absolute discretion to establish the conditions and processes the Executive will use to implement a Presidential Proclamation. *See* 50 U.S.C. § 21; *United States ex rel. Schlueter v. Watkins*, 158 F.2d 853, 853 (2d Cir. 1946) (the AEA authorizes "the making of an order of removal of an alien enemy without a court order and without a hearing of any kind"); *see also Ludecke*, 335 U.S. at 162–63 (noting the entirely administrative process established for determining whether an individual was

an alien enemy). The only process due those deemed to fall within the scope of the Proclamation is notice and an opportunity to challenge that designation through habeas relief. *J.G.G.*, 2025 WL 1024097, at *2.

In any case, Petitioners are receiving all the process they are due: "notice . . . that they are subject to removal under" the AEA, "afforded within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs." 2025 WL 1024097, at *2. The procedures established provide the reasonable notice the Supreme Court contemplated. The government is not required to provide procedures that a reviewing court or Petitioners find "preferable;" instead, a court "must evaluate the particular circumstances and determine what procedures would satisfy the minimum requirements of due process." *Landon*, 459 U.S. at 35.

**D.    Voluntary departure relief is not available to aliens subject to the AEA.**

Petitioners' contention that a period of voluntary departure is *required* is not a defensible reading of the statute. PI Mot. 15-16. The AEA permits the President to "provide for the removal of those who, not being permitted to reside within the United States, refuse or neglect to depart therefrom." 50 U.S.C. § 21. But the next section of the law makes clear that the departure period is only available to those "not chargeable with actual hostility, or other crime against public safety."  Id. § 22.  And the President here expressly found that the identified TdA members are engaged in active hostility.  90 Fed. Reg. at 13,033.   Thus, where the alien enemies are members of the hostile force itself, and for obvious reasons, the President need not provide any period of voluntary departure prior to effectuating removal. Indeed, the fact that the alien enemies are generally already in detention under the INA, and that basis of detention is not challenged, only underscores

the inaptness of allowing voluntary departure for terrorist gang members. The AEA's entire purpose would be undercut if active participants in hostilities must be asked to depart on their own terms.

Here, the President found that "all such members of TdA are, by virtue of their membership in that organization, chargeable with actual hostility against the United States and are therefore ineligible for the benefits of 50 U.S.C. 22."  In support of that finding, the President explained that TdA engaged in "mass illegal migration to the United States to further its objectives of harming United States citizens," and that this activity undermines public safety. 90 Fed. Reg. at 13,033. These findings by the President negate Petitioners' assertion that a period of voluntary departure is statutorily required here.

Finally, Petitioners have not challenged the merits of the President's finding, nor do they cite any authority for their conclusory assertion that 50 U.S.C. § 22 "cannot be invoked categorically." PI Mot. 16. Those challenges are therefore forfeited. *See, e.g.*, *Herrera-Castillo v. Holder*, 573 F.3d 1004, 1010 (10th Cir. 2009).

### E.    Title 8 is not the sole mechanism for removal of aliens from this country.

Petitioners are also mistaken in arguing that the AEA has been repealed *sub silentio* because Section 1229a states that it is the "sole and exclusive procedure" for removing an alien who has been admitted to the United States. PI Mot. 27-28. Rather, the INA and AEA have distinct mechanisms for effectuating the removal of certain aliens, just as Title 42 and the INA constitute different bases for excluding aliens. *See generally* *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022).

In fact, the immigration laws and AEA have been read harmoniously for over 75 years. *See United States ex rel. Von Kleczkowski v. Watkins*, 71 F. Supp. 429, 437

(S.D.N.Y. 1947). Not all alien enemies will be subject to removal under Title 8 because the authority under Title 50 extends to aliens regardless of lawful status if they "are not actually naturalized." 50 U.S.C. § 21. Likewise, not all aliens subject to Title 8 will be subject to removal under the AEA—as removal under the AEA is premised on discrete findings, such as nationality and age, beyond admissibility or removability. And for aliens subject to both Title 8 and Title 50, the Executive has discretion in deciding how and whether to proceed under either or both statutes. (recognizing this discretion under pre-INA immigration law). Thus, the AEA and INA coexist with some overlap that gives the Executive discretion to determine how, whether, or when to apply them. *See, e.g., Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) ("When confronted with two Acts of Congress allegedly touching on the same topic, this Court . . . must . . . strive to give effect to both." (cleaned up)).

Even if there were a conflict between the AEA and the INA, it is the AEA that would control in this circumstance. "[I]t is a commonplace of statutory construction that the specific governs the general." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992). Here, the AEA provides specific rules for the removal of a narrow subset of aliens—those designated as alien enemies through a discrete mechanism providing authority to the President—against the more general provisions relating to removability provided by the INA. *See, e.g., Morton v. Mancari*, 417 U.S. 535, 550–51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.").

For these same reasons, the AEA does not violate the CAT treaty, which only permits court involvement in Title 8 removal proceedings. As we have explained, there is

no jurisdiction to consider CAT claims in habeas. *Kapoor*, 2025 WL 908234, at *11. And the United States continues to abide by its policy not to remove aliens to countries in which they are likely to be tortured and to seek assurances where appropriate. *See Munaf*, 553 U.S. at 702.

Nor does the AEA provide for or need an asylum or withholding procedure. With respect to asylum and statutory withholding of removal based on persecution, none of the cited INA provisions limit the President's authority under Title 50. *See* 8 U.S.C. § 1158(b)(1)(A); 8 U.S.C. § 1231(b)(3); 8 C.F.R. §§ 1208.16, 1208.18; *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 172–73 (1993) (recognizing distinct grants of authority under the INA to the President and Attorney General). These constraints do not apply simply because the President has delegated implementation of the Proclamation to the Attorney General. *See id.* at 172 n.28 (noting that the Attorney General, when implementing an executive command, is not necessarily bound by the INA's provisions).

## III. The remaining equitable factors weigh strongly in the government's favor.

### A. Petitioners failed to show that they suffer irreparable harm.

Petitioners' claims of irreparable harm from "summary removal to places, such as El Salvador" are wholly unsupported and should be disregarded. P.I. Mot. at 29. As established, Petitioners are currently in removal proceedings under 8 U.S.C. § 1229 and are not subject to the Proclamation, making their allegations both speculative and unsubstantiated by evidence, in any event.

### B. The balance of equities and public interest weigh in the government's favor.

The balance of harms and the equities strongly favor the government here as an injunction irreparably harms the President's national security and foreign policy

judgments. An injunction effectively usurps the President's statutory and constitutional authority to address a terrorist gang that is engaging in an invasion. Such an injunction "deeply intrudes into the core concerns of the executive branch," *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978), and frustrates the "public interest in effective measures to prevent the entry of illegal aliens," *United States v. Cortez*, 449 U.S. 411, 421 n.4 (1981). The Executive Branch's protection of these interests, including "sensitive and weighty interests of national security and foreign affairs" inherent to combating terrorist groups, warrants the utmost deference. *Humanitarian Law Project*, 561 U.S. at 33–35; *see also Barr v. U.S. Dept. of Justice*, 819 F.2d 25, 26 (2d Cir. 1987) ("[B]ecause the injunction Barr sought would interfere with the executive branch's conduct of foreign affairs, the application must be considered under particularly stringent standards[.]").

Additionally, the Supreme Court has warned of "the danger of unwarranted judicial interference in the conduct of foreign policy." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013). An injunction does just that, impeding the Executive's ability to swiftly remove aliens with no right to remain in the United States who are identified as alien enemies due to their gang activity. *See, e.g.*, *Nken*, 556 U.S. at 436 (noting there "is always a public interest in prompt execution of removal orders" even where an alien asserts a risk of harm, and that interest "may be heightened" where "the alien is particularly dangerous").

Granting an injunction could also undermine the United States' ability to negotiate on critical foreign affairs and national security matters in the future, as foreign governments might reconsider their willingness to accept enemy aliens or attempt to use any resulting delays as bargaining leverage. In contrast to the harm to the government

and the public, nothing prevents Petitioners or others from seeking individualized relief if they receive notice that they are subject to the AEA.  ECF No. 26-2. Because they have not shown the balance of the equities and public interest lie in their favor, they have not made this essential showing for injunctive relief.

### V.    Petitioners must provide security.

Under the federal rules, this Court "may issue a preliminary injunction or a temporary restraining order *only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c) (emphasis added). If this Court grants preliminary relief to Petitioners, it should order Petitioners to post security for taxpayer funds expended during the pendency of this Court's order if it is later determined that Respondents were wrongfully enjoined. Moreover, despite the fact that ordinarily indigent plaintiffs are not to post bond under Rule 65(c), Petitioners have not adduced evidence of indigence. *See Carranza v. Reams*, 614 F.Supp. 899, 923 (D. Col. 2020*); Brown v. Callahan*, 979 F. Supp. 1357, 1363 (D. Kan. 1997) (because plaintiff has demonstrated that the limited preliminary injunction poses no likelihood of harm to the defendant and has been granted in *forma pauperis* status, the court presumes he cannot provide security for potential damages, and thus no bond is required).

### <u>CONCLUSION</u>

The motion should be denied in all respects.

Dated: April 30, 2025

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

Drew C. Ensign
Deputy Assistant Attorney General
Civil Division

s/ Michael Velchik
**Michael Velchik**
Senior Counsel to the Assistant Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20001
Telephone:  (202) 305-7920
Email: michael.velchik@usdoj.gov

ANTHONY NICASTRO
Acting Director
Office of Immigration Litigation

SARAH WILSON
Assistant Director

*Counsel for Respondents*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 30, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system.

*s/ Michael Velchik*
U.S. Department of Justice